EXHIBIT A



*30 January 2004*

# CDC IXIS FINANCIAL GUARANTY HOLDING

## 2003 STOCK OPTION PLAN

**CDC IXIS FINANCIAL GUARANTY HOLDING**

Headquarters:

31-33 rue de Mogador
75009 Paris

Société anonyme à directoire et conseil de surveillance
au capital de 500.087.200 euros

R.C.S. PARIS B 439 357 302





**TABLE OF CONTENTS**

Pages

1. Purposes of the Plan........................................................................................................1
2. Definitions.......................................................................................................................1
3. Securities Subject to the Plan..........................................................................................4
4. Administration of the Plan...............................................................................................5
   (a) Procedure...................................................................................................................5
   (b) Powers of the Executive Board.................................................................................5
   (c) Effect of Executive Board's Decision. .....................................................................6
   (d) Members of the Executive Board. ............................................................................7
5. Limitations.......................................................................................................................7
6. Term of Option Grant Period...........................................................................................8
7. Term/Expiration of Options.............................................................................................8
8. Exercise Price and Form of Consideration......................................................................8
   (a) Exercise Price...........................................................................................................8
   (b) Form of Consideration. ............................................................................................8
9. Vesting and Exercise of Options......................................................................................9
   (a) Vesting Date .............................................................................................................9
   (b) Procedure for Exercise and Rights as a Shareholder. ..............................................9
   (c) Taxes and Social Security Contributions..................................................................9
   (d) Exercise in event of Termination of Optionee's Continuous Status as Beneficiary ....10
10. Non-Transferability of Options......................................................................................122
11. Adjustments Upon Changes in Capitalization ..............................................................12
12. Adjustments upon Dissolution or Liquidation ..............................................................12
13. Adjustments in case of Merger, Sale of Assets or Change in Control ..........................13
    (a) Merger, Sale of Assets, or Change in Control, whether or not the result of the Listing of the Company .....13
    (b) Potential consequences of Merger, Sale of Assets, Change in Control ..................14
14. Notification of the Grant of Options .............................................................................14
15. Amendment and Termination of the Plan ......................................................................14
16. Legal Compliance..........................................................................................................14
17. Redemption by the Company ........................................................................................155
    (a) Right to Redeem Investment Certificates................................................................155
    (b) Redemption Price....................................................................................................155
    (c) Redemption Procedure.............................................................................................155
18. Determination of Fair Market Value .............................................................................15
19. Right of Beneficiary to Require Company to Repurchase.............................................156
    (a) Put Option...............................................................................................................166
    (b) Put Price..................................................................................................................166
    (c) Put Procedure..........................................................................................................166
    (d) Termination of Put Rights.......................................................................................16

i

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

(e) Period for Exercise of Put Rights. ................................................................. 16
20.   Sale of Voting Certificates by the holders of Voting Certificates .................... 17
21.   Liability of Company ....................................................................................... 177
22.   Correspondence ............................................................................................... 177
23.   Governing Law, Jurisdiction and Language .................................................. 17

ii

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

# CDC IXIS FINANCIAL GUARANTY HOLDING
## 2003 STOCK OPTION PLAN

In accordance with the authorization granted on January 29, 2004 at the extraordinary shareholders' meeting of CDC IXIS FINANCIAL GUARANTY HOLDING, a French corporation organized under the laws of the Republic of France (hereinafter, the "Company"), the Executive Board (*Directoire*) of the Company resolved on January 30, 2004, in conformity with the provisions of Articles L. 225-177 to L. 225-186 of the Commercial Code (defined below), to adopt a set of rules for the grant to Beneficiaries (defined below) of stock options giving rights to subscribe to Investment Certificates or Shares of the Company (defined below). In furtherance of such resolution, the Executive Board has approved and adopted this CDC IXIS FINANCIAL GUARANTY HOLDING 2003 Stock Option Plan (hereinafter, the "Plan"), the terms and conditions of which are set forth below.

## 2.    PURPOSES OF THE PLAN

The purposes of the Plan are:

- to attract, motivate and retain the best available personnel for positions of substantial responsibility;

- to provide additional incentive to Beneficiaries;

- to align the interests of Beneficiaries with those of the shareholders of the Company; and

- to promote the success of the Company's business.

Options granted under this Plan to Beneficiaries who are residents in France are intended to qualify for the preferential treatment applicable to options granted under Articles L. 225-177 to L. 225-186 of the Commercial Code, provided all necessary conditions are satisfied.

## 2.  DEFINITIONS

As used herein, the following definitions shall apply.

(a)    "**Affiliated Company**" means, pursuant to Article L. 225-180 of the Commercial Code, prior to the Listing Date, a company of which at least 50% of the share capital or voting rights are held directly or indirectly by the Company. After the Listing Date, "Affiliated Company" means a company of which at least 50% of the share capital or voting rights are held directly or indirectly by the Company, a company which holds at least one tenth of the share capital or voting rights of the Company, or a company, 50% of the share capital or voting rights of which are held, directly or indirectly, by a company that holds, directly or indirectly, at least 50% of the Company.

(b)    "**Beneficiary**" means a member of the Executive Board or any person employed by the Company or an Affiliated Company under the terms and conditions of an employment

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
℡ 01 45 53 23 13

contract governed by the law of the Republic of France, or who is otherwise considered to be an employee of the Company or an Affiliated Company under any law applicable to a Beneficiary outside France. Neither service as a member of the Supervisory Board (*Conseil de surveillance*) of the Company nor payment of a director's fee by the Company or an Affiliated Company shall be deemed to constitute an employment relationship.

(c) "**Change in Control**" means, pursuant to Article L. 233-3 of the Commercial Code, the occurrence of any of the following events:

    (i) an acquisition by an individual, entity or group directly or indirectly, of an ownership interest in the Company, giving to such individual, entity or group the majority of voting rights of the Company in the Company's shareholders' meeting; or

    (ii) an acquisition by an individual, entity or group of the majority of voting rights of the Company as a result of an agreement with the Company's shareholders; or

    (iii) an acquisition by an individual, entity or group of voting rights enabling such individual, entity or group *de facto* to determine the outcome of matters to be decided in a meeting of the Company's shareholders, pursuant to Article L. 233-3. I. 3° of the Commercial Code.

As used herein, the term "Change in Control" shall exclude an acquisition of an interest in the Company, an Affiliated Company, or a company which holds at least 50% of the share capital or the voting control of the Company by the Caisse Nationale des Caisses d'Epargne ("CNCE") or an affiliate of CNCE, in which the CNCE directly or indirectly holds at least 50% of the share capital or voting control.

(d) "**Closed Periods**" means specific periods as set forth by Article L. 225-177 of the Commercial Code, during which Option cannot be granted by companies listed on a regulated market. Such periods are set forth herein at Section 5 (c).

(e) "**Commercial Code**" means the new French Commercial Code.

(f) "**Common Stock**" means shares of common stock of the Company.

"Company" means the company CDC IXIS FINANCIAL GUARANTY HOLDING, French corporation oraganized as a *société anonyme* with Executive Board (*Directoire*) and Supervisory Board (*Conseil de Surveillance*), corporation organized under the laws of the Republic of France, whose registered office is located at 31-33 rue de Mogador, in Paris (75009) on the date of approval of the Plan and registered to the Trade Registry of Commerce under number B 439 357 302.

(g) "**Compensation Committee**" means a committee composed of two or more members of the Supervisory Board (*Conseil de Surveillance*) of the Company, to be consulted by the Executive Board, with respect to the administration of the Plan.

2

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

(h) **"Continuous Status as a Beneficiary"** means that there shall have been no termination of (i) the term of office of a Beneficiary who is a member of the Executive Board or (ii) the employment relationship between a Beneficiary and the Company or any Affiliated Company.

As used herein, the term "termination" shall not include:

(i) any leave of absence or retirement in accordance with and as authorized by the French Labor Code with respect to tax residents of France or a Beneficiary to whom the French Labor Code is applicable;

(ii) any leave of absence or retirement approved by the Executive Board with respect to tax residents of jurisdictions other than France with specific reference to the Plan, or whose relationship with the Company or an Affiliated Company is not governed by French Labor Code. With specific reference to tax residents of the United States, "leave of absence" shall include medical leave, military leave, or other authorized personal leave; "retirement" shall refer to a Beneficiary who is at least 55 years of age at the time that he or she voluntarily ceases to be an employee of the Company or an Affiliated Company;

(iii) transfers between locations of the Company and an Affiliated Company, transfers among Affiliated Companies, or transfers from the Company or an Affiliated Company to CNCE or the Caisse des Dépôts et Consignations ("CDC"), or to a company or other legal entity, at least 50 % of the share capital or voting rights of which are directly or indirectly held by CNCE or CDC.

(i) **"Date of Grant"** means the date on which a grant of Options shall be effective, which shall be the date on which the Executive Board designates an Optionee and specifies the terms and conditions of Options granted to such Optionee, including the exercise price in respect thereof and the respective number of Investment Certificates or Shares.

(j) **"Date of Permitted Exercise"** means the date on which any or all of the Optionee's Options become exercisable. The Date of Permitted Exercise shall be the fourth anniversary of the Date of Grant.

(k) **"Director"** means a member of the Executive Board.

(l) **"Disability"** means a disability which totally prevents a Beneficiary from fulfilling his or her duties as a Director or as an employee of the Company or an Affiliated Company.

(m) **"Executive Board"** means the Executive Board (*Directoire*) of the Company. The Executive Board may, to the extent legally permissible, delegate such of the Executive Board's powers to administer the Plan to the President of the Executive Board. In the event of such delegation and for the duration thereof, the term "Executive Board" shall also be deemed to refer to the President of the Executive Board.

(n) **"Fair Market Value"** means, until the Listing Date, the value of Investment Certificates or Shares, as determined in accordance with financial methods and procedures approved

3

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

by the Shareholder Authorization and applied by the Executive Board from time to time. After the Listing Date, the quoted price of the Shares on a nationally recognized securities exchange market shall determine the value of Investment Certificates or Shares.

(o) "**Investment Certificates**" means the securities (*valeurs mobilières*) issued by the Company as a result of the bifurcation of voting rights and financial rights attached to the Shares, in which Investment Certificates represent such financial rights.

(p) "**Listing of the Company**" means the listing of one or more categories of securities issued by the Company on a regulated securities exchange market.

(q) "**Listing Date**" means the date upon which securities (*valeurs mobilières*) of the Company become listed on a regulated securities exchange market.

(r) "**Option**" or "**Options**" means the right to subscribe to Investment Certificates or Shares pursuant to the Plan.

(s) "**Option Agreement**" means a written agreement between the Company and an Optionee evidencing the terms and conditions of an individual grant of Option, including the exercise price in respect thereof and the respective number of Investment Certificates or Shares. The Option Agreement is subject to the terms and conditions of the Plan.

(t) "**Optionee**" means a Beneficiary who holds at least one Option.

(u) "**Plan**" means this 2003 Stock Option Plan, as may be amended from time to time.

(v) "**Shares**" means the shares of common stock issued by the Company.

(w) "**Shareholder Authorization**" means the authorization given by the shareholders of the Company in an extraordinary general meeting held on January 29, 2004, permitting the Executive Board to grant Options, for a period of six (6) months as from the extraordinary general meeting.

(x) "**Vesting Date of the Option or of the Options**" means the date on which an Optionee's ownership of all or a portion of Options granted to him or to her becomes unforfeitable, subject to the terms and conditions hereof. Options shall vest in accordance with the vesting schedule to be set forth in an Option Agreement.

(y) "**Voting Certificates**" means the securities (*valeurs mobilières*) issued by the Company as a result of a bifurcation of voting rights and financial rights attached to the Shares, in which Voting Certificates represent such voting rights.

## 3.    SECURITIES SUBJECT TO THE PLAN

The total number of Investment Certificates and Shares that may be issued pursuant to grants of Options and according to the Shareholder Authorization is 876.414, subject to adjustment in accordance with Section 11 of the Plan.

4

BONNEFOUS
32 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13
AVOCAT CONSEIL COUR D'APPEL DE PARIS

Prior to the Listing Date, the securities (*valeurs mobilières*) subject to Options shall be Investment Certificates. An equivalent number of Voting Certificates will be issued to the Company's shareholders in proportion to their respective ownership of Shares, subject to adjustment in accordance with Section 11 of the Plan.

From and after the Listing Date, or such other date as may be determined by the Executive Board subject to the approval of the Supervisory Board of the Company (*Conseil de Surveillance*), the securities subject to Options shall be Shares, subject to the limitations set forth in Section 5 and the adjustments set forth in Section 11 of the Plan.

Grants of Options shall result in an equivalent (i.e. 1:1) reduction of the total number of Investment Certificates or Shares subsequently available to be granted pursuant to the Plan.

The issuance of Investment Certificates and/or Shares pursuant to the exercise of Options shall result in an increase in the share capital of the Company.

Investment Certificates or Shares that may be be issued pursuant to grants of Options expire or are terminated or forfeited for any reason prior to being exercised shall revert to the Plan and become available for future grants.

## 4.    ADMINISTRATION OF THE PLAN

### (a)    Procedure

The Plan shall be administered by the Executive Board.

### (b)    Powers of the Executive Board

Subject to the provisions of the Commercial Code, the Shareholder Authorization and the Plan, the Executive Board shall have the authority, in its discretion:

(i)    to determine the Beneficiaries to whom Options may be granted hereunder;

(ii)    to select the Beneficiaries and determine whether and to what extent Options shall be granted hereunder;

(iii)    to decide the number of Investment Certificates or Shares to be covered by Options granted hereunder;

(iv)    to approve and amend forms of agreement for use under the Plan;

(v)    to determine the terms and conditions of Options granted hereunder. Such terms and conditions include, but are not limited to the exercise price, the time or times when Options may be vested, the time or times when Options may be exercised (which may be based on performance criteria), vesting acceleration, and any restriction or limitation regarding Options or Investment Certificates or Shares relating thereto;

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

(vi)  to construe and interpret the terms of the Plan and Options granted pursuant to the Plan;

(vii)  to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub-plans established for the purpose of qualifying for preferential tax and social security treatment under applicable tax and social security laws;

(viii)  to modify or amend the terms and conditions of the Options (subject to the provisions of Sections 11, 12 and 13 of the Plan), including the discretionary authority to extend the period for the permitted exercise of an Option after the termination of the Continuous Status of a Beneficiary;

(ix)  to authorize any person to execute on behalf of the Company any instrument required to implement the grant of an Option previously granted by the Executive Board;

(x)  to make all other determinations deemed necessary or appropriate for the orderly administration of the Plan.

(e)    **Effect of Executive Board's Decision**

The Executive Board shall consult with the Compensation Committee of the Supervisory Board (*Conseil de Surveillance*) prior to granting Options or taking any other decision above-mentioned that would have a significant effect on the Plan or on Options granted hereunder.

The Executive Board's decisions, determinations and interpretations, including without limitation the determination of the Fair Market Value, shall be final and binding on all Optionees.



**(d)    Members of the Executive Board**

The Compensation Committee of the Supervisory Board will propose the grants of Options to Members of the Executive Board, to the extent permitted by Law, subject to the provisions of Section 4(c) of the Plan.

## 5.    LIMITATIONS

(a)    The following limitations shall apply to grants of Options to Beneficiaries:

        (i)    No Beneficiary shall be granted Options if he or she holds more than 10% of the share capital of the Company.

        (ii)    Prior to the Listing Date, the total number of outstanding Options granted hereunder may not give rise to the subscription for Investment Certificates representing more than one-fourth (1/4) of the share capital of the Company; from and after the Listing Date, the total number of outstanding Options granted hereunder may not give rise to the subscription for Shares representing more than one-third (1/3) of the share capital of the Company.

(b)    Neither the Plan nor the grant of Options shall confer upon an Optionee any right with respect to continuing the Optionee's employment or his or her term of office with the Company or an Affiliated Company, nor shall they interfere in any way with the Company's or Affiliated Company's right, as the case may be, to terminate such employment or such term of office.

(c)    From and after the Listing Date, no Options will be granted by the Company during the following Closed Periods:

    -    Ten quotation days preceding and following the disclosure to the public of the consolidated financial statements or at least of the annual statements of the Company, and

    -    During the period from the date that the corporate management entities of the Company, such as the Executive Board and Supervisory Board, have knowledge of information which could, if disclosed to the public, significantly impact the quotation of the Shares, until ten quotation days after the day such information is disclosed or made available to the public.



## 6. TERM OF OPTION GRANT PERIOD

The Plan shall become effective and Options may be granted hereunder as of January 30, 2004, the date of the Plan's adoption by the Executive Board, according to the terms of the Shareholder Authorization. Termination of the Plan shall not affect the rights of Beneficiaries with respect to Options granted to them as of the date of such termination, and all unexpired Options shall continue in force after termination of the Plan except as they may lapse or be terminated in accordance with the terms and conditions of the Plan and the Option Agreement.

## 7. TERM/EXPIRATION OF OPTIONS

The term of Options shall be set forth in the respective Option Agreement, and shall in no event be greater than ten (10) years from the Date of Grant (the "Term of the Options").

## 8. EXERCISE PRICE AND FORM OF CONSIDERATION

### (a)  Exercise Price

The exercise price to be paid by an Optionee in connection with the exercise of Options shall be determined by the Executive Board as of the Date of Grant.

Prior to the Listing Date, the exercise price shall not be determined to be less than the Fair Market Value of the Investment Certificates as of the Date of Grant.

Subsequent to the Listing Date, the exercise price shall not be determined to be less than eighty percent (80%) of the average closing sale price of a Share during the twenty (20) days of quotation preceding the Date of Grant.

### (b)  Form of Consideration

The consideration to be paid for the Investment Certificates or Shares to be issued upon the exercise of Options shall consist entirely of an amount in euro currency corresponding to the exercise price, which shall be paid by one or more of the following methods, as determined by the Executive Board:

    (i)    wire transfer;

    (ii)    check;

    (iii)    offset against receivables; or

    (iv)    delivery of a properly executed notice, together with such other documentation as the Executive Board, and the broker, if applicable, shall require to effect the following transactions on the same day: (A) exercise of the Options, and (B), sale of the underlying Investment Certificates or Shares ("Cashless Exercise"). Prior to the Listing Date, an Optionee utilizing the Cashless Exercise method shall simultaneously deliver a properly executed notice of exercise of the Put Option according to Section 19 hereof, and the notice of exercise of the Options.

8

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

As used herein, Cashless Exercise comprehends (A) a loan by the Company or by any company substituted for the Company if legally required, the terms and conditions of which loan to the Beneficiary shall be duly authorized in accordance with applicable law, prior to the Date of Permitted Exercise, for the purpose of financing an Optionee's exercise of vested Options, (B) the repayment of such loan from the proceeds of sale of the related Investment Certificates or Shares, and (C) the payment to the Optionee of the net amount of the difference between the exercise price and the applicable Fair Market Value.

## 9.    VESTING AND EXERCISE OF OPTIONS

### (a)    Vesting Date

At the time that Options are granted, the vesting schedule shall be set forth in the Option Agreement.

Except as otherwise set forth in Section 9(d) below, upon termination of an Optionee's Continuous Status as a Beneficiary, his or her unvested Options shall be forfeited and revert to the Plan, unless (i) the Executive Board, in its discretion, shall decide otherwise, or (ii) such termination is due to the retirement of the Optionee.

### (b)    Procedure for Exercise and Rights as a Shareholder

Options may not be exercised for a fraction of an Investment Certificate or Share.

Options shall be deemed exercised when the Company receives: (i) written notice of exercise (in accordance with the provisions of the Option Agreement), duly executed by the person entitled to exercise the Option, and (ii) full payment for the corresponding Investment Certificates or Shares. Investment Certificates or Shares, as the case may be, to be issued upon the exercise of Options shall be issued in the name of the Optionee.

Incident to the exercise of Options, Investment Certificates or Shares issued to an Optionee shall be assimilated with all other Investment Certificates or Shares, as the case may be, and shall be entitled to dividends and other rights of ownership from and after the date of issuance.

### (c)    Taxes and Social Security Contributions

Any income tax or social security contributions legally due by the Optionee as a result of such Optionee's exercise of Options and/or sale of Investment Certificates or Shares shall be the Optionee's responsibility.

The Company or an Affiliated Company may, within legal limits, withhold from the Optionee's remuneration, if any, such amounts that are sufficient to satisfy the Company's or an Affiliated Company's tax or social security withholding obligations as a result of the exercise by such Optionee of Options and/or the sale of Investment Certificates or Shares.

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 20 13

If the Company or an Affiliated Company does not withhold an amount from the Optionee's remuneration, if any, in an amount sufficient to satisfy the Company's or an Affiliated Company's tax or social security withholding obligations as set forth above, such Optionee will reimburse the Company or the relevant Affiliated Company on demand, in cash, for the amount not withheld but paid by the Company or such Affiliated Company.

(d)     **Exercise in the event of termination of an Optionee's Continuous Status as Beneficiary**

(i)     *Termination of an Optionee's Continuous Status as a Beneficiary for a reason other than death, Disability or voluntary termination*

In the event that termination of an Optionee's Continuous Status as a Beneficiary for a reason other than death, Disability or voluntary termination occurs subsequent to the Date of Permitted Exercise, Options vested at the time of such termination shall remain exercisable for a period of ninety (90) days from the date of such termination, but in no event later than the expiration of the Term of the Options.

In the event that termination of an Optionee's Continuous Status as a Beneficiary for a reason other than death, Disability or voluntary termination occurs prior to the Date of Permitted Exercise, Options vested at the time of such termination shall become exercisable on the Date of Permitted Exercise and shall remain exercisable for a period of ninety (90) days from the Date of Permitted Exercise, but in no event later than the expiration of the Term of the Options.

Notwithstanding the foregoing, in the event that an Optionee's Continuous Status as a Beneficiary terminates subsequent to the Date of Permitted Exercise as a result of dismissal for willful or serious misconduct, as that term is defined below, Options vested at the time of such termination shall remain exercisable for a period of fifteen (15) days from the date of such termination, but in no event later than the expiration of the Term of the Options. In the event that an Optionee's Continuous Status as a Beneficiary terminates prior to the Date of Permitted Exercise as a result of dismissal for willful or serious misconduct, Options vested at the time of such termination shall become exercisable on the Date of Permitted Exercise and shall remain exercisable for a period of fifteen (15) days, from the Date of Permitted Exercise, but in no event later than the expiration of the Term of the Options. As used herein, "dismissal for willful or serious misconduct" shall mean (i) as to Optionees whose employment relationship is governed by French law, the definition prescribed by the French Labor Code and case law thereunder, and (ii) as to all others, gross negligence or willful misconduct in the performance of employment duties, including the willful disobedience of the directives of management, the perpetration of a fraud, conviction of a felony or other act of serious misconduct.



(ii)    *Voluntary termination of an Optionee's Continuous Status as a Beneficiary*

In the event that voluntary termination of an Optionee's Continuous Status as a Beneficiary occurs subsequent to the Date of Permitted Exercise, Options vested at the time of such termination shall remain exercisable for a period of ninety (90) days from the date of such termination, unless the Executive Board shall determine to modify the period of exercisability, but in no event later than the Term of the Options.

In the event that voluntary termination of an Optionee's Continuous Status as a Beneficiary occurs prior to the Date of Permitted Exercise, Options vested at the time of such termination shall become exercisable on the Date of Permitted Exercise and shall remain exercisable for a period of ninety (90) days from the Date of Permitted Exercise, unless the Executive Board shall determine to modify the period of exercisability, but in no event later than the Term of the Options.

Notwithstanding the foregoing, in the case of termination due to retirement, unvested options shall continue to vest according to the relevant vesting schedule, and vested Options shall remain exercisable until the expiration of the Term of the Options.

(iii)    *Disability of Optionee*

In the event that termination of an Optionee's Continuous Status as a Beneficiary due to Disability occurs subsequent to the Date of Permitted Exercise, Options vested at the time of such termination shall remain exercisable for a period of twelve (12) months from the date of such termination, but in no event later than the expiration of the Term of the Options.

In the event that termination of an Optionee's Continuous Status as a Beneficiary due to Disability occurs prior to the Date of Permitted Exercise, Options vested at the time of such termination shall become exercisable on the Date of Permitted Exercise and remain exercisable for a period of twelve (12) months from the Date of Permitted Exercise, but in no event later than the expiration of the Term of the Options.

(iv)    *Death of Optionee*

In the event that termination of an Optionee's Continuous Status as a Beneficiary due to death, unvested Options shall become immediately vested, and all vested Options shall become immediately exercisable for a period of six (6) months following the date of death by the Optionee's estate or by a person who acquires the right to exercise such Options by bequest or inheritance.



## 10.  NON-TRANSFERABILITY OF OPTIONS

Options may not be sold, pledged, assigned, hypothecated, transferred or disposed of in any manner other than by will or by laws of descent or distribution and may be exercised, during the lifetime of an Optionee, only by the Optionee.

## 11.  ADJUSTMENTS UPON CHANGES IN CAPITALIZATION

In the event of any of the following transactions, the Executive Board shall effect an adjustment of the number and the exercise price of the Options, pursuant to Article L. 225-181 of the Commercial Code, in accordance with the conditions set forth in Articles 174-8 et seq. of Decree No. 67-236 dated March 23, 1967 relating to commercial companies:

(i)  an issuance of new shares for cash consideration reserved to the Company's existing shareholders ;

(ii)  a capitalization of retained earnings, profits, or issuance premiums ;

(iii)  an issuance of convertible or exchangeable bonds reserved to the Company's existing shareholders ;

(iv)  a distribution of reserves by payment in cash or shares ;

(v)  a cancellation of shares in order to absorb losses ; or

(vi)  the purchase by the Company, when listed, of its own shares at a price higher than the current quotation price.

## 12.  ADJUSTMENTS UPON DISSOLUTION OR LIQUIDATION

In the event of a proposed dissolution or liquidation of the Company, unexercised Options will terminate and become null and void at the time of the consummation of such event. Notwithstanding the foregoing, the Executive Board may, in the exercise of its sole discretion, declare that vested Options shall become exercisable for a specified period of time prior to the dissolution or liquidation.

BONNEFOUS
30 bis, RUE EMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

### 13. ADJUSTMENTS IN CASE OF MERGER, SALE OF ASSETS OR CHANGE IN CONTROL.

(a) **Merger, Sale of Assets, or Change in Control, whether or not the result of the Listing of the Company**

In the event of any of the following events during the term of the Options:

- a merger of the Company with or into another corporation as a result of which the shareholders of the Company cease to own 50% or more of the surviving corporation by vote or value ("Merger"), or

- the sale of substantially all of the assets of the Company or any Affiliated Company, including the portfolio of insured risks ("Sale of Assets"), or

- a Change in Control,

whether or not such an event is the result of the Listing of the Company, all Options shall become fully vested and exercisable for the duration of their term on the effective date of such Merger, Sale of Assets or Change in Control. The successor corporation or purchaser(s) of control of the Company in a Merger, Sale of Assets or Change in Control, as the case may be, shall assume the rights and obligations of the Company in respect of the Plan, including the provisions of Sections 17 and 19 hereof.

Notwithstanding the foregoing, said successor corporation or purchaser(s) of control, as a result of a Merger, Sale of Assets or Change in Control, may effect a replacement of the Options by issuing other stock options, rights or entitlements that such party or parties determine(s) in good faith to be of a value that is equal to or greater than the Options then held by the Optionees, respectively, to be validated by a third party jointly chosen by the Executive Board and the successor corporation or purchaser(s) of control. In such event of the aforesaid replacement of the Options, the Options shall become fully vested and exercisable on the effective date of a Merger, Sale of Assets or Change in Control. The Optionees shall exchange their Options for new stock options in proportion to their respective Options at such time, as determined with reference to the then-remaining Term of the Options.

In the event of the Listing of the Company not resulting in a Change of Control, there will be no change in the terms of the Options.

13



(b)    **Potential consequences of Merger, Sale of Assets, Change in Control**

As a consequence of accelerated vesting and exercise of an Option or substitution of an Option, an Optionee may be ineligible for certain preferential tax and social security treatment that may be available in France and in other jurisdictions.

## 14.    NOTIFICATION OF THE GRANT OF OPTIONS

The Option Agreement shall be provided to each Optionee within a reasonable time after the Date of the Grant.

## 15.    AMENDMENT AND TERMINATION OF THE PLAN

The Executive Board may at any time amend, alter, suspend or terminate the Plan, provided, however, that no amendment, alteration, suspension or termination of the Plan shall impair the rights of any Optionee, unless mutually agreed between an Optionee and the Executive Board, which agreement must be in writing and signed by an Optionee and the Company.

## 16.    LEGAL COMPLIANCE

Neither Investment Certificates nor Shares shall be issued pursuant to the exercise of Options unless the exercise of such Options and the issuance and delivery of such Investment Certificates or Shares complies with all relevant provisions of the Commercial Code and, subsequent to the Listing Date, the requirements of any stock exchange or quotation system on which the Shares are then listed or quoted. To the extent that the Options become subject to Section 16 of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company shall use reasonable efforts to ensure that such Options are exempt from Section 16(b) of the Exchange Act. The Company shall act in good faith to satisfy and comply with all applicable laws and requirements to enable Investment Certificates and Shares to be issued pursuant to the exercise of Options.

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

## 17.    REDEMPTION BY THE COMPANY

### (a)    Right to Redeem Investment Certificates

At any time prior to the Listing Date, particularly in the event of termination of an Optionee's Continuous Status as a Beneficiary, and subject to any restriction under French corporate laws or other laws, the Company shall have the right (i) to redeem any Investment Certificates issued to an Optionee pursuant to an Option Agreement, or (ii) to be substituted by one or more of its shareholders or by one or more third parties (a "Substituted Party") in such right (the "Call Option"). Upon the exercise by the Company (or a Substituted Party) of its Call Option, an Optionee accepts to sell his or her Investment Certificates to a Company or to the respective Substituted Party.

### (b)    Redemption Price

The redemption price for said Investment Certificates to be paid to an Optionee by the Company or a Substituted Party in the context of a redemption under this Section 17 shall be the Fair Market Value of the Investment Certificates on a fully diluted basis, according to the most recent valuation of the Company as of the date on which notice is given of the exercise of the Call Option.

### (c)    Redemption Procedure

The Company or a Substituted Party may exercise its Call Option under this Section 17 by sending a written notice to an Optionee, specifying the number of Investment Certificates to be redeemed. The notice required by this Section 17 (c) shall be valid if sent to the last known mailing address of the Optionee, as shown on the books and records of the Company. The Company or a Substituted Party shall then promptly pay the total redemption price to the Optionee in the form of cash, or by check or wire transfer.

## 18.    DETERMINATION OF FAIR MARKET VALUE

Prior to the Listing Date, the Fair Market Value shall be determined on the basis of valuation methods and procedures applied from time to time by the Executive Board, as may be modified from time to time by the Executive Board with the approval of the general assembly of the shareholders subject to and in conformity with the requirements of French law (the "Valuation Methodology").

In the event of a Merger, Sale of Assets, Change in Control or a transaction involving an acquisition by one or more third parties of ten percent (10%) of the Common Stock of the Company, the price of the Shares in such transaction shall be deemed to be a reliable indicator of actual value, and shall for a period of three (3) months following the effective date of such transaction, be used to determine the Fair Market Value in lieu of the application of the Valuation Methodology. At the end of such three-month period, the Executive Board shall revert to the application of the Valuation Methodology.

## 19.    RIGHT OF AN OPTIONEE TO REQUIRE COMPANY TO REPURCHASE

15

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

(a)    **Put Option**

From and after the Date of Permitted Exercise, an Optionee may require the Company (or one or several of its shareholders or any third party, as substituted by the Company and as communicated to the Optionee) to repurchase the Investment Certificates that such Optionee may have acquired under the Plan, in accordance with the provisions set forth in this Section 19 (or in a separate agreement entered into with the Beneficiary) (the "Put Option"). The Company's rights and obligations under this Section 19 shall be freely assignable, in whole or in part.

(b)    **Put Price**

In the event and at such time that an Optionee exercises the Put Option, the repurchase price to be paid by the Company or a Substituted Party for Investment Certificates shall be equal to the Fair Market Value in effect at the time that the Company receives notice of exercise of the Put Option from such Optionee on a fully diluted basis (the "Put Price"). In the event that an Optionee desires to effect the exercise of Options by means of Cashless Exercise in connection with the Put Option, such Optionee shall simultaneously deliver to the Company both the notice of exercise of such Options and the notice of exercise of the Put Option.

(c)    **Put Procedure**

An Optionee may exercise the Put Option under this Section 19 by the giving of written notice to the Company, specifying the number of Investment Certificates to be repurchased by the Company. This notification should be made by registered letter with acknowledgment receipt to the Company. The Company shall then pay to the Optionee the total Put Price in cash, by check, wire transfer, or offset against receivables, as applicable in the discretion of the Executive Board. In the event of an Optionee's death, his or her Put Option shall be exercisable by the legal representative of his or her estate pursuant to this Section 19.

(d)    **Termination of Put Option**

Notwithstanding any other provision of this Section 19, the right of an Optionee to require the Company to repurchase his or her Investment Certificate will terminate as of the Listing Date, and the Company shall have no further obligation to comply with this Section 19.

(e)    **Period for Permitted Exercise of Put Option**

From and after the Date of Permitted Exercise, the Put Option will be exercisable for a period of thirty (30) days following the delivery to the Supervisory Board of the Company by the Executive Board of quarterly reports determining the Fair Market Value and the determination by the Executive Board of the Fair Market Value of the Investment Certificates. Notwithstanding the 15-day period set forth in Section 9(d) for the exercise of Options by an Optionee following an event of termination of Continuous Status as a Beneficiary due to dismissal for willful or serious misconduct, in the event the 15-day period begins subsequent to the foregoing (30) thirty-day period, an Optionee intending to exercise Options within said 15-day period shall have the right to exercise the Put Option within a 10-day period commencing on the date of the next following announcement by the Executive Board of the Fair Market Value.



## 20. SALE OF VOTING CERTIFICATES BY THE HOLDERS OF VOTING CERTIFICATES

In the event of a Merger, Sale of Assets or Change in Control, whether or not the result of the Listing of the Company, as described in Section 13 hereof and in case of Listing of the Company (the "Transaction"), the holders of Voting Certificates pursuant to a written agreement between the Company and such holders of Voting Certificates would accept to sell Voting Certificates to those Optionees that hold corresponding Investment Certificates, within a reasonable time prior or subsequent to the effective date of the Transaction. The sale of such Voting Certificates shall be in accordance with the terms and conditions of the aforementioned written agreement between the Company and the holders of Voting Certificates, and shall provide that the sale price for such Voting Certificates shall be a fixed amount of 0,001 euro per Optionee per Investment Certificate held by such Optionee.

## 21. LIABILITY OF COMPANY

The inability of the Company to obtain authorization from any regulatory body having jurisdiction over its activities, which authorization is deemed by counsel to the Company to be necessary to the lawful issuance of Investment Certificates or Shares hereunder shall relieve the Company of any liability in respect of the failure to issue such Investment Certificates or Shares as to which such authorization is not obtained.

## 22. CORRESPONDENCE

Any notice from an Optionee to the Company relating to an Option must be sent to the following address by registered mail with acknowledgment of receipt, unless a different address or method is notified to the Optionee:

CDC IXIS FINANCIAL GUARANTY HOLDING

31-33 rue de Mogador
75009 Paris FRANCE

## 23. GOVERNING LAW, JURISDICTION AND LANGUAGE

This Plan shall be governed by and construed in accordance with the laws of France. The *Tribunal de Grande Instance* of Paris shall be exclusively competent to determine any claim or dispute arising in connection herewith.

This Plan has been established in the English language. A sworn translation of the Plan in French is available from the Company upon request.

° O °

17