EXHIBIT B

DECEMBER 30, 2005

## CIFG HOLDING

## CALENDAR 2004 STOCK OPTION PLAN

**CIFG HOLDING**
Headquarters:

31-33 rue de Mogador
75009 Paris

Société anonyme à directoire et conseil de surveillance
au capital de 450.078.480 euros

R.C.S. PARIS B 439 357 302

## TABLE OF CONTENTS

| | | Pages |
|---|---|---|
| 1. | PURPOSES OF THE PLAN | 1 |
| 2. | DEFINITIONS | 1 |
| 3. | SECURITIES SUBJECT TO THE PLAN | 8 |
| 4. | ADMINISTRATION OF THE PLAN | 9 |
| (a) | Procedure | 9 |
| (b) | Powers of the Executive Board | 9 |
| (c) | Effect of Executive Board's Decision | 10 |
| (d) | Members of the Executive Board | 10 |
| 5. | LIMITATIONS | 10 |
| 6. | TERM OF OPTION GRANT PERIOD | 11 |
| 7. | TERM/EXPIRATION OF OPTIONS | 11 |
| 8. | EXERCISE PRICE AND FORM OF CONSIDERATION | 11 |
| (a) | Exercise Price | 11 |
| (b) | Form of Consideration | 12 |
| 9. | VESTING AND EXERCISE OF OPTIONS | 12 |
| (a) | Vesting Date | 12 |
| (b) | Procedure for Exercise and Rights as a Shareholder | 13 |
| (c) | Taxes and Social Security Contributions | 13 |
| (d) | Exercise in the Event of Termination of an Optionee's Continuous Status as Beneficiary | 13 |
| 10. | NON-TRANSFERABILITY OF OPTIONS | 15 |
| 11. | ADJUSTMENTS UPON CHANGES IN CAPITALIZATION | 15 |
| 12. | ADJUSTMENTS UPON DISSOLUTION OR LIQUIDATION | 16 |
| 13. | ADJUSTMENTS UPON CHANGE IN CONTROL OR REDOMICILIATION | 16 |
| (a) | Change in Control, whether or not the Result of the Listing of the Company | 16 |
| (b) | Redomiciliation | 17 |
| (c) | Potential Consequences of Change in Control or Redomiciliation | 17 |
| 14. | AMENDMENT AND TERMINATION OF THIS PLAN | 18 |
| 15. | LEGAL COMPLIANCE | 18 |
| 16. | REDEMPTION BY THE COMPANY | 18 |
| (a) | Right to Redeem P Category Shares | 18 |
| (b) | Redemption Price | 19 |
| (c) | Redemption Procedure | 19 |
| (d) | Effectiveness of Transfer | 19 |
| 17. | DETERMINATION OF FAIR MARKET VALUE | 19 |
| 18. | RIGHT OF AN OPTIONEE TO REQUIRE COMPANY TO REPURCHASE | 20 |
| (a) | Put Option | 20 |
| (b) | Put Price | 20 |
| (c) | Put Procedure | 20 |
| (d) | Termination of Put Option | 20 |
| (e) | Period for Permitted Exercise of Put Option | 21 |
| (f) | Effectiveness of Transfer | 21 |
| 19. | LIABILITY OF COMPANY | 21 |
| 20. | ASSIGNMENT – TRANSFER | 21 |
| 21. | NOTICES | 21 |

22.   GOVERNING LAW, JURISDICTION AND LANGUAGE ..................................... 22

Annex A – Valuation Methodology ........................................................................... 1

Annex B – Article 6.2 of the by-laws                                                              5

**CIFG HOLDING**
**CALENDAR 2004 STOCK OPTION PLAN**

In accordance with the Shareholders' Authorization, the Executive Board of the Company (CIFG Holding as defined below) resolved on December 30, 2005, in conformity with the provisions of Articles L. 225-177 to L. 225-186, the provisions of Articles L.228-11 to L. 228-20 of the Commercial Code and the Decree n°67-236 dated March 23, 1967 (as amended, including by the Decree n°2005-112 dated February 10, 2005), to adopt a program providing for the grant to Beneficiaries of stock options giving rights to subscribe to P Category Shares or Ordinary Shares of the Company. In furtherance of such resolution, the Executive Board has approved and adopted this CIFG Holding Calendar 2004 Stock Option Plan (hereinafter, the **"Plan"**), the terms and conditions of which are set forth below.

## 1.    PURPOSES OF THE PLAN

The purposes of the Plan are:

- to attract, motivate and retain the best available personnel for positions of substantial responsibility;

- to provide additional incentive to Beneficiaries;

- to align as much as possible the interests of Beneficiaries with those of the shareholders of the Company; and

- to promote the success of the Company's business.

Options granted under this Plan to Beneficiaries who are residents in France are intended to qualify for the preferential treatment applicable to options granted under Articles L. 225-177 to L. 225-186 of the Commercial Code, provided all necessary conditions are satisfied.

## 2.    DEFINITIONS

As used herein, the following definitions shall apply.

### (a)    "Beneficiary"

means a member of the Executive Board or any person employed by the Company or a CIFG Affiliate. Neither service as a member of the Supervisory Board of the Company nor

payment of a fee to a member of the Supervisory Board by the Company or a CIFG Affiliate shall be deemed to constitute an employment relationship.

(b)     "Call Option"

has the meaning set forth in Section 16(a).

(c)     "Cashless Exercise"

has the meaning set forth in Section 8(b)(iv).

(d)     "Change in Control"

means any of: (i) a merger of the Company with or into another corporation as a result of which CNCE ceases to own, directly or indirectly, 50% or more of both the share capital and the voting rights of the surviving corporation; (ii) the sale or other transfer of substantially all of the assets, and/or of substantially all of the portfolio of insured risks, of the Group to an entity that is neither a CIFG Affiliate nor a CNCE Affiliate; (iii) a transaction as a result of which CNCE ceases to have the ability, directly or indirectly and whether by contract, sufficient voting rights or otherwise, to elect 50% or more of the members of the Supervisory Board; (iv) a transaction as a result of which CNCE ceases to be able, directly or indirectly and whether by contract, sufficient voting rights or otherwise, to determine the result of matters submitted to a vote of the Company's shareholders; (v) a transaction as a result of which CNCE ceases to be able, directly or indirectly and whether by contract, sufficient voting rights or otherwise, to direct the management and affairs of the Group; or (vi) any other transaction as a result of which substantially all of the Group ceases to be a CNCE Affiliate; *provided, however, that* if CNCE and another party have entered into a shareholder's agreement that governs the control of the Group, "CNCE" shall refer in this definition to CNCE and such other party together.

(e)     "CIFG Affiliate"

means any company (1) of which at least 50% of the share capital or 50% of the voting rights are held, directly or indirectly, by the Company, (2) of which the Company has the right, directly or indirectly and whether by contract, sufficient voting rights or otherwise, to determine the outcome of matters to be decided in a meeting of the company's shareholders, or (3) which is otherwise controlled by the Company.

(f)     "Closed Periods"

means specific periods during which Options cannot be granted by companies listed on any regulated securities exchange market on which the Shares (or, if applicable, shares of CNCE or any other company controlling the Company) shall have been listed.

(g)     "CNCE"

means the Caisse Nationale des Caisses d'Epargne et de Prévoyance, a French company organized under the laws of the Republic of France, as a *société anonyme* with Executive Board (Directoire) and Supervisory Board (Conseil de Surveillance) whose registered office is located

at 50, avenue Pierre Mendès France in Paris (75201 cedex 13) and registered to the Trade Registry of Commerce of Paris under number 383 680 220.

(h)    "CNCE Affiliate"

means any company (1) of which at least 50% of the share capital or 50% of the voting rights is held, directly or indirectly, by CNCE, (2) of which CNCE has the right, directly or indirectly and whether by contract, sufficient voting rights or otherwise, to determine the outcome of matters to be decided in a meeting of the company's shareholders, or (3) which is otherwise controlled by CNCE.

(i)    "Commercial Code"

means the French Commercial Code.

(j)    "Company"

means CIFG Holding, a French company organized under the laws of the Republic of France, as a *société anonyme* with Executive Board (*Directoire*) and Supervisory Board (*Conseil de Surveillance*) whose registered office is located at 31-33 rue de Mogador, in Paris (75009) on the date of approval of the Plan by the Executive Board and registered to the Trade Registry of Commerce of Paris under number 439 357 302, and its successors pursuant to applicable law or Section 13 hereof.

(k)    "Compensation Committee"

means the compensation committee designated by the Supervisory Board of the Company or, if no such committee has been so designated, the Supervisory Board of the Company.

(l)    "Continuous Status as a Beneficiary"

means that there shall have been no termination of, as applicable, (i) the term of office of an Optionee who is a member of the Executive Board or (ii) the employment relationship (according to applicable law) between an Optionee and the Company or any CIFG Affiliate.

As used herein, the term "termination" shall not include:

(i)    any permitted leave of absence, *i.e.*, medical leave, military leave, or other authorized personal leave;

(ii)    Disability;

(iii)    retirement, which means, as applicable,

1)    with respect to a Beneficiary to whom the French Labor Code is applicable, retirement in accordance with and as authorized by the French Labor Code and subject to any service requirement that is approved by the

Executive Board in its sole discretion and set forth in an Option Agreement;

2) with respect to other employees, that the Optionee shall have ceased employment on or after the age of 55 and subject to any service requirement that is approved by the Executive Board in its sole discretion and set forth in an Option Agreement; shall not engage in any paid consulting or employment activity (including without limitation any Prohibited Actions) unless he or she shall have given prior written notice of such activity to the Company and the Executive Board shall not have disapproved of his or her engaging in such activity in writing within four full calendar weeks of receipt of such notice; and shall certify, no later than January 31 of each year thereafter, that he or she is not engaging and did not engage in any such activity during the current and preceding calendar years; or

3) with respect to any employee subject to specific provisions of applicable law governing retirement, the foregoing clauses (1) and (2) modified to the extent necessary to conform to such specific provisions.

(iv) transfer of an Optionee from the Company to a CIFG Affiliate, from one CIFG Affiliate to another CIFG Affiliate or the Company, or from the Company or a CIFG Affiliate to CNCE or a CNCE Affiliate; or

(v) any other form of departure decided on a discretionary basis by the Executive Board after consultation with the Compensation Committee.

(m) **"Conversion Date"**

has the meaning set forth in Section 3.

(n) **"Date of Grant"**

means the date on which a grant of Options shall be effective and shall be the date specified as such in the related Option Agreement, which shall be the date on or as of which the Executive Board designates an Optionee and specifies the terms and conditions of Options granted to such Optionee, including the exercise price in respect thereof and the respective number of the underlying P Category Shares or Ordinary Shares.

(o) **"Date of Permitted Exercise"**

means the first date on which an Option may be exercised, which shall be (i) the fourth anniversary of the Date of Grant or such other date as may be specified as such in the related Option Agreement, (ii) in the event an Optionee dies before such date, the date of death as set forth in Section 9(d)(iv) hereof, or (iii) such earlier date as may be determined by the Executive Board pursuant to Section 4(b) hereof.

(p)     "Disability"

means (i) a disability for which the Optionee is receiving or could receive benefits under the Company's long-term disability plan applicable to such Optionee, as in effect at the commencement of such disability, (ii) in the absence of such a plan, which prevents the Optionee from performing the essential tasks, functions, skills or responsibilities required by employers for the performance of his or her own occupation or (iii) with respect to an Optionee to whom the French Labor Code and the French Social Security Code are applicable, a disability of the second or third level as defined by the French Social Security Code.

(q)     "Executive Board"

means the Company's executive board (*Directoire*) as long as French law is applicable or any equivalent body under applicable law, as the case may be. In accordance with the provisions of Section 4(a) hereof, "Executive Board" may also be deemed to refer to the President of the Executive Board as long as French law is applicable, the President of the Company, the equivalent officer under applicable law, or such other person employed by a member of the Group as may be designated by the Compensation Committee (or, if the Company is no longer domiciled in France, by the Supervisory Board), as the case may be.

(r)     "Fair Market Value" (*Valeur de Marché*)

means, as of any date, the fair market value of the Shares as of the immediately preceding valuation date, as determined pursuant to Section 17 hereof.

(s)     "Fair Market Value Report"

has the meaning set forth in Section 17.

(t)     "Group"

means the Company and CIFG Affiliates.

(u)     "Listing of the Company"

means the listing of any shares of the Company on a regulated securities exchange market.

(v)     "Listing Date"

means the date upon which shares of the Company become listed on a regulated securities exchange market.

(w)     "Option" or "Options"

means the right to subscribe to P Category Shares or Ordinary Shares pursuant to this Plan.

(x)    "Option Agreement"

means a written agreement between the Company and an Optionee evidencing the terms and conditions of an individual grant of Options, including the exercise price in respect thereof and the related number of P Category Shares or Ordinary Shares. Unless otherwise specified therein, the Option Agreement is subject to the terms and conditions of this Plan.

(y)    "Optionee"

means a Beneficiary who holds at least one Option.

(z)    "Ordinary Shares"

means the ordinary shares, shares of common stock or equivalent securities under applicable law, as the case may be, issued by the Company.

(aa)    "P Category Shares"

means the "P category" preferred shares without any voting rights issued by the Company pursuant to article 6.2 of the by-laws of the Company, which is attached as annex B hereto, as amended from time to time, subject to Sections 11, 12, 13 and 14 hereof.

(bb)    "Plan"

means this Calendar 2004 Stock Option Plan, as amended from time to time pursuant to the terms hereof.

(cc)    "Prohibited Actions"

means any, or any combination of, the following actions:

(i)    directly or indirectly engaging in, owning, managing, operating, controlling or otherwise participating in any entity in the financial guaranty insurance business or otherwise deemed by the Executive Board to be a competitor of the Group, whether as principal, agent, employee, employer, consultant, advisor, independent contractor, stockholder, director, officer, partner, joint venturer or in any other individual or representative capacity, provided, however, that the mere (direct or indirect) ownership by an Optionee of not more than one percent (1%) of the equity securities of any such competitor shall not be deemed to be a Prohibited Action so long as such Optionee does not actively participate in the business or management of such entity in any manner whatsoever;

(ii)    employing, soliciting for employment, or advising or recommending that any third party employ or solicit for employment any person who is or was an employee of the Group during the preceding twelve calendar months;

    (iii)    directly or indirectly soliciting the clients of the Group in an attempt to provide goods or services of the type that it provides, or in an attempt to persuade such clients to cease to do business with the Group; or

    (iv)    disclosing, furnishing or making accessible to any person or entity, or using other than for the benefit of the Group, any confidential or proprietary information obtained or developed while in the employ of the Group. As used herein, confidential or proprietary information shall not apply to information that becomes generally known or available to the public other than as a result of disclosure or other breach of the terms hereof by an Optionee, or any disclosure of confidential information by Optionee that is expressly required by judicial or administrative order, provided that the Optionee shall have notified the Company as promptly as practicable of the existence, terms and circumstances of any order, subpoena or other process issued by a court or administrative authority that may require to the disclosure of any such confidential information, and shall have cooperated with the Company, if applicable, in taking legally available steps to resist or narrow such requirement and to obtain a protective order or other reliable assurance that confidential treatment be given to the information to be disclosed.

**(dd)**    **"Put Option"**

shall have the meaning set forth in Section 18(a) hereof.

**(ee)**    **"Put Price"**

shall have the meaning set forth in Section 18(b) hereof.

**(ff)**    **"Redomiciliation"**

means, with respect to the Group, the change of domicile of the Company or any successor thereof as the holding company of the Group and to which all or substantially all of the voting shares or assets of the Company shall have been transferred.

**(gg)**    **"Shares"**

means without any distinction P Category Shares, Ordinary Shares or both.

**(hh)**    **"Shareholders' Authorization"**

means the authorization given by the shareholders of the Company in a general meeting held on December 30, 2005, permitting the Executive Board to grant Options for a period of twelve (12) months from the date of such meeting.

**(ii)**    **"Substituted Party"**

shall have the meaning set forth in Section 16(a) hereof.

(jj)    "Supervisory Board"

means the Company's Supervisory Board (*Conseil de Surveillance*) as long as French law is applicable, or the Board of Directors or the equivalent body under applicable law, as the case may be.

(kk)    "Term"

means, with respect to any Option, the period of time beginning on the Date of Grant of such Option and ending on and including the last day on which such Option may be exercised and, subject to Section 7 of this Plan, shall be the period specified as such in the related Option Agreement.

(ll)    "Valuation Methodology"

means the Valuation Methodology attached as Annex A hereto.

(mm)    "Vesting Date"

means the date, set forth in (or determined pursuant to a vesting schedule set forth in) an Option Agreement, or such earlier date as may be determined by the Executive Board pursuant to Section 4(b) hereof, on which an Optionee's ownership of all or a specified portion of the Options granted to him or her becomes unforfeitable, subject to the terms and conditions hereof and of the related Option Agreement.


3.    SECURITIES SUBJECT TO THE PLAN

The total number of P Category Shares and Ordinary Shares that may be issued pursuant to grants of Options and pursuant to the Shareholders' Authorization is four hundred and sixteen thousand, one hundred and thirty eight (416,138) Shares, subject to adjustment in accordance with Section 11 hereof.

Prior to the Listing Date, the securities subject to Options shall be P Category Shares, subject to the limitations set forth in Section 5 and the adjustments set forth in Section 11 hereof.

On and after the Listing Date, or such other date as may be determined by the Executive Board subject to the approval of the Supervisory Board (the Listing Date or such other date, the "Conversion Date"), the securities subject to Options shall be Ordinary Shares, subject to the limitations set forth in Section 5 and the adjustments set forth in Section 11 hereof. On the Conversion Date, each of the P Category Shares issued upon the exercise of the Options granted under this Plan shall be converted into one Ordinary Share, and each of the outstanding Options to subscribe to P Category Shares shall become an Option to subscribe to an equal number of Ordinary Shares, in accordance with the terms and conditions set forth in the by-laws of the Company.

Grants of Options shall result in an equivalent (*i.e.*, 1:1) reduction of the total number of P Category Shares or Ordinary Shares subsequently available to be granted pursuant to this Plan.

The issuance of P Category Shares or Ordinary Shares pursuant to the exercise of Options shall result in an increase in the share capital of the Company.

## 4.    ADMINISTRATION OF THE PLAN

### (a)    Procedure

This Plan shall be administered by the Executive Board. The Executive Board may, to the extent legally permissible, delegate its powers to administer this Plan to the President of the Executive Board, the Company's President, the equivalent officer of the Company under applicable law or such other person employed by a member of the Group as may be designated by the Compensation Committee (or, if the Company is no longer domiciled in France, by the Supervisory Board).

### (b)    Powers of the Executive Board

Subject to the provisions of the Commercial Code, the Shareholders' Authorization and this Plan, the Executive Board shall have the authority, in its discretion:

      (i)    to determine the Beneficiaries to whom Options may be granted hereunder;

      (ii)    to select the Beneficiaries and determine whether and to what extent Options shall be granted hereunder;

      (iii)    to decide the number of P Category Shares or Ordinary Shares to be covered by Options granted hereunder;

      (iv)    to approve and amend forms of agreement for use under this Plan;

      (v)    to determine the terms and conditions of Options granted hereunder. Such terms and conditions include, but are not limited to the exercise price, the time or times when Options may be vested, the time or times when Options may be exercised, acceleration of vesting or exercise, the form of proceeds to be received on Cashless Exercise after the Listing Date, and any restriction or limitation regarding Options or P Category Shares or Ordinary Shares relating thereto;

      (vi)    to construe and interpret the terms of this Plan and Options granted pursuant to this Plan;

      (vii)    to prescribe, amend and rescind rules and regulations relating to this Plan, including rules and regulations relating to sub-plans established for the purpose of qualifying for preferential tax and social security treatment under French or foreign applicable tax and social security laws;

(viii)    to modify or amend the terms and conditions of any or all of the Options (subject to the provisions of Sections 11, 12, 13 and 14 hereof), including the discretionary authority to extend the period for the permitted exercise of an Option after the termination of the Continuous Status of a Beneficiary;

(ix)    to authorize any person to execute on behalf of the Company any instrument required to implement the grant of an Option previously granted by the Executive Board;

(x)    to make all other determinations deemed necessary or appropriate for the orderly administration of this Plan.

(c)    **Effect of Executive Board's Decision**

The Executive Board shall consult with the Compensation Committee prior to granting Options or taking any other of the foregoing actions that would have a significant effect on this Plan or on Options granted hereunder.

The Executive Board's decisions, determinations and interpretations, including without limitation the determination of the Fair Market Value, shall be final and binding on all Optionees.

(d)    **Members of the Executive Board**

The Compensation Committee will, if and to the extent permitted by applicable law, determine the grants of Options to Members of the Executive Board. If applicable law does not permit the Compensation Committee to determine the grants of Options to Members of the Executive Board, the Compensation Committee will propose such grants to the Executive Board, which shall consult with the Compensation Committee prior to granting any such Options.

5.    **LIMITATIONS**

(a)    So long as may be required by applicable French law, the following limitations shall apply to grants of Options to Beneficiaries:

(i)    No Beneficiary shall be granted Options if he or she holds more than 10% of the share capital of the Company.

(iii)    From and after the Listing Date, no Options may be granted by the Company during Closed Periods.

(b)    Neither this Plan nor the grant of Options shall confer upon an Optionee any right with respect to continuing the Optionee's employment or his or her term of office with the Company or a CIFG Affiliate, nor shall they interfere in any way with

the Company's or CIFG Affiliate's right, as the case may be, to terminate such employment or such term of office.

(c)    The granting of Options, issuance of Shares upon exercise thereof and all other terms and conditions of this Plan and Options granted hereunder shall be subject to any limitations required by applicable law.

## 6.   TERM OF OPTION GRANT PERIOD

This Plan shall become effective and Options may be granted hereunder beginning December 30, 2005, the date of the Plan's adoption by the Executive Board, according to the terms of the Shareholders' Authorization.

## 7.   TERM/EXPIRATION OF OPTIONS

The Term of any Options is the period specified as such in the related Option Agreement, which shall in no event be greater than ten (10) years from the Date of Grant (except that the Term shall be extended to the extent necessary to permit exercise of an Option for six months after the death of an Optionee as provided in Section 9(d)(iii) hereof). Any Option as to which notice of exercise has not been given on or before the last day of its Term shall automatically lapse, may not be exercised and shall confer no right to any benefits or claim from or upon the Company, any CIFG Affiliate, or CNCE or any CNCE Affiliate.

## 8.   EXERCISE PRICE AND FORM OF CONSIDERATION

### (a)   Exercise Price

The exercise price to be paid by an Optionee in connection with the exercise of Options shall be determined by the Executive Board as of the Date of Grant, subject to the limitations set forth below.

      (i)    Prior to the Listing Date, the exercise price shall not be less than the Fair Market Value of the P Category Shares as of the Date of Grant.

      (ii)    On and after the Listing Date, the exercise price shall not be less than one hundred percent (100%) of the weighted average sale price of the Company's shares during the twenty (20) days of quotation (or, to the extent permitted by applicable law, during such lesser number of days as such shares shall have been quoted) preceding the Date of Grant.

11

(b)    **Form of Consideration**

The consideration to be paid for the P Category Shares or the Ordinary Shares to be issued upon the exercise of Options shall consist entirely of the exercise price in Euros, or the equivalent amount in United States dollars or pounds sterling at the closing spot rate of exchange for Euros on the date of exercise, which shall be paid by one or a combination of the following methods:

(i)    wire transfer;

(ii)   check;

(iii)  at the option of the Executive Board, offset against receivables; or

(iv)   delivery of a properly executed notice of Cashless Exercise and, if required, other documentation as set forth below.

"Cashless Exercise" means, (i) prior to the Listing Date, simultaneous exercise of Options and of the Put Option relating to the P Category Shares subscribed as a result of the exercise of such Options in accordance with Section 19 hereof, as a result of which the Optionee will be paid in cash the excess of the Fair Market Value of the P Category Shares over the exercise price of such Options and, (ii) from and after the Listing Date, the exercise of Options which shall include such other documentation as the Executive Board shall require to effect the sale of all or a portion of the Ordinary Shares acquired as a result of such exercise, as a result of which the Optionee will be paid the excess of the proceeds of such sale (net of any related broker's commission) over the exercise price of such Options, the Executive Board determining in its discretion whether such proceeds shall be paid in cash or Ordinary Shares or whether the Optionee may elect payment in cash and/or Ordinary Shares.

## 9.    VESTING AND EXERCISE OF OPTIONS

(a)    **Vesting Date**

As of and from each Vesting Date, each Option shall be a vested Option to the extent specified in the related Option Agreement. The Optionee's ownership of vested Options is not forfeitable, and vested Options may be exercised during the Term of the Options subject to the terms and conditions hereof and of the related Option Agreement.

To the extent permitted by applicable law, upon expiration, termination or forfeiture of any Option prior to exercise (including but not limited to as a result of termination of an Optionee's Continuous Status as a Beneficiary), his or her unvested Options, and the Shares subject to such Options, shall be forfeited, unless the Executive Board, in its discretion, shall decide otherwise. Any such Options and the related Shares shall revert to the Plan and become available for future grants, subject to the terms and conditions of this Plan.

(b)    **Procedure for Exercise and Rights as a Shareholder**

Vested and exercisable Options may be exercised in all or in part until (but not after) the expiration of the Term of the Options. Options may not be exercised for a fraction of a P Category Share or an Ordinary Share.

Options shall be deemed exercised when the Company receives: (i) written notice of exercise (in accordance with the provisions of the Option Agreement), duly executed by the person entitled to exercise the Option, and (ii) full payment (including but not limited to payment by Cashless Exercise) for the corresponding P Category Shares or Ordinary Shares. P Category Shares or Ordinary Shares, as the case may be, to be issued upon the exercise of Options shall be issued in the name of the Optionee. The Company intends to issue the Shares received upon exercise, or make payment to the Optionee as a result of Cashless Exercise, within ten (10) business days of receipt of such notice and payment.

The Shares issued to an Optionee upon exercise of Options shall be identical in all ways to all other P Category Shares or Ordinary Shares, as the case may be, and shall be entitled to dividends and other rights of ownership from and after the date of issuance.

(c)    **Taxes and Social Security Contributions**

Any income tax or social security contributions legally due from the Optionee as a result of such Optionee's exercise of Options and/or sale of P Category Shares or Ordinary Shares are the Optionee's sole responsibility.

The Company or any CIFG Affiliate may, to the extent permitted by applicable law, withhold from the Optionee's remuneration, if any, such amounts as may be required to satisfy the Company's or any CIFG Affiliate's tax or social security withholding obligations as a result of the exercise by such Optionee of Options and/or the sale of P Category Shares or Ordinary Shares. If the Company or CIFG Affiliate does not withhold an amount from the Optionee's remuneration, if any, in an amount sufficient to satisfy the Company's or CIFG Affiliate's tax or social security withholding obligations as set forth above, such Optionee must reimburse the Company or the relevant CIFG Affiliate on demand for the amount not withheld but paid by the Company or CIFG Affiliate.

(d)    **Exercise in the Event of Termination of an Optionee's Continuous Status as Beneficiary**

(i)    Termination of an Optionee's Continuous Status as a Beneficiary for a reason other than death or voluntary termination

In the event that termination of an Optionee's Continuous Status as a Beneficiary for a reason other than death or voluntary termination occurs on or after the Date of Permitted Exercise, Options vested at the time of such termination shall remain exercisable for a period of ninety (90) days from the date of such termination, but in no event later than the expiration of the Term of the Options.

13

In the event that termination of an Optionee's Continuous Status as a Beneficiary for a reason other than death or voluntary termination occurs prior to the Date of Permitted Exercise, Options vested at the time of such termination shall become exercisable on the Date of Permitted Exercise and shall remain exercisable for a period of ninety (90) days from the Date of Permitted Exercise, but in no event later than the expiration of the Term of the Options.

Notwithstanding the foregoing, in the event that an Optionee's Continuous Status as a Beneficiary terminates on or after the Date of Permitted Exercise as a result of dismissal for willful or serious misconduct, as that term is defined below, Options vested at the time of such termination shall remain exercisable for a period of fifteen (15) days from the date of such termination, but in no event later than the expiration of the Term of the Options. In the event that an Optionee's Continuous Status as a Beneficiary terminates prior to the Date of Permitted Exercise as a result of dismissal for willful or serious misconduct, Options vested at the time of such termination shall become exercisable on the Date of Permitted Exercise and shall remain exercisable for a period of fifteen (15) days, from the Date of Permitted Exercise, but in no event later than the expiration of the Term of the Options. As used herein, "dismissal for willful or serious misconduct" shall mean (i) as to Optionees whose employment relationship is governed by French law, the definition of "*faute grave*"or "*faute lourde*" prescribed by the French Labor Code and case law thereunder, and (ii) as to all others, gross negligence or willful misconduct in the performance of his or her duties, including willful disobedience of the directives of management, perpetration of a fraud, conviction of a felony or other act of serious misconduct.

        (ii)     Voluntary termination of an Optionee's Continuous Status as a Beneficiary

In the event that voluntary termination of an Optionee's Continuous Status as a Beneficiary occurs on or after the Date of Permitted Exercise, Options vested at the time of such termination shall remain exercisable for a period of ninety (90) days from the date of such termination, unless the Executive Board shall in its sole discretion decide to extend the period of exercisability, but in no event later than the Term of the Options.

In the event that voluntary termination of an Optionee's Continuous Status as a Beneficiary occurs prior to the Date of Permitted Exercise, Options vested at the time of such termination shall become exercisable on the Date of Permitted Exercise and shall remain exercisable for a period of ninety (90) days from the Date of Permitted Exercise, unless the Executive Board shall in its sole discretion decide to extend the period of exercisability, but in no event later than the Term of the Options.

Retirement that does not, or that ceases to, meet the requirements for not terminating an Optionee's Continuous Status as a Beneficiary will constitute voluntary termination of an Optionee's Continuous Status as a Beneficiary. Notwithstanding the foregoing, so long as retirement does not terminate an Optionee's Continuous Status as a Beneficiary, unvested options shall continue to vest according to the relevant vesting schedule, and vested Options shall remain exercisable until the expiration of the Term of the Options.

    (iii)   Death of Optionee

In the event of termination of an Optionee's Continuous Status as a Beneficiary due to death, unvested Options shall become immediately vested; if death occurs prior to the Date of Permitted Exercise, the date of death shall be deemed the Date of Permitted Exercise, and all vested Options shall become immediately exercisable for a period of six (6) months following such date, (the expiration of the Term of the Options being extended to the extent necessary to permit such exercise), by the Optionee's estate or by a person who acquires the right to exercise such Options by bequest or inheritance.

## 10.   NON-TRANSFERABILITY OF OPTIONS

Options may not be transferred or disposed of in any manner other than by will or by laws of descent or distribution and shall not otherwise be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, hypothecation, encumbrance, or charge, and any such attempted action shall be void. Notwithstanding the foregoing, if permitted by applicable law, the Options and/or any related rights or benefits may be transferred to a trust or similar arrangement for the benefit of one or members of an Optionee's immediate family (including without limitation his or her domestic partner). Options may be exercised, during the lifetime of an Optionee, only by the Optionee.

## 11.   ADJUSTMENTS UPON CHANGES IN CAPITALIZATION

In the event that any of the actions listed by article L. 225-181 of French Commercial Code, as amended from time to time, are effected by the Company during the Term of the Option or the Options, the Executive Board shall take any measures necessary in order to protect the interests of the Optionees. Such measures shall comply with provisions of article L. 228-99 of French Commercial Code and articles 174-10 and following of the Decree n° 67-236 dated March 23, 1967 (as amended by the Decree n° 2005-112 as of February 10, 2005)), each as amended from time to time, and may include, in particular, adjusting the number of Shares. As of the date of this Plan, such actions include:

    (i)    a redemption (*amortissement*) or decrease in capital;

    (ii)   a change in the distribution of profits;

    (iii)  a restricted stock grant;

    (iv)  a capitalization of reserves (*réserves*), profits (*bénéfices*) or additional paid-in capital (*primes d'émission*);

    (v)   a distribution of reserves, in cash or in kind; and

(vi)    any issuance of shares in the capital (*titres de capital*) or securities giving rise to the grant of shares in the capital comprising a subscription right reserved to shareholders.

In the event this Plan is no longer governed by French law, the Executive Board shall, subject to Section 14 hereof, adjust the foregoing provisions as it shall then deem necessary to comply with then-applicable law and to protect the interest of the Optionees in a manner substantially equivalent, *mutatis mutandis*, to the foregoing. Such measures may include without limitation an additional grant of Options in favour of the Optionees with the intent of placing the Optionees in a position substantially equivalent to the position in which they had been under previous law, *provided, however, that*, as a result of such measures, an Optionee may become ineligible for certain preferential tax and social security treatment under French law and, in such event, the Optionee shall bear the consequences of the forfeiture of such preferential treatment.

## 12.    ADJUSTMENTS UPON DISSOLUTION OR LIQUIDATION

Subject to Section 13 hereof, in the event of a proposed dissolution or liquidation of the Company, unexercised Options will terminate and become null and void at the time of the consummation of such event. Notwithstanding the foregoing, the Executive Board may, in the exercise of its sole discretion, declare that vested Options shall become exercisable for a specified period of time prior to the dissolution or liquidation.

## 13.    ADJUSTMENTS UPON CHANGE IN CONTROL OR REDOMICILIATION

### (a)    Change in Control, whether or not the Result of the Listing of the Company

In the event a Change in Control occurs during the Term of the Options, whether or not such Change in Control is the result of the Listing of the Company, all Options shall become fully vested and exercisable for the duration of their Term immediately prior to the effective date of, and conditioned on the consummation of, such Change in Control. If permitted by applicable law, the successor corporation or purchaser(s) of control of the Company in a Change in Control, as the case may be, shall assume the rights and obligations of the Company in respect of the Plan, including the provisions of Sections 16 and 18 hereof.

Notwithstanding the foregoing, the successor corporation or purchaser(s) of control, as a result of a Change in Control, may effect a replacement of the Options by issuing other stock options or, if the issuance of such stock options is not permitted under applicable law, other rights or entitlements, that such party or parties determine(s) (the "Replacement Options"). In such event, the Optionees shall be required to immediately surrender their Options in exchange for the Replacement Options. The Replacement Options shall have essentially the same intrinsic value ("moneyness") and leverage ("ratio of fair market share price to strike price") as the Options, with reference to the then-remaining Term of the Options. The Replacement Options additionally shall be fully vested and excisable for the duration of their Term and shall be on

such other terms and conditions that are substantially equivalent to or better than the terms and conditions applicable under the Options. The successor corporation or purchaser(s) of control shall in good faith assign a value to the Replacement Options that takes into account the foregoing considerations and that is at least equal to or greater than the value of the Options held by the Optionees, respectively, as of the effective date of such Change in Control, to be determined and validated by a third party jointly chosen by the Executive Board and the successor corporation or purchaser(s) of control (the "Value"). If permitted by applicable law, in the event that the Company is not the surviving entity in a Change in Control or if the Executive Board so approves, the Optionees may at their sole discretion elect to surrender any or all of their Options or Replacement Options, as the case may be, for an immediate cash payment equal to the Value of such surrendered Options or Replacement Options.

In the event of the Listing of the Company not resulting in or from a Change of Control, there will be no change in the terms of the Options.

    (b)    **Redomiciliation**

In the event of a Redomiciliation of the Company or the Group, whether or not such Redomiciliation results in a Change in Control, the Executive Board may, subject to Section 14 hereof, take any action and make any amendments or modifications necessary under applicable law to: change the law governing this Plan to the law of such jurisdiction as may be advisable in connection with such Redomiciliation; transfer this Plan to any successor of CIFG Holding as parent or holding company of the Group; and/or conform this Plan to such new governing law. The Executive Board shall procure that any such successor of CIFG Holding shall be the successor of the Company hereunder and shall assume the rights and obligations of the Company in respect of this Plan, including the provisions of Sections 16 and 18 hereof. If necessary or advisable in connection with such Redomiciliation, the Executive Board may effect a replacement of the Options by issuing other stock options, rights or entitlements that, singly or in combination, shall have a value at least equal to the value of, and shall control at least the same percentage of the voting rights of the successor Company as, the Options held by the Optionees immediately prior to the Redomiciliation, and the Optionees shall exchange their Options for new stock options, rights or entitlements in proportion to their respective Options at such time, as determined with reference to the then-remaining Term of the Options, *provided that* each Optionee shall be offered the right to refuse the substitution, retain his or her Options, to the extent such Options are vested as of the consummation of the Redomiciliation, under the terms and conditions of the Plan without modification following the Redomiciliation (except for those modifications required by applicable law) and forfeit his or her Options to the extent such Options are not vested as of the consummation of the Redomiciliation.

    (c)    **Potential Consequences of Change in Control or Redomiciliation**

As a consequence of assumption or substitution of, or adjustment to, an Option accelerated vesting and exercise of an Option or payment of cash in exchange for the cancellation of an Option, an Optionee may become ineligible for certain preferential tax and social security treatment under French or other applicable law. In such event, the Optionee shall bear the consequences of the forfeiture of such preferential treatment.

## 14.   AMENDMENT AND TERMINATION OF THIS PLAN

The Executive Board may at any time amend, alter, suspend or terminate this Plan, including without limitation in connection with the matters described in Sections 11, 12 and 13 hereof, *provided, however, that* no amendment, alteration, suspension or termination of this Plan shall impair the rights of any Optionee, unless such Optionee agrees to such impairment in writing, signed by such Optionee and the Company. Termination of this Plan shall not affect the rights of Optionees with respect to Options granted to them prior to the date of such termination, and all unexpired Options shall continue in force after termination of this Plan except as they may lapse or be terminated in accordance with the terms and conditions of this Plan and the Option Agreement.

## 15.   LEGAL COMPLIANCE

Neither P Category Shares nor Ordinary Shares shall be issued pursuant to the exercise of Options unless the exercise of such Options and the issuance and delivery of such P Category Shares or Ordinary Shares complies with all relevant provisions of applicable law, including the Commercial Code for so long as this Plan is governed by French law, and, subsequent to the Listing Date, the requirements of any regulated securities exchange market or quotation system on which the Shares are then listed or quoted. To the extent that the Options become subject to Section 16 of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company shall use reasonable efforts to ensure that transactions involving such Options and the exercise thereof are exempt from Section 16(b) of the Exchange Act. The Company shall act in good faith to satisfy and comply with all applicable laws and requirements to enable P Category Shares and Ordinary Shares to be issued pursuant to the exercise of Options.

## 16.   REDEMPTION BY THE COMPANY

### (a)    Right to Redeem P Category Shares

On and after the Date of Permitted Exercise and at any time prior to (but not after) the Listing Date, in the event of termination of an Optionee's Continuous Status as a Beneficiary, and subject to any restriction under French corporate laws or other applicable law, the Company shall have the right for a period of one hundred and fifty (150) days from the later of the date of such termination and the Date of Permitted Exercise (i) to redeem any P Category Shares issued to an Optionee on and after exercise of an Option pursuant to an Option Agreement, and (ii) to substitute one or more of its shareholders or one or more third parties (a "**Substituted Party**") in such right (the "**Call Option**"). Upon the exercise by the Company (or a Substituted Party) of its Call Option, each Optionee agrees to sell his or her P Category Shares to the Company or to the Substituted Party.

The Call Option may not be exercised for the periods during which the Put Option may be exercised.

### (b)    Redemption Price

The redemption price for said P Category Shares to be paid to an Optionee by the Company or a Substituted Party in the context of a redemption under this Section 16 shall be the Fair Market Value of the P Category Shares in effect on the date of redemption.

### (c)    Redemption Procedure

The Company or a Substituted Party may exercise its Call Option under this Section 16 by written notice to an Optionee specifying the number of P Category Shares to be redeemed. The Company or such Substituted Party shall then promptly pay the total redemption price to the Optionee by check or wire transfer and such P Category Shares shall be transferred to the Company or such Substituted Party effective upon such payment.

### (d)    Effectiveness of Transfer

No transfer of ownership of the P Category Shares may occur as a result of the Call Option unless such Call Option has been duly exercised in writing in accordance with its terms and conditions.

## 17.    DETERMINATION OF FAIR MARKET VALUE

Prior to the Listing Date, the fair market value of the Shares (the "**Fair Market Value**") shall be determined by applying the Valuation Methodology. On and after the Listing Date, the weighted average sale price of the Company's shares on the regulated securities exchange market on which such shares are primarily listed during the twenty (20) days of quotation (or, to the extent permitted by applicable law, during such lesser number of days as such shares shall have been quoted) preceding the date of valuation shall be the Fair Market Value of the Shares for all purposes of this Plan, including without limitation Section 8 hereof.

Prior to the Listing Date, in the event of a Change in Control or a transaction involving an acquisition by one or more third parties of at least ten percent (10%) of the P Category Shares of the Company, the price of the Shares in such transaction (including cash and other forms of consideration) shall be deemed to be a reliable indicator of the fair market value of the P Category Shares and shall for a period of three (3) months following the effective date of such transaction, be used to determine the Fair Market Value in lieu of the application of the Valuation Methodology. At the end of such three-month period, the Executive Board shall revert to the application of the Valuation Methodology.

The Executive Board shall deliver to the Supervisory Board at least once in each three-month period a report (the "**Fair Market Value Report**") determining the Fair Market Value of the Shares as of the date of such Fair Market Value Report, which report shall include a

description of the method by which such Fair Market Value was computed. Such Fair Market Value shall continue in effect until the date of the next following Fair Market Value Report and may be updated prior to the next three-month period to reflect a material change.

## 18.    RIGHT OF AN OPTIONEE TO REQUIRE COMPANY TO REPURCHASE

### (a)    Put Option

On and after the Date of Permitted Exercise but prior to the Listing Date, an Optionee may require the Company (or one or more Substituted Parties of which the Optionee shall have been notified) to repurchase any or all of the P Category Shares that such Optionee shall have acquired under this Plan, in accordance with the provisions set forth in this Section 18 (or in the Option Agreement or a separate agreement entered into with the Optionee) (the "**Put Option**"). The Company's rights and obligations under this Section 18 shall be freely assignable, in whole or in part; *provided, however, that* the Company shall remain responsible for the performance by any such assignee of its obligations hereunder.

### (b)    Put Price

In the event that and at such time as an Optionee exercises the Put Option, the repurchase price to be paid by the Company or a Substituted Party for P Category Shares shall, subject to paragraph (c) of this Section 18, be equal to the Fair Market Value in effect on the date that the Company receives notice of exercise of the Put Option from such Optionee (the "**Put Price**"). The Optionee may simultaneously exercise the Options and the Put Option as provided in Section 8 hereof.

### (c)    Put Procedure

An Optionee may exercise the Put Option under this Section 18 by written notice to the Company specifying the number of P Category Shares to be repurchased by the Company. The Company shall pay to the Optionee the total Put Price by check, wire transfer, or offset against receivables, in the discretion of the Executive Board and such P Category Shares shall be transferred to the Company or a Substituted Party effective upon such payment. The Company intends to make payment to the Optionee within ten (10) business days of receipt of such notice. In the event of an Optionee's death, his or her Put Option shall be exercisable by the legal representative of his or her estate pursuant to this Section 18.

### (d)    Termination of Put Option

Notwithstanding any other provision of this Section 18, the right of an Optionee to require the Company to repurchase his or her P Category Shares will terminate as of the Listing Date, any P Category Shares not yet purchased by the Company shall remain with the Optionee, and the Company shall have no further obligation in respect of this Section 18. If, however, the Optionee has exercised the Put Option prior to the Listing Date, the Company shall purchase the related P Category Shares no later than the day prior to the Listing Date.

(e)     **Period for Permitted Exercise of Put Option**

From and after the Date of Permitted Exercise, the Executive Board shall notify each Optionee, promptly after delivering each Fair Market Value Report to the Supervisory Board, of the Fair Market Value of the P Category Shares, which notice shall include a copy of the Fair Market Value Report. The Put Option will be exercisable for a period of thirty (30) days following each such notice to an Optionee. Notwithstanding the 15-day period set forth in Section 9(d) for the exercise of Options by an Optionee following an event of termination of Continuous Status as a Beneficiary due to dismissal for willful or serious misconduct, in the event the 15-day period begins subsequent to the foregoing (30) thirty-day period, an Optionee intending to exercise Options within said 15-day period shall have the right to exercise the Put Option within a 10-day period commencing on the date of the next following notification by the Executive Board of the Fair Market Value.

(f)     **Effectiveness of Transfer**

No transfer of ownership of the P Category Shares may occur as a result of the Put Option unless such Put Option has been duly exercised in writing in accordance with its terms and conditions.

## 19.   LIABILITY OF COMPANY

In the event that any legal or regulatory provision prevents the issuance of the Shares subject to the Options, the Company may not be held liable for its failure to issue the Shares but instead will compensate the Optionees for such failure, including without limitation by paying the Optionees the Fair Market Value of such Shares (less the exercise price therefore) in effect on the date such Shares would otherwise have been issued. The Optionee shall bear the tax and social security consequences, if any, of the receipt of such compensation.

## 20.   ASSIGNMENT – TRANSFER

The Company reserves the right to use any available means to assign or transfer its rights and obligations under this Plan to any CIFG Affiliate, provided, however, that any such CIFG Affiliate shall be the successor of CIFG Holding as parent or holding company of the Group, shall be the successor of the Company hereunder and shall assume the rights and obligations of the Company in respect of this Plan, including the provisions of Sections 16 and 18 hereof. .

In such event, the Company shall do all that may be necessary or advisable to be done to maintain and protect the rights of the Optionees, and to ensure the full performance by the successor Company of its obligations, under this Plan.

## 21.   NOTICES

Notices hereunder must be sent to the Company at the following address, or to such other address as may subsequently be specified by the Company in notice given to the Optionee:

**CIFG HOLDING**
**31-33, rue de Mogador**
**75009 Paris**

Notices hereunder must be sent to the Optionee at his or her address as set forth in the Option Agreement or such other address as may subsequently be specified by the Optionee in notice given to the Company. Notice of any action taken by the Compensation Committee or the Executive Board hereunder may be given by in writing signed by the Executive Board or the Director of Human Resources of the Company.

Notices hereunder shall be effective only if sent by registered or certified mail, overnight courier, telefacsimile or personal delivery, in each case with evidence of receipt, unless the Executive Board determines otherwise in the case of any notice to be given to the Company.

## 22. GOVERNING LAW, JURISDICTION AND LANGUAGE

For so long as the Company is domiciled in France, this Plan shall be governed by and construed in accordance with the laws of France and the court of competent jurisdiction within the Court of Appeal of Paris shall be exclusively competent to determine any claim or dispute arising in connection herewith that is not or cannot be resolved by mediation or arbitration as provided herein.

In the event of any claim or dispute arising out of or relating to this Plan, or the breach thereof, and unless the parties shall have resolved such claim or dispute within ninety (90) days after written notice from one party to the other setting forth the nature of such claim or dispute, such claim or dispute shall be submitted to a mediator jointly selected by the parties for nonbinding, confidential mediation. If such mediation does not result in resolution of such claim or dispute within one hundred and eighty (180) days from the date of such notice, in the event this Plan is governed at that time by French law, the parties may proceed to any and all remedies available to them in law or equity or, in the event this Plan is no longer governed at that time by French law, the parties will submit to binding arbitration in London, England or New York, New York, in the case of employees located in, respectively, Europe and the United States, in accordance with the arbitration rules then generally in effect in such location for such disputes. Judgment upon the award rendered by such arbitrator(s) shall be entered in any court having jurisdiction thereof upon the application of either party.

This Plan has been established in the English language. A sworn translation of this Plan in French is available from the Company upon request and will be provided to each Optionee resident in France.

° O °

## ANNEX A

### VALUATION METHODOLOGY

### SUMMARY DESCRIPTION OF METHODOLOGY OF VALUATION FOR CIFG HOLDING STOCK OPTION PLAN AND RESTRICTED STOCK PLAN PRIOR TO LISTING

### INTRODUCTION

This memorandum briefly summarizes the methodology (the "**Methodology**") for valuation of the shares of CIFG Holding, a French corporation (the "**Company**") in connection with the Company's Calendar 2004 Stock Option Plan (the "**SO Plan**") and with the Company's 2005 Restricted Stock Plan (the "**RS Plan**"). Specifically, implementation of the SO Plan and the RS Plan requires a procedure to calculate Fair Market Value (as that term is defined in the SO Plan and the RS Plan) prior to the listing of the shares of the Company on a recognized regulated stock exchange market ("**Listing Date**").

The Valuation Methodology has several parameters that are set by current market prices, including interest rates, exchange rates, etc. Additionally, the Valuation Methodology requires the utilization of capital charges promulgated by Standard & Poor's Ratings Group ("S&P"). It should be noted that for the 2003 valuation used to establish the strike price of stock options granted, the Company utilized the industry average capital charges that S&P instructed CIFG to use in its assessment of CIFG pursuant to S&P's capital adequacy model. For the 2005 valuation, the Company used its actual capital charges, as S&P instructed CIFG to use its own average capital charges in the capital adequacy assessment. Since the business that CIFG has written to date has had lower capital charges than the industry average, this change by S&P has reduced the required capital charges for CIFG. Management believes this is an appropriate approach, since the results are more closely tied to the Company's actual risk portfolio.

The Valuation Methodology constitutes the valuation methods and procedures approved by the Shareholders' Authorization to be applied from time to time by the Executive Board, in conformity with the requirements of French law, among them those set forth in Article L. 225-177 of the Commercial Code, as amended from time to time. It is designed to approximate the Fair Market Value of the Company's shares, absent a quoted market price for such shares. The application of the Valuation Methodology may result in a value which could be different from the value that could be negotiated between unrelated parties in an arm's length exchange.

Note: the Methodology is documented in full detail in a document entitled:

## "CIFG HOLDING STOCK OPTION PLAN AND CIFG HOLDING RESTRICTED STOCK PLAN - METHODOLOGY OF VALUATION PRIOR TO LISTING"

## VALUATION APPROACH

The following describes the valuation approach for determining Fair Market Value ("**FMV**"), which has at its foundation the Book Value of the Company, as determined under US Generally Accepted Accounting Principles ("**US GAAP**"), expressed in euros. The valuation procedure relies on two approaches: an Actuarial Valuation Approach, and a Surrogate Market Value Approach. These two methods are frequently seen in practice in the valuation of insurance and financial services enterprises.

The basis for the valuation will be the Actuarial Method ("**AM**") supplemented when appropriate by the Surrogate Market Value Approach ("**SMV**"). The Actuarial Method alone will be used for valuations which may be required under respectively the SO Plan and the RS Plan until the date where the Company's Net Insured Par Outstanding is at least $30 billion. When the Conditions for the Computation of SMV are met, a weighted average of the AM and the SMV will be used.

### A. Actuarial Method

The traditional approach to an actuarial valuation is to identify the individual components of value, in general comprised of three parts: the adjusted net worth, the value of in-force business, and the value of new business. As used in the valuation methodology, these concepts are discussed more fully below:

- Adjusted net worth (ANW) is the Book Value of the CIFG Holding Consolidated Group (US GAAP basis).

- Value of Business In-force (VBI) is the discounted present value of future after-tax earnings on the existing in-force portfolio as of the valuation date, less the cost of capital.

- The value of new business (Franchise Value) is the value of future earnings expected to be derived from business that will be produced subsequent to the valuation date, and which is attributable to the Company's presence in the marketplace.

The sum of the Adjusted Net Worth and the Value of Business In-force is called the "Embedded Value".

### 1) Method of Calculation of Value of Business In-force (VBI)

To compute the Value of Business In-force (VBI), the existing book of business is simulated to be in 'run-off' (i.e. no new business is undertaken) in order to compute the annual after tax income to be derived from the book. For each year, the underwriting results are estimated, which are comprised of earned premium, losses, expenses, and income taxes. In addition, the after-tax GAAP earnings include the investment income earned on the invested assets supporting the book of business (i.e. reserves and capital), net of taxes payable.

Briefly, the value of business in-force is determined by projecting the future earnings to be produced from the existing insured portfolio, as follows:

The present value of the US GAAP future earned premium on the "existing book"
*Plus*: the present value of investment income on the "invested assets for the book"
*Minus*: the present value of loss reserves posted as the premium is earned
*Plus*: the present value of loss reserves released at policy expiration
*Minus*: the present value of the expected loss on the book posted at policy expiration
*Minus*: the present value of run-off and related overhead expenses on the "existing book"
*Minus*: the present value of taxes paid on underwriting and investment income
*Minus*: the present value of the "cost of capital"

Below is a list of the assumptions (and the related rationales) used in the runoff analysis which forms the basis of the calculation of VBI for a given valuation date:

      A. <u>Actuarial Assumptions</u>:

          i. Losses
          ii. Expenses
          iii. Prepayment assumptions

      B. <u>Economic Assumptions</u>

          i. Exchange rates
          ii. Interest rates

      C. <u>Investor Preference Assumptions</u>

          i. Discount Rate

      D. <u>Taxation Assumptions</u>

      E. <u>Capital Usage Assumptions</u>

          The capital allocation method closely matches the actual S&P capital adequacy model, where the capital usage pattern varies by the expected maturity of the transaction. This method is described more fully in the detailed valuation document referred to above.

2) <u>Method of Calculating Franchise Value</u>

Established firms tend to have market prices above their book value. For insurers, some of this additional value is explained by the value of business in force (VBI). For certain types of insurers there may be additional value from future renewals, but this is not common for financial

3

guarantors. The sum of these quantities is the Embedded Value. Typically, the market price of an established financial guarantor is more than this amount. The additional value represents the market's estimate of the value of several intangibles such as being an established business, the firm's presence in the market, the quality of management, industry know-how, etc.

This additional value can be expressed as the present value of the excess returns that the enterprise is expected to earn in the future. The market will not pay any premium for future normal returns, only the excess portion is rewarded with a premium.

To evaluate the franchise value, the assumption is made that this **"excess amount"** will be produced each year for the next five years. It is further assumed that the excess amount will grow each year at the average rate of growth in embedded value over the previous three years (adjusted for capital contributions and dividends) (the **"growth rate"**). The present value of this stream of excess amounts, discounted at 20%, is the estimate of the franchise value.

While the concept of Franchise Value can be deemed to be important element of the valuation process, for purposes of calculating Fair Market Value for respectively Options or Shares granted under respectively the SO Plan and the RS Plan within the first twelve (12) months from the inception of respectively the SO Plan and the RS Plan, Franchise Value is deemed to be zero.

Additionally, for valuations required to determine Fair Market Value respectively (i) at the date of exercise of the Options and the redemption of the underlying Shares according to the SO Plan and (ii) at the date of the redemption of the Shares pursuant to the RS Plan, the Franchise Value will be deemed to be equal to zero. Options and Shares shall have the meaning ascribed to them in the SO Plan and in the RS Plan.

3) Financial Data for Reference

The valuation of the Company according to the Actuarial Method described above is based upon the Consolidated Financial Statements of CIFG Holding approved by the Executive Board.

**B. Surrogate Market Value Approach**

Over time, the Company further develops its value. Progressively, its value derivation can be seen to evolve from an Actuarial Valuation Approach to a Surrogate Market Value ("**SMV**") approach, whereby the Company's value can be derived from the observable market values of publicly traded, triple-A rated financial guaranty insurance companies (the "**Public Monolines**").

The SMV is computed from data that is only available quarterly, so the SMV will change at the end of each quarter (a "**Quarterly Valuation Date**"). SMV is calculated as described in the detailed valuation methodology.

If the Conditions for the Computation of SMV are met, the FMV is a weighted average of the AM and the minimum of the SMV and 140% of AM, the weights being a linear function of US $ Par Outstanding so that:

a) Below $30 billion of Par Outstanding the weight on AM remains at 1.00
b) Above $100 billion of Par Outstanding the weight on AM remains at 0.65
c) Between $30 billion and $100 billion of Par Outstanding, the weight on AM will vary on a linear basis between 1.00 and 0.65 as a function of the Par Outstanding.

If the Conditions for the Computation of SMV are not met, the FMV is equal to the AM.

\* \* \*

5

## ANNEX B - ARTICLE 6.2 OF THE BY-LAWS

### 6.2 –Preferred Shares

« P » category shares are governed by the scheme which applies to the preferred shares created under order n°2004-604 of June 24, 2004 such as codified in Articles L.228-11 and the followings of the Commercial Code.

### 6.2.1 –Voting right

The shareholders who own « P » category shares are deprived of voting rights.

In accordance with Article L. 228-11 of the Commercial Code, « P » category shares cannot represent over one half (1/2) of the share capital (and in the event of the admission of the Company's shares on a regulated market, over one quarter (1/4) of the share capital).

Shareholders who own « P » category shares are entitled to communication of the company documents on the same conditions as the shareholders who own « O » category shares.

### 6.2.2. – Entitlement to dividends

The shareholders who own "P" category shares have the same pecuniary rights as the shareholders who own "O" category shares; in particular they are entitled (i) to all the sums or assets which the Shareholders Meeting decides to distribute, and in particular the dividends, reserves and share premium and (ii) in the event of the company's liquidation, to the reimbursement of the nominal value of their "P" category shares and to the liquidating dividends.

The shareholders who own « P » category shares are liable for the company's liabilities within the limit of the nominal value of the shares they own.

### 6.2.3 –Special Meeting of the Shareholders

The shareholders who own « P » category shares convene in a special meeting to vote on the quorum and majority conditions stipulated by law.

Any change in the rights attached to the « P » category shares is final only if approved by the Special Shareholders Meeting. It is specified, for all useful purposes, that the approval of the Special Meeting is not required in the case of the conversion into "O" category shares or the redemption of the "P" category shares in accordance with 6.2.5. (i) and (ii) of this Article 6 of the By-laws.

The shareholders who own « P » category shares, convened in a Special Meeting, are entitled to appoint one of the Company's Statutory Auditors to draft a special report on the Company's respect of the particular rights attached to the "P" category shares. This report is circulated to the shareholders who own "P » category shares, during a Special Meeting.

In the event of a merger or split off, the « P » category shares may be exchanged against shares in companies benefiting from the transfer of assets comprising equivalent particular rights, or according to a specific par rate of exchange which takes account of the particular rights relinquished. In the absence of a swap against shares conferring equivalent particular rights, the merger or split off is subject to the approval of the Special Meeting.

### 6.2.4 - Conversion

« P » category shares will be converted forthwith into ordinary « O » shares as soon as the Company's shares are admitted for trading on a regulated market, with effect on the date of the listing of the shares. Consequently, on the same date they will lose their characteristics as « P » category shares.

A « P » category share carries entitlement to one (1) « O » category share.

The conversion of the « P » category shares into « O » category shares will be established by the Executive Board as soon as possible, without the necessity of convening an ordinary or special shareholders meeting. The Executive Board amends the By-laws accordingly, in accordance with Article L.228-12 of the Commercial Code.

### 6.2.5 – Redemption of the shares

#### (i) The Company's redemption right

At any time prior to the admission of the Company's shares for trading on a regulated market, the Company is entitled to (i) redeem all « P » category shares or (ii) to be replaced by one or several of its shareholders or one or several third parties to redeem them.

In the event that the Company (or a person replacing it) exercises this redemption right, the shareholder who owns « P » category shares accepts to sell his shares.

The redemption must be notified by registered mail with return receipt to the owner of the "P" category shares, at the address appearing in the Company's registers, and specify (i) the number of "P" category shares to be redeemed and (ii) the price at which they are being redeemed.

The price for redeeming the "P" category shares to be paid to the shareholder must correspond to the value determined on the basis of the evaluation methods and procedures applied quarterly by the Executive Board, which may be modified, as the case may be, by the Executive Board with the approval of the Shareholders Meeting.

In the event of a merger, a sale of assets, a change of control or an operation resulting in the acquisition by one or several third parties of ten (10) percent of the Company's "O" category shares, the price of the shares in said operation must be considered as a reliable indicator of the value of the shares and must be utilized to determine the redemption price of the "P" category shares for a period of three (3) months beginning on the effective date of the operation.

The redemption price is calculated on the basis of the company's entirely diluted capital.

The amount corresponding to the redemption price must be paid, as rapidly as possible in cash, by check or bank transfer.

### (ii) « P » category shareholder's redemption right

A "P" category shareholder may demand, for a period of thirty (30) days beginning on the date of each presentation to the Company's Supervisory Board by the Executive Board of the quarterly reports concerning the determination of the value of the « P » category shares of the Company (or of one or several of its shareholders or of any third party replacing the Company), redemption of all or a portion of its « P » category shares.

The redemption request must be notified by registered mail with return receipt to the address of its registered offices and specify the number of "P" category shares which the owner would like to have redeemed from it.

The redemption price is determined in accordance with the provisions of 6.2.5 (i) of this Article 6.

The amount corresponding to the redemption price must be paid, as rapidly as possible in cash, by check or by bank transfer.

* * *