EXHIBIT D

Draft as of July 13, 2007

**CIFG SERVICES, INC.**
**CIFG EUROPE**

**MASTER PERFORMANCE UNIT PLAN**

**(Effective as of January 1, 2005)**

1.      **Purposes.**   The purposes of this Master Performance Unit Plan are to assist CIFG Services, Inc., a Delaware corporation (and its successor) and CIFG Europe, a French company (and its successor) in attracting, retaining, and motivating their respective employees in France, the United States and the United Kingdom whose performance can impact the long term success of CIFG Services, Inc., CIFG Europe and the CIFG Group (defined below) by providing competitive compensation opportunities that reward outstanding performance.   This Plan provides for the payment of cash bonuses based on an indexed performance valuation (and does not represent an interest(s) in the equity or assets of CIFG Services, Inc., CIFG Europe or any affiliates in the CIFG Group).

2.      **Definitions.**   The following terms used in the Plan shall have the meanings set forth below:

(a)      "Annex" means each annex to the Plan that is established by the applicable Board and that sets forth the Valuation Formula for each annual series of Units granted to three separate groups of Participants receiving Units (which groups are based on the currencies of the Participants' respective jurisdictions, France, the United States, or the United Kingdom).

(b)      "Board" means the Board of Directors of each Company, as applicable.

(c)      "Company" or "Companies" mean CIFG Services, Inc. and/or CIFG Europe, as applicable.

(d)      "Cause" means (1) as to Participants whose employment relationship is governed under French law, the definition of "*faute grave*" of "*faute lourde*" prescribed by the French Labor Code and case law thereunder; and (2) as to all others: (i) a Participant's willful failure to perform his or her duties (excluding any action taken and any decision not to act if such action is taken or such decision is made in the good faith belief that it is in the furtherance of the business of the Company); (ii) gross negligence or gross malfeasance in the performance of the Participant's duties; or (iii) a final finding by a court or other judicial body of competent jurisdiction that a Participant is guilty of a felony under the laws of the United States or any state thereof, if, as a result of such finding the Board determines that the continued employment of the Participant by the Company or any subsidiary or affiliated company would be contrary to the best interests of the Company.

(e)      "CIFG Group" means CIFG Services, Inc., CIFG Europe and CIFG Holding, a French company, and their respective majority owned subsidiaries, if any.

(f)     "Continuous Status as a Participant" means that there shall have been no termination of the employment relationship between a Participant and the Company employing the Participant.  As used herein, the term "termination" shall not include: (1) any transfer between the Company and an affiliated company; (2) any permitted leave of absence (as defined below); (3) retirement (as defined below); or (4) the applicable Board in its absolute discretion so deciding.  "Permitted leave of absence" shall include medical leave, military leave, or other authorized personal leave.

"Retirement" (except with respect to a Participant subject to UK age discrimination laws and regulations) means, as applicable and as approved by the applicable Board: (i) for Participants to whom the French Labor Code is not applicable, a Participant who (a) is at least 55 years of age at the time that he or she voluntarily ceases to be an employee of the Company and subject to any service requirement that is approved by the Board in its sole discretion and set forth in any award agreement, and (b) does not engage in any paid consulting or employment activity (including without limitation any Prohibited Actions) unless he or she has give prior written notice of such activity to the Company employing the Participant and the applicable Board has not disapproved of his or her engaging in such activity in writing within four (4) full calendar weeks of receipt of such notice and certifies, no later than January 31 of each year thereafter, that he or she is not engaging and did not engage in any such activity during the current and preceding calendar years; and (ii) for Participants to whom the French Labor Code is applicable, retirement in accordance with, and as authorized by, the French Labor Code and subject to any service requirement that is approved by the Board in its sole discretion and set forth in any award agreement.  With respect to any employee subject to specific provisions of applicable law governing retirement, the foregoing clauses are modified to the extent necessary to conform to such specific provisions.

(g)     "Disability" means: (1) with respect to a Participant to whom the French Labor Code is applicable, a disability of the second or third level as defined by the French Social Security Code; (2) with respect to a Participant who is subject to tax under the laws of the United States, any medically determinable physical or mental impairment that can be expected to result in death or expected to last for a continuous period of at least twelve (12) months pursuant to which the Participant is either unable to engage in any substantial gainful activity or is receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of the Company, as determined by the applicable Board, and the Board is permitted to rely upon: (x) a determination that a Participant is "totally disabled" by the US Social Security Administration; or (y) a determination of disability under a disability insurance program that complies with the definition of Disability set forth above; and (3) as to all others, either a disability for which the Participant is receiving or could receive benefits under the Company's long-term disability plan applicable to such Participant, as in effect at the commencement of such disability, or an injury or illness that prevents a Participant from the performance of the duties of his or her position, as determined by the applicable Board.

(h)     "Effective Date" means, in respect of a given annual series of Units granted pursuant to the Plan, the effective date set forth in the related Annex to the Plan.

(i)     "Net Income Before Taxes" means, for each fiscal year, or other period determined by the Board, the net consolidated earnings or losses of the CIFG Group before

income taxes, as determined in the sole discretion of the Board, whose determination shall be conclusive and binding on all interested parties, including Participants.

(j)    "Participant" means an eligible employee of a Company who has been designated by that Company's respective Board to receive Units for a specified Performance Period.

(k)    "Performance Period" means in respect of a given annual series of Units granted pursuant to the Plan, and unless otherwise determined by the Board at or after the Effective Date, the period of three consecutive years during which the value of a Unit shall be measured as set forth in the related Annex. Notwithstanding the foregoing, a period of time shorter than the Performance Period may be used for such measurement in certain cases as determined by the Board.

(l)    "Plan" means this Master Performance Unit Plan.

(m)    "Prohibited Actions" means that without the prior written consent of the Company, a Participant will not:

        (i)    directly or indirectly engage in, own, manage, operate, control or otherwise participate in any entity in the financial guaranty insurance business or otherwise deemed by the Board to be a competitor of the CIFG Group, whether as principal, agent, employee, employer, consultant, advisor, independent contractor, stockholder, director, officer, partner, joint venturer or in any other individual or representative capacity during the Performance Period, provided, however, that the mere ownership by a Participant of not more than one percent (1%) of the equity securities of any such competitor shall not be deemed to be a Prohibited Action so long as a Participant does not actively participate in the business or management of such entity in any manner whatsoever;

        (ii)    employ, solicit for employment, or advise or recommend that any third party employ or solicit for employment any person who is or was an employee of the CIFG Group during the Performance Period;

        (iii)    directly or indirectly solicit the clients of the CIFG Group in an attempt to provide goods or services of the type that it provides, or in an attempt to persuade such clients to cease to do business with the CIFG Group; or

        (iv)    disclose, furnish or make accessible to any person or entity, or use other than for the benefit of the CIFG Group, any confidential or proprietary information obtained or developed while in the employ of the Company. As used herein, confidential or proprietary information shall not apply to information that becomes generally known or available to the public other than as a result of disclosure

or other breach of the terms hereof by a Participant, or any disclosure of confidential information by a Participant that is expressly required by judicial or administrative order, provided that the Participant shall have notified the Company as promptly as practicable of the existence, terms and circumstances of any order, subpoena or other process issued by a court or administrative authority that may require to the disclosure of any such confidential information, and shall have cooperated with the Company, if applicable, in taking legally available steps to resist or narrow such requirement and to obtain a protective order or other reliable assurance that confidential treatment be given to the information to be disclosed.

(n)    "Unit" means: (i) the nominal grant of one US dollar ($1.00) with respect to Participants who are employed by CIFG Services, Inc. and located in the United States; (ii) a net value of one Euro (EU €1.00), after deductions of the employer and management expenses (if any), which are the responsibility of CIFG Europe as employer, with respect to Participants who are employed by CIFG Europe subject to French law; or (iii) the nominal grant of one Pound (£1.00) with respect to Participants who are employed by CIFG Europe and located in the United Kingdom. Each Unit granted to a Participant is subject to the terms and conditions of the Plan, to be monetized and paid to such Participant in an amount derived from the Valuation Formula. As used herein, a Unit is a specific accounting device for use in connection with the Plan. A Unit does not represent a right of ownership in the equity or the assets of the Companies or the CIFG Group, is not transferable and has no value outside the context of the Plan.

(o)    "Valuation Formula" means, for each annual series of Units granted pursuant to this Plan, the method of determining the value of a Unit, as set forth in the related Annex, attached hereto and incorporated herein by this reference. A separate and distinct Valuation Formula shall be set forth for each annual series of Units granted pursuant to this Plan in the related Annex.

3.    **Administration.**

(a)    Board Authority. The Board shall administer the Plan in accordance with its terms, and shall have full power and authority to construe and interpret the Plan, to prescribe, amend and rescind the terms and conditions hereof, and to make all other determinations necessary or advisable for the administration of the Plan.[1] The actions of the Board with respect to the Plan shall be conclusive and binding upon all persons having an interest in the Plan.

(b)    Delegation. Each Board may delegate any of its rights, duties, and functions in respect of the Plan to a designated officer of one of the Companies or an officer of any member of the CIFG Group, in which case references to the Board shall be deemed to include such delegate or delegates. The foregoing notwithstanding, only the Board [of CIFG Services, Inc.][2]

---

[1] The proviso has been deleted, which was a provision of the original PUP plan. As the language is duplicative with Section 6(h) (and is less flexible than Section 6(h)), we recommend deleting the provision.

[2] Should authority for grants to officers, and to establish Net Income, be the responsibility of the board of CIFG Services, Inc. or of both boards?

shall have the authority to (1) authorize the participation in the Plan by officers of the Company and actions taken in respect of Units held by officers of the Company, or (2) make determinations relating to the calculation of Net Income Before Taxes.

(c)     Interpretation. The Plan, all Annexes and any award agreements hereunder shall constitute the governing documents of the Plan. In the event of any conflict between an Annex and the Plan or any award agreements hereunder, the terms of the Annex shall govern and, in the event of any conflict between the Plan and any award agreements hereunder, the terms of the Plan shall govern.

(d)     Limitation of Liability. In their exercise of authority under the Plan, the members of the Board, and any person acting as a delegate of the Board, shall be entitled in good faith, to rely and act upon any report or other information furnished to him or her by any officer or other employee of the Company or affiliated company, or the Company's independent certified public accountants or any executive compensation consultant, legal counsel, or other professional retained by the Company to assist in the administration of the Plan. Neither a member of the Board nor any person acting as a delegate of the Board shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the Plan, and each such person shall, to the extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination, or interpretation.

4.     **Eligibility.** Units may be granted only to employees of the Companies, as designated and approved by the applicable Board.

5.     **Grants and Settlement of Units.**

(a)     Grant of Units. Subject to the terms and conditions of the Plan, the Board may select eligible employees to whom Units shall be granted, specify the number of Units to be granted to each such eligible employee, and specify the Performance Period to which such Units relate. Such grants shall be made not later than 120 days after the beginning of a specified Performance Period.[3] The Board shall determine in its sole discretion whether a given employee who meets the eligibility requirements of Section 4 for any Performance Period will receive a grant of Units, and if so, the number of Units that may be granted to any such eligible employee for any Performance Period. The Board may consider an employee's past performance, current or future responsibility level, individual ability to impact the future success of the Company and the CIFG Group, or other factors and circumstances deemed relevant to such determinations. Such grants and the factors and circumstances considered by the Board in making such determinations need not be uniform or consistent for all employees or any identifiable group of employees within a given Performance Period or otherwise.

(b)     Determination of Unit Value. The value of a Unit will be determined as of each anniversary of the first day of the Performance Period to which it pertains. The value of a Unit as of each such anniversary shall be determined in accordance with the Valuation Formula set out in the related Annex. Unless circumstances require otherwise, annual determinations of Unit

---

[3] We will look at this further.

value shall be made within 45 days after the completion of the annual audit by the Company's independent certified public accountants.

Notwithstanding the foregoing, the Board may adjust the value of Units at any time as a result of events having a material effect on the financial results of the Company or any member of the CIFG Group during the Performance Period that are not directly related to its business activity or performance. Such events may include, without limitation, a change in law or accounting standards. It is expected that such events will, by their nature, be rare and that any such adjustment will only be made after careful consideration of the fairness of such adjustment to the Company and the Participants in view of the objectives of the Plan.

(c)    Vesting of Units; Forfeiture of Unvested Units. The Board shall determine in its sole discretion the vesting schedule (which vesting may include fractional Units) that applies to the grant of Units in respect of a Performance Period. The vesting schedule generally will be set forth in [an agreement evidencing the terms of the Units granted to a Participant].[4]  In the event of a Participant's retirement as set forth in the definition of Continuous Status as a Participant, such Participant's unvested Units shall continue to vest at the vesting rate that would apply if the Participant had remained employed through the date of disbursement, provided that the Participant does not engage in any Prohibited Actions, in which event all Units that have not vested as of the first date of any Prohibited Actions immediately shall be forfeited. Units granted to a Participant that have not vested in accordance with this Section 5(c) at the time of any termination of Continuous Status as a Participant shall be forfeited as of the date of such termination. Notwithstanding the foregoing, in the event of termination of Continuous Status of a Participant due to the Participant's death or Disability, all of the Participant's Units granted for a Performance Period and then outstanding shall fully vest as of such date.

(d)    Disbursement.

(1)    Disbursement.   Except as otherwise set forth below, the value of a Participant's vested Units shall be determined in accordance with Section 5(b) and disbursed as soon as reasonably practicable following the end of the Performance Period and the final vesting date to which such Units relate, but no later than the end of the calendar year in which all of the Units in respect of a Performance Period vest.

(2)    Voluntary or Involuntary Termination Excluding Cause. In the event of voluntary or involuntary termination of Continuous Status as a Participant prior to the end of a Performance Period (excluding termination for Cause), the value of such Participant's vested Units will be determined [as of the last day of the fiscal year immediately preceding the date of termination,][5] and paid to such Participant following the third anniversary of the Effective Date

___

[4] The vesting schedule has not in the past been set forth in an Annex, which represents the valuation formula. Rather vesting is set forth in the PUP agreement, with 1/3 vesting on each anniversary of the grant date (March 15th), along with the termination provisions. We could put it in the Annex, but I think the award agreement is more likely to be read by the participants.
[5] To be discussed. We understand that this is a design decision that was previously made; the reasoning is that by using the fiscal year closest to the termination date, there would be the avoidance of any possible windfall if performance improves following termination.

to which such Units relate, but no later than the end of the calendar year in which the third anniversary occurs.

(3)  Termination for Cause.  In the event of termination of Continuous Status as a Participant for Cause prior to the end of a Performance Period, (a) for a Participant who is employed by the Company and located in the United States, such value will be equal to the lower of (1) the value of such vested Units, determined as of the last day of the Performance Period, and (2) the value of such vested Units, determined as of the last day of the fiscal year immediately preceding such date of termination and (b) for a Participant who is employed by the Company and located in either France or the United Kingdom, such value will be equal to the value of such Participant's vested Units, determined as of the last day of the fiscal year immediately preceding such date of termination (or, if lower and subject to applicable law governing termination, the value of such vested Units will be determined as of the last day of the Performance Period). Such value will be paid to such Participant following the third anniversary of the Effective Date to which such Units relate, but no later than the end of the calendar year in which the third anniversary occurs.

(4)  Death.  In the event of termination of Continuous Status as a Participant as a result of the Participant's death prior to the end of a Performance Period, the value of such Participant's fully vested Units will be determined as of the last day of the fiscal year immediately preceding the date of death and paid to the Participant's estate in the calendar year of the Participant's death or, if later, within ninety (90) days of the Participant's death.

(5)  Disability.  In the event of termination of Continuous Status as a Participant as a result of the Participant's Disability prior to the end of a Performance Period, the value of such Participant's fully vested Units will be determined as of the last day of the fiscal year immediately preceding the date of Disability and paid to the Participant in the calendar year of the Participant's Disability or, if later, within ninety (90) days of the Participant's Disability.

## 6.  General Provisions.

(a)  No Rights to Participate or Receive Grants or Payouts; No Rights as Stockholder. Until the Board has determined to grant Units to a Participant, no employee shall have any right or entitlement to participate in this Plan or receive a grant of Units hereunder, and the granting of Units hereunder shall not be construed as a commitment that any payment will be made with respect to such Units except in accordance with the terms of the Plan. No Participant shall have any rights of a stockholder of the Company or any affiliates of the CIFG Group as a result of the grant of Units under the Plan.

(b)  No Rights to Employment.  Nothing contained in the Plan or in any documents related to the Plan and no grant of Units shall (1) confer upon any employee or Participant any right to continue as a Participant or in the employ of the Company or any subsidiary of the Company, (2) constitute any contract or agreement of employment, or (3) interfere in any way with the right of the Company or any subsidiary of the Company to reduce such person's compensation, to change the position held by such person or to terminate the employment of such employee or Participant, with or without Cause.

(c)    Code Section 409A.  The Plan and any agreement hereunder is intended to comply with Section 409A of the United States Internal Revenue Code of 1986, as amended (the "Code"), and shall be administered, operated and interpreted accordingly.  The Company reserves the right to unilaterally amend the Plan and any agreement hereunder in its sole discretion to comply with Section 409A of the Code and any guidance issued thereunder. Notwithstanding the foregoing, the Company does not guarantee the tax treatment of any benefits or payments under the Plan, including without limitation pursuant to the Code or any applicable federal, state, local or foreign tax law.

(d)    Non-Transferability.  Units and other rights under the Plan shall not be transferable by a Participant except upon a Participant's death by will or the laws of descent and distribution, and shall not otherwise be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any such attempted action shall be void.

(e)    Unfunded Plan.  The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation.  With respect to any amount payable to a Participant under the Plan, nothing contained in the Plan (or in any agreement or other documents related thereto), nor the creation or adoption of the Plan, the grant of any Unit, or the taking of any other action pursuant to the provisions of the Plan shall give any such Participant any rights that are greater than those of a general creditor of the Company; provided, however, that the Board may authorize the creation of trusts or make other arrangements to meet the Company's obligations under the Plan, which trusts or other arrangements shall be consistent with the "unfunded" status of the Plan unless the Board determines otherwise.

(f)    Tax Matters.  The Company and any subsidiary of the Company shall withhold taxes with respect to Units whether as wages or otherwise pursuant to any applicable federal, state, local or foreign law, rules or regulations.  The Company and any subsidiary of the Company also shall have the right to deduct from any disbursement payable hereunder an amount equal to federal, state, local, or foreign taxes required to be withheld with respect to such disbursement.

(g)    Governing Law.  Except as set forth herein, i.e., reference to French Labor Code and UK laws and regulations, the Plan, any Annex and all related documents shall be governed by, and construed in accordance with, the laws of the State of New York.  If any provision hereof shall be held by a court of competent jurisdiction to be invalid and unenforceable, the remaining provisions of the Plan and any Annex shall continue to be fully effective.

(h)    Amendment and Termination.  The Board may, at any time terminate or, from time to time, amend, modify, or suspend the Plan, any Annex and any agreements under the Plan, provided that no such action shall materially and adversely affect the rights of a Participant with respect to previously granted Units without the consent of such affected Participant, and provided further that any such action shall comply with Section 409A of the Code with respect to Participants who are US taxpayers, including, without limitation, compliance with all restrictions on plan termination set forth in US Treas. Reg. Section 1.409A-3(j)(4)(ix)(C).  Unless earlier terminated hereunder, the Plan will terminate at such time that the Companies have no further rights or obligations under the Plan.

(i)     Arbitration Clause. In the event of any claim or dispute arising out of or relating to this Plan, or the breach thereof, and unless the parties shall have resolved such claim or dispute within 90 days after written notice from one party to the other setting forth the nature of such claim or dispute, then such claim or dispute shall be submitted to a mediator jointly selected by the parties for nonbinding, confidential mediation. If such mediation does not result in resolution of such claim or dispute the parties will submit to binding arbitration in New York, New York, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Judgment upon the award rendered by such arbitrator(s) shall be entered in any court having jurisdiction thereof upon the application of either party.

At the end of the Second Year, the Second Year Floor will be reset to the largest of (A), (B), and (C), where:

If the Second Year IBT is greater than the Second Year Target, then (A) is the sum of 0.333333 and the First Year Floor, otherwise (A) is zero.

If the Second Year IBT is greater than the Second Year Target, then (B) is the sum of the Second Year IBT divided by the Performance Period Target and the First Year Floor, otherwise (B) is zero.

If the Two-year Total is greater than the sum of the First Year Target and the Second Year Target, then (C) is the Two-year Total divided by the Performance Period Target, otherwise (C) is zero.

The Payout Amount is the smaller of the Cap and (D), where (D) is the greater of the Three-Year Total divided by the Performance Period Target times the Interest Factor and the Actual Floor.

FORM OF ANNEX[6]
(CALENDAR YEAR _____ UNITS)

[This form of Annex may be modified by the Board in its discretion from time to time][7]

THE EFFECTIVE DATE IS _____ FOR THE PERFORMANCE PERIOD
COMMENCING JANUARY 1, _____ AND ENDING DECEMBER 31, _____

Definitions:

The "First Year" is _____.
The "Second Year" is ____.
The "Third Year" is ____.
The "First Year Target" is Euro _____.
The "Second Year Target" is Euro _____.
The "Third Year Target" is Euro _____.
The "Interest Factor" is _____.
The "Cap" is _____.
The "First Year IBT" is the First Year fiscal year Income Before Taxes expressed in Euro.
The "Second Year IBT" is the Second Year fiscal year Income Before Taxes expressed in Euro.
The "Third Year IBT" is the Third Year fiscal year Income Before Taxes expressed in Euro.
The "Two-year Total" is the sum of the First Year IBT and the Second Year IBT.
The "Three-year Total" is the sum of the Two-year Total and the Third Year IBT.
The "Performance Period Target" is the sum of the First Year Target, the Second Year Target, and the Third Year Target.
The "First Year Floor" is initially zero and may be reset as described below.
The "Second Year Floor" is initially zero and may be reset as described below.
The "Actual Floor" at any point in time is the larger of the First Year Floor and the Second Year Floor, however if the Floor so computed is larger than the Cap, the Floor will equal the Cap.

If at the end of the First Year, the First Year IBT is greater than the First Year Target, then the First Year Floor will be reset to the larger of 0.333333 and the First Year IBT divided by the Performance Period Target.

---

[6] This Form of Annex should be reviewed by finance to make sure that it accurately represents the generic formula that will be applied.

[7] In the future, the Board might want the flexibility to approve a different valuation formula for new grants.