EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KATHLEEN G. CULLY,

               Plaintiff,

      - against -

CIFG HOLDING, CIFG
GUARANTY, CIFG EUROPE,
CIFG SERVICES, INC., CIFG
ASSURANCE NORTH AMERICA,
INC., and JACQUES ROLFO

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**JUDGE CASTEL**

07 **07 CIV 8195**

COMPLAINT

ECF CASE

PLAINTIFF DEMANDS
A TRIAL BY JURY

RECEIVED

SEP 19 2007

U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Kathleen G. Cully ("plaintiff" or "Cully"), through her attorneys,

Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendants CIFG Holding, CIFG

Guaranty, CIFG Europe, CIFG Services, Inc., CIFG Assurance North America, Inc. (collectively

"CIFG" or the "CIFG Group"), and Jacques Rolfo ("Rolfo") (collectively "defendants") as

follows:

## NATURE OF THE ACTION

    1.    Cully, an accomplished and experienced attorney who was formerly

CIFG's General Counsel, found that CIFG had a "glass ceiling" that limited the advancement of

women, and interfered with her ability to do her job. Because Rolfo was uncomfortable with a

woman in the position of General Counsel, among other things he concealed information

affecting CIFG's legal affairs, putting Cully in an untenable position because of her ethical and

legal obligations to CIFG as its General Counsel, to CIFG's counterparties who relied on her

opinions, and to CIFG's independent accountants, who relied upon her certifications. After Cully

complained about gender discrimination, Rolfo made it even more difficult for Cully to perform her duties, forcing her to announce her retirement. Despite the manner in which CIFG treated Cully, she made every effort to ensure a smooth transition. However, CIFG frustrated her efforts by reneging on its agreements concerning the transition. CIFG also attempted to make improper changes to plans governing Long-Term Incentive compensation ("LTI") that had previously been awarded or promised to Cully. Many of the purported changes appear designed specifically to deny Cully the benefit of her LTI, and one change improperly denied Cully as well as many other employees the benefits resulting from a change in control of CIFG.

2.    As a result of defendants' actions, plaintiff brings this action against defendants to remedy discrimination on the basis of her sex in the terms, conditions, and privileges of employment, and to remedy retaliation for her opposition to unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., ("Title VII"); the New York State Human Rights Law, Executive Law § 296 et seq., ("Executive Law"); and the New York City Human Rights Law § 8-107 et seq. ("City Law"). In addition, plaintiff brings this action to remedy defendants' breach of contract and violation of the duty of good faith and fair dealing, or in the alternative, for promissory estoppel and unjust enrichment, and to remedy defendants' fraudulent inducement.

3.    Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Title VII, the Executive Law, the City Law, New York common law and French law.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and Title VII, 42 U.S.C. § 2000e-5(f)(3). The Court has jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367.

5.    Venue is proper in this District pursuant to Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful practices complained of herein occurred within, and defendants regularly do business within, the Southern District of New York.

6.    On or about June 14, 2006, plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC"). On or about May 22, 2007, the EEOC issued to plaintiff notice of her right to sue. The parties thereafter entered into an agreement tolling the filing deadline. Plaintiff has complied fully with the administrative prerequisites to the filing of this action.

7.    Pursuant to § 8-502(c) of the Administrative Code, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## PARTIES

8.    Cully was employed by CIFG from January 2003 until her employment ended on December 31, 2006, as a result of a constructive discharge. Cully was paid through CIFG Services, but worked for all of the CIFG entities through various service agreements between the companies.

9.    CIFG Holding, a French corporation, is the parent corporation of the other CIFG entities, and is an employer within the meaning of Title VII, the Executive Law, and the City Law.

10.    CIFG Services, Inc., is a Delaware corporation with its principal place of business in New York City, and is an employer within the meaning of Title VII, the Executive Law, and the City Law.

11.    CIFG Guaranty is a French reinsurer dedicated to the CIFG group, and an employer within the meaning of Title VII, the Executive Law, and the City Law.

12.    CIFG Europe is a French insurer and is an employer within the meaning of Title VII, the Executive Law, and the City Law.

13.    CIFG Assurance North America, Inc. ("CIFG NA"), is a New York financial guaranty insurance corporation and an employer within the meaning of Title VII, the Executive Law, and the City Law.

14.    Rolfo is the Chief Executive Officer ("CEO") of the CIFG Group, which is comprised of all of the CIFG entities, and is formally the CEO of CIFG NA, the President of CIFG Services, and the President of the Executive Board of CIFG Holding.  Rolfo is an employer within the meaning of the Executive Law and the City Law.  He is based in CIFG's New York City offices.

## FACTUAL ALLEGATIONS

### Facts Concerning Plaintiff's Employment

15.    Plaintiff has worked for more than twenty five years as an attorney involved in all types of transactions in the U.S. and international securities markets, including public and project finance, structured finance and credit default swaps, with a specialty in structured finance.  Before Cully began working at CIFG, she held the position of General Counsel for the only U.S.-based single-A rated bond insurer and had been Deputy General Counsel of one of the three largest rating agencies.

16.    Plaintiff began working for CIFG in January 2003, after being recruited by Michael Freed ("Freed"), who was then CIFG's General Counsel. Freed and Cully agreed that although Cully would formally report to Freed, in practice they would act as partners, with Freed having primary responsibility for corporate and licensing matters and Cully having primary responsibility for transactions and related regulatory matters. CIFG gave plaintiff the title of Managing Director and General Counsel of CIFG NA, and she performed the equivalent function for CIFG Europe.

17.    As set forth in more detail below, Cully discovered that there was a "glass ceiling" at CIFG. Women were permitted to hold the title of Managing Director and to advance to the level just below senior management, but they could not serve as department heads or members of senior management. Cully was briefly the exception to the rule, as described below. Since her removal as General Counsel and replacement by a man, senior management once more consists solely of men.

18.    Cully received an excellent performance appraisal for 2003, and a larger bonus than had been agreed to when she joined CIFG. Despite plaintiff's excellent performance, CIFG did not award her any LTI compensation in 2004 for her work in calendar year 2003. Upon information and belief, plaintiff was the only Managing Director at CIFG who was not awarded LTI compensation in 2004.

19.    On or about May 13, 2004, while Freed was on vacation, Rolfo called Cully into his office and berated her for almost an hour. Among other things, Rolfo referred to Freed and Cully as a "two-headed hydra," apparently because Freed often consulted Cully and worked in tandem with her on various projects. Rolfo complained that Cully and Freed had not made a better offer to a male candidate for an open position for a junior lawyer, and said that he

was uncomfortable that Freed and Cully had offered an administrative assistant position to a man, saying that a different position should be found for him. Throughout Cully's employment, all of the administrative assistants (other than a few temporary employee provided by agencies) at CIFG were women. The man was later offered a job as a junior analyst in another department. Rolfo also discussed his dissatisfaction with plaintiff's management decisions. Freed later told Cully that Rolfo had never raised these issues with him and had never spoken to him as he had spoken to Cully.

20.    In or about June 2004, Rolfo interviewed Robert Drillings ("Drillings") for a position within the Legal Department. At the time, there was an open position for a junior lawyer who would report to Freed and Cully. Drillings was too senior for the open position, and was unable to start until October 2004. Rolfo nonetheless decided to hire Drillings, although there were two more suitable candidates, one of whom Rolfo referred to only as "the (female) candidate." Rolfo also decided that Drillings would report only to Freed and not to Cully. As Cully remained General Counsel of CIFG NA, this created a situation in which she was responsible for Drillings' work as counsel for CIFG NA, but had no authority over him. Rolfo's "resolution" was to direct Freed to resolve any differences between Cully and Drillings.

21.    Drillings joined CIFG on October 1, 2004, as General Counsel of Public Finance for CIFG NA. Although Cully remained General Counsel of CIFG NA and retained responsibility for structured finance transactions, her public finance responsibilities were given to Drillings. The hiring of Drillings substantially reduced plaintiff's responsibilities.

22.    In December 2004, Freed resigned his position at CIFG to become CEO of a new financial guaranty insurer being formed. Freed provided only a few days' notice prior to his departure from CIFG. With no time to find a replacement, Rolfo offered the position of

General Counsel of CIFG to plaintiff, who was the only person familiar enough with, and qualified to handle, Freed's ongoing projects to be able to step in and take over his responsibilities without causing any disruption to the business. Cully was also the only qualified person for the General Counsel position because she was the only attorney at CIFG who could advise on financial guaranty law and manage structured and project finance transactions, as well as supervise public finance transactions. Evidencing his discomfort that promoting Cully was the only choice available to him, Rolfo, when offering Cully the promotion, suggested that perhaps she might prefer not to accept it and asked her to consider it overnight. Cully did accept the promotion, and became General Counsel for CIFG Holding, each of its subsidiaries, and all of its operations in North America and Europe. At that time she became the only female member of senior management and the only female department head (other than Human Resources, which is headed by a Vice President, two levels below a Managing Director, who was not a member of the Management Committee).

23.    Early in 2005, Rolfo asked Cully to suggest her own compensation level. Plaintiff's compensation was substantially less than that of the General Counsel of any other financial guaranty insurer, and she did not receive a raise in 2004. Prior to his departure, Freed had suggested to Rolfo that Cully receive an eight percent increase. In light of her promotion, plaintiff recommended to Rolfo that she receive an increase of approximately twenty two percent. However, Rolfo refused, saying that CIFG, which began operations in 2002, was still a "start-up" and could not afford to pay market rates. Rolfo limited Cully's raise to the one recommended by Freed, even though Cully had taken on Freed's former responsibilities while retaining her own. At that time, plaintiff reminded Rolfo that she had not received an LTI award in 2004. Rolfo agreed to provide her with an award in 2005 for calendar year 2004, but did not

make up for the lack of an award in 2004 for calendar year 2003. Plaintiff's total cash compensation for 2005 constituted only a 4.55 percent raise from her initial compensation, in spite of the substantial increase in her responsibilities.

24.    In or about May 2005, soon after a meeting with Drillings in which Drillings complained that he was not being treated as a member of senior management, Rolfo transferred a significant part of plaintiff's responsibilities to Drillings. For example, on or about May 1, 2005, Rolfo instructed Cully to arrange for Drillings to interview candidates for a structured finance attorney position. Drillings had no experience in structured finance and interviewing candidates was outside the scope of his responsibilities as counsel to the public finance business.

25.    On or about May 2, 2005, during a meeting, Rolfo berated plaintiff regarding several perceived flaws in her performance. None of the complaints he made were justified. One of the allegations made by Rolfo was that Cully had failed to include Drillings in the management of the Legal Department. However, prior to directing plaintiff to have Drillings interview candidates for the structured finance position, Rolfo had never expressed his desire for Drillings to have a management function. Indeed, this instruction contradicted Rolfo's objection to having to deal with a "two-headed hydra" when Freed was General Counsel.

26.    On or about May 2, 2005, Rolfo removed Cully from an important project affecting all of CIFG. Rolfo gave the project to Drillings and instructed him to keep it secret from plaintiff. Cully had substantially more experience in the issues involved in the project than Drillings. Rolfo's conduct seriously undermined Cully's position because, as General Counsel, she was responsible for all legal matters affecting the CIFG Group and was required to give opinions and sign certificates as to the Group's legal affairs.

27. In an exchange of e-mails that began on or about May 28, 2005, plaintiff complained to Rolfo that his actions constituted gender discrimination. Rolfo eventually reaffirmed that Cully was General Counsel and that Drillings would report to her.

28. After Cully complained to Rolfo about gender discrimination, he began to retaliate against her. For example, Rolfo made unfounded complaints about Cully and communicated with her as little as possible. Rolfo continued to treat Drillings as if he were also General Counsel, and also discussed transactions with a newly hired male attorney in the structured finance department instead of with Cully. Cully was forced to defend and explain her actions and judgments against Rolfo's unfounded complaints.

29. Cully concluded that Rolfo had made it impossible to do her job. He dealt with the junior male attorneys to her exclusion while holding plaintiff to an impracticable standard of performance. Most importantly, by excluding Cully from important legal matters, Rolfo was making it impossible for Cully to fulfill her professional responsibilities to CIFG as its General Counsel, effectively forcing her out of her job. Cully repeatedly tried to meet with Rolfo to address her concerns so that she could perform her job, but he refused to do so. Reluctantly, Cully concluded she had no alternative but to leave CIFG.

30. On or about October 3, 2005, Cully informed Rolfo by e-mail that she intended to retire at the end of the year. Rolfo agreed to meet with Cully three days later to discuss her retirement. At the meeting Rolfo approved Cully's retirement.

31. In or about November 2005, Cully spoke to Chuck Webster ("Webster"), the head of the Risk Department, who she learned had been told of her retirement before the official announcement. Cully told Webster that she was retiring because it was clear that Rolfo was uncomfortable with her as General Counsel, which made it untenable for her to remain at

CIFG. Webster offered to speak to Rolfo. After Webster did so, he told Cully that Rolfo would like her to stay at CIFG as General Counsel for Structured Finance, reporting to a new General Counsel. As that would constitute a major demotion from her current position, and even from her initial position, Cully rejected it. Webster then told Cully that Rolfo wanted to work out an arrangement to keep her at CIFG, and Cully agreed to try to do so.

32.    In her discussions with Rolfo, it became clear to Cully that Rolfo was not willing to compromise and that Cully had three choices: accept a substantial demotion and report to a new General Counsel, continue in the current, untenable manner, or retire. On or about December 29, 2005, Cully informed Rolfo that she would retire at the end of March 2006, having delayed her retirement date at his request. He responded by asking her to stay through December 2006 or March 2007, offering to hire another attorney to assist plaintiff with her heavy workload. Cully agreed.

33.    On or about January 12, 2006, Rolfo and Cully met again to discuss her future with CIFG. Rolfo proposed that Cully consider a full-time employment position after her retirement at the end of March 2006. He stated that her job responsibilities would not change and agreed not to exclude Cully from any legal matters, other than the project he gave to Drillings in early May 2005, and promised to apprise Cully of material developments with respect to that project. Rolfo also promised to hire two additional attorneys. Cully accepted this offer by e-mail. Less than half an hour later, Rolfo responded with a different description of his proposal, saying for the first time that the Legal Department would be divided into three sub-groups.

34.    Rolfo thereafter refused to discuss Cully's status or his proposal with Cully. Further discussions regarding Cully's new position were conducted through Pam Brown

("Brown"), head of Human Resources for CIFG. Brown, speaking for Rolfo, and Cully ultimately agreed that plaintiff would retain her position as General Counsel until the end of December 2006. During the remainder of her tenure with CIFG, Cully would focus on training her colleagues to assume her responsibilities. CIFG would institute a search for a new General Counsel during that time. Rolfo made a company-wide announcement of this agreement on February 15, 2006.

35.    In or about early March 2006, Rolfo informed plaintiff that she would receive a salary increase of less than one percent of her salary. This was contrary to Rolfo's earlier promise that Cully would receive a raise for 2006 on the same basis as the rest of the company, which was four percent. After Cully protested, Rolfo told her that he would not change her salary, but promised that her bonus and LTI compensation for calendar year 2006 would be at a higher rate if she remained for all of 2006. Cully relied upon the LTI awarded in 2006 for calendar year 2005 and the promised LTI compensation for calendar year 2006, to be awarded in 2007, as material inducements for her to stay to the end of December 2006, despite her low raise. Even with this adjustment, Cully's total compensation would increase only about 6.7 percent over two years, which was less than any male member of the Legal Department.

36.    In contrast, Drillings received an increase of about 35 percent, a far more generous increase than Cully had cumulatively received over the four years she had been with CIFG, including her promotion to General Counsel. Drillings had been with CIFG for only a year and a half and had not been promoted. The reason given to Cully was that Drillings' compensation had to be brought up to the "market." As stated above, Rolfo had previously told Cully that CIFG could not pay market rates.

37.    Although Cully performed her job very well, Rolfo continued to ignore her except to criticize her. He began increasingly to manage the Legal Department by himself, leaving Cully once again concerned about whether she could carry out her duties as General Counsel.

38.    Plaintiff retained counsel who sent Rolfo a letter on April 5, 2006, advising him of Cully's claims of gender discrimination, retaliation and breach of contract.

39.    Only one month later, CIFG's outside counsel informed Cully's counsel that the Legal Department would be restructured at the end of May 2006, and that a new General Counsel for Structured Finance and Capital Markets, Michael Knopf ("Knopf"), had been hired from MBIA, another financial guaranty company, while plaintiff would become General Counsel "Emerita." Knopf is less experienced and qualified than Cully.

40.    However, a few days later, on May 8, 2006, Rolfo and Brown told plaintiff that a press release would be published the following day to announce the restructuring of the Legal Department, which was now scheduled to occur on May 10, 2006. Under the new structure, Drillings would become General Counsel for Public Finance, Project Finance and Infrastructure; three of the lawyers in the Department would report directly to Knopf; three other attorneys would report directly to Drillings; and plaintiff would have no direct reports, with her responsibilities limited to licensing, serving as an internal consultant, and helping the Risk Department develop CIFG's business. Rolfo disregarded Cully's objections that the restructuring violated their earlier agreement that she would remain General Counsel until the end of December 2006. The next day, licensing was removed from Cully and reassigned to Drillings.

41.    As of May 10, 2006, other than work with Human Resources, plaintiff was not permitted to continue with any of the work she had been doing unless expressly requested to do so. While Cully continued to report to work, she was given little or no work to do.

42.    Even after the restructuring, Rolfo continued to retaliate against plaintiff. For example, in July 2006, Rolfo forced Cully to resign as corporate secretary and member of the Board of Directors.

43.    In or about November 8, 2006, a few days after Cully had rejected an unfavorable settlement offer from CIFG's outside counsel, and only ten days before the corporate restructuring described below as a change in control was consummated, Brown e-mailed plaintiff, instructing her to "work" from home until the end of 2006. Plaintiff was not given any work to do once she was sent home, but did continue to receive her salary through December 31, 2006.

44.    On July 12, 2007, CIFG announced that Knopf had been promoted to General Counsel, while Drillings had become Deputy Head of U.S. Public Finance. CIFG also announced the formation of a new Executive Committee, consisting only of men. CIFG's senior management continues to consist solely of men.

Additional Facts Concerning Long-Term Incentive Plans

45.    Senior employees of CIFG were eligible to participate in various LTI plans, including stock options, restricted stock, and performance units.

Facts Concerning the 2003 Stock Option Plan

46.    When Cully was hired, she was promised an award of stock options. Pursuant to plaintiff's offer letter, in 2004 CIFG granted her stock options under the 2003 Stock Option Plan. CIFG granted many other employees stock options at this time.

47.     The 2003 Stock Option Plan was CIFG's first stock option plan, and it expired on June 28, 2004. The plan states that it is governed by French law.

48.     In 2004 CIFG also awarded many employees performance units under the 2004 Performance Unit Plan, which expired at the end of 2004. CIFG did not award Cully any performance units in 2004. CIFG did not make any awards of restricted stock in 2004.

49.     The 2003 Stock Option Plan defines "retirement" as referring, in the case of a United States resident, "to a Beneficiary who is at least 55 years of age at the time that he or she voluntarily ceases to be an employee" of CIFG. The 2004 Performance Unit Plan contains the same provision, except that it adds a provision that a retiree is not permitted to engage in specified actions that are deemed to compete with CIFG.

50.     Under both the 2003 Stock Option Plan and the 2004 Performance Unit Plan, a retiree's options continue to vest and become exercisable as if he or she were still employed.

51.     The 2003 Stock Option Plan contained a "change in control" provision under which the vesting and exercisabilty of the options were accelerated if, inter alia, an entity or group acquired a majority interest in CIFG. The 2004 Performance Unit Plan did not contain a change in control provision.

52.     The Executive Board could not amend the 2003 Stock Option Plan in any manner that would impair the rights of any optionee unless the amendment was mutually agreed to between the optionee and the Executive Board and the amendment was agreed to in writing and signed by the optionee and the Executive Board. Cully never agreed to any amendments of the 2003 Stock Option Plan.

53.    Rolfo, as president of the Executive Board of CIFG Holding, is authorized to make determinations under the 2003 Stock Option Plan.

54.    In the fall of 2005, at the time Cully told Rolfo that she intended to retire, she was over 55 years old.

55.    In the spring of 2006, CNCE, the sole shareholder of CIFG Holding, announced an agreement with Banque Populaire ("BP") under which CNCE would acquire an equal interest in BP's then-subsidiary Natexis. Natexis would be renamed Natixis and would acquire, among other entities, CIFG. The Natixis transaction was consummated on or about November 18, 2006.

56.    Prior to the time that Cully was ordered not to come to the office, on or about November 8, 2006, the information available to her was that the Natixis transaction would not constitute a change of control under the definition in the 2003 Stock Option Plan.

57.    In July 2006, Rolfo for the first time took the position that engaging in any paid activity was inconsistent with retirement, despite the lack of any such provision in the 2003 Stock Option Plan. He informed Cully that the vesting of her rights under the LTI plans would terminate upon her obtaining any paid employment, including consulting or self-employment. Rolfo re-stated this position several times over the next few months, most recently in a letter to Cully dated January 4, 2007.

58.    By letter dated February 13, 2007, Rolfo, through counsel, informed Cully that CIFG considered the vesting of all of Cully's LTI, under all of the plans, to have terminated on December 31, 2006, regardless of whether or not Cully was engaging in any activity, paid or unpaid. Under this interpretation, the LTI Rolfo promised Cully to induce her to remain to the end of 2006 was worthless, and the value of her prior LTI awards was substantially reduced.

59.    The February 13, 2007 letter from defendants' counsel, specifically stated that Cully's "unvested" options awarded under the 2003 Stock Option Plan would cease vesting as of December 31, 2006, and that Cully should "take counsel" as to the time to exercise vested options.

60.    By letter dated March 2, 2007, Cully, through counsel stated that, based upon Cully's review of the websites of Natixis, BP, and CNCE, she now believed that the Natixis transaction probably constituted a change in control under the LTI plans. In the letter, Cully's counsel asked if CIFG was treating the transaction as a change in control under any of the plans.

61.    By letter dated March 14, 2007, defendants, through counsel, acknowledged for the first time that CIFG did consider the Natixis transaction to be a change in control under the 2003 Stock Option Plan.

62.    That the Natixis transaction constituted a change in control had significant repercussions. It meant that even CIFG admitted that all of Cully's stock options awarded under the 2003 Stock Option Plan had become fully vested on November 18, 2006. Also, had there been no change in control, Cully could not have exercised any of her vested 2003 stock options until January 2008 at the earliest. However, with the change of control, under CIFG's position that Cully had not retired, her time to exercise her options would have expired on March 31, 2007. It is clear that CIFG's failure to inform Cully that the Natixis transaction constituted a change in control, together with the deliberately misleading February 13, 2007 letter referring to "unvested" 2003 stock options, was intended to deceive Cully into thinking that there was no change of control and thus cause her to miss their deadline for exercising her 2003 stock options, which consequently would have become worthless.

63.    Having been caught in this attempt to defraud Cully and not having provided her with material information (including the value of the options), CIFG agreed to extend by a few months Cully's time to exercise the options granted under the 2003 Stock Option Plan.

64.    Because of CIFG's continued insistence that Cully had not "retired" within the meaning of the 2003 Stock Option Plan, she will be forced to exercise her options under the 2003 Stock Option Plan in September 2007.  By denying Cully several additional years to exercise, which is her right as a retiree, CIFG has caused her substantial harm.

Fact Concerning Plans After 2003

65.    In March 2005, CIFG awarded Cully LTI in a specified notional amount for calendar year 2004.  On or about March 2006, CIFG provided Cully with the details of the award, which consisted of stock options, restricted stock, and performance units.  CIFG did not provide Cully with any agreements governing the awards until April 2007, when it provided agreements for the stock options and restricted stock that had been substantially revised in ways adverse to Cully, as described below.

66.    Although awards of performance units were made in 2005, the related plans existed only in draft form.

67.    In March 2006, CIFG awarded Cully LTI in a specified notional amount for calendar year 2005.  CIFG has not provided Cully with the details of this award or any agreements governing the award.

68.    Although awards of stock options, restricted stock and performance units were made in 2006, the related plans existed only in draft form.

69.     In March 2006, Rolfo promised Cully LTI in a specified notional amount to be awarded in 2007 for calendar year 2006. CIFG has not provided Cully with the details of this award or any agreements governing the award.

70.     Although awards of stock options, restricted stock and performance units were promised for 2007, the related plans existed only in draft form.

71.     Drafting for the plans for 2005 and thereafter began in late 2004. After Freed's departure at the end of 2004, Cully was responsible for drafting the plans. Management's intention was that subsequent stock option and restricted stock plans would conform in substance to the 2003 Stock Option Plan, with only such changes as were required to reflect the different treatment of stock options and restricted stock under French law.

72.     Cully was familiar with the contents of the draft LTI plans as they existed prior to December 2005.

73.     During the time Cully was employed by CIFG, Rolfo, as president of the Executive Board of CIFG Holding, was authorized to make determinations under the drafts of the LTI plans.

74.     When Cully informed Rolfo in the fall of 2005 that she planned to retire, she relied upon the contents and provisions of the draft LTI plans. At the time, she was over 55 years old. In October 2005, Rolfo approved Cully's retirement. When Cully and Rolfo discussed Cully's retirement, Cully stated that she intended to do consulting work after her retirement. Rolfo suggested that she could consult for CIFG.

75.     In late November 2005, Cully, as instructed by Rolfo, announced her retirement to members of the management committee of CIFG.

76.    On December 30, 2005, the shareholder of CIFG Holding approved a revision of the draft LTI plans to require approval by the Executive Board for any paid post-retirement activity, with approval to be based on a finding that such activity did not compete with CIFG. Cully was not informed of this revision.

77.    In early 2006, Cully learned of the changes in the draft LTI plans. Cully stated to Rolfo that she did not consider the new retirement provision applicable to her, as CIFG had approved her retirement under the prior provision in the draft plans, which was in conformity with the 2003 Stock Option Plan. Rolfo did not dispute Cully's statement.

78.    Upon information and belief, the change in control provisions in the draft plans were revised. Based on the contents and timing, after the revision the Natixis transaction would not constitute a change in control (such a change in control would accelerate vesting of the LTI). Thus, while the Natixis acquisition was determined to be a change in control under the 2003 Stock Option Plan, the later plans deprived all employees with LTI granted for 2004 and 2005 (including Cully) of the benefit of accelerated vesting.

79.    As stated above, in July 2006, Rolfo for the first time took the position that engaging in any paid activity was inconsistent with retirement, and that the vesting of Cully's rights under the LTI plans would terminate upon her obtaining any paid employment, including consulting or self-employment, whether or not such employment competed with CIFG (contrary to the amendment purportedly effected by the shareholder's meeting in December 2005). Rolfo re-stated this position several times over the next few months, most recently in a letter to Cully dated January 4, 2007.

80.    Upon information and belief, on or about November 15, 2006, a meeting of the shareholder of CIFG Holding was held at which the definition of "retirement" was once

again amended to preclude any employment or paid consulting unless explicitly approved by CIFG. The method by which the stock was to be valued was also revised. This meeting took place three days before the Natixis acquisition was consummated, which resulted in a change in the identity of CIFG's shareholder.

81.    By letter dated February 13, 2007, Rolfo, through counsel, informed Cully that CIFG considered the vesting of all of Cully's LTI, under all of the plans, to have terminated on December 31, 2006, regardless of whether or not Cully was engaging in any activity, paid or unpaid. Under this interpretation, the LTI Rolfo promised Cully to induce her to remain to the end of 2006 was worthless and the value of her prior LTI awards was substantially reduced. Upon information and belief, either Rolfo intended to make the LTI worthless when he offered it to Cully to induce her to stay until the end of 2006, or he added new requirements to the LTI in retaliation for Cully having hired counsel to assert her claims of discrimination and retaliation.

82.    On April 3, 2007, CIFG, through counsel, sent for Cully's signature proposed stock option and restricted stock agreements for the awards made in 2005, along with purported final versions of the 2004 Stock Option Plan and 2004 Restricted Stock Plan. Both plans state they are governed by French law. Both plans contained the new definition of change in control that would exclude the Natixis transaction and the more restrictive definition of retirement. In addition, the definition of retirement had been further modified to authorize the Executive Board to add a service requirement of unspecified length to individual agreements. The agreements sent to Cully imposed a service requirement of six years, slightly over two years more than Cully's years of service. If Cully signed the agreements as presented to her, she would be forfeiting a substantial part of her LTI awards, including most of the awards in 2005 for calendar year 2004. Cully has not received any agreements for later awards; if similar

agreements are proposed for them, Cully would lose all of the awards in 2006 for calendar year 2005 and in 2007 for calendar year 2006.

83.     By letter dated April 18, 2007, Cully provided to CIFG an opinion from an expert in French law that the purported changes to the retirement and change in control provisions were invalid under French law.  Cully also provided signed agreements for the stock options and restricted stock, with hand-written changes to conform the agreements to French law.

84.     By letter dated June 12, 2007, CIFG, through counsel, stated that CIFG did not accept Cully's changes to the stock option and restricted stock agreements.  Moreover, CIFG stated that it considered Cully to have declined to accept and to waive the grants made to her in 2005 and that the grants were therefore void.  CIFG provided no basis for its decision and disregarded, without even mentioning, the opinion that Cully had provided.

85.     Since Cully's employment with CIFG terminated on December 31, 2006, she has not engaged in any activities that would constitute competition with CIFG.

## FIRST CAUSE OF ACTION

### (Discrimination Under Title VII)

86.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 85 of this Complaint with the same force and effect as if set forth herein.

87.     By the acts and practices described above, CIFG discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender in violation of Title VII.

88.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of CIFG's discriminatory acts.

89.    CIFG acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

## SECOND CAUSE OF ACTION

### (Discrimination Under the Executive Law)

90.    Plaintiff repeats and realleges paragraphs 1 through 89 of the Complaint with the same force and effect as if set forth herein.

91.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender in violation of the Executive Law.

92.    CIFG is liable under the Executive Law as plaintiff's "employer."

93.    Rolfo is liable under the Executive Law as plaintiff's "employer" and is also liable under the Executive Law as an aider and abettor of the discrimination against plaintiff.

94.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

## THIRD CAUSE OF ACTION

### (Discrimination Under the City Law)

95.    Plaintiff repeats and realleges paragraphs 1 through 94 of the Complaint with the same force and effect as if set forth herein.

96.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the City Law.

97.    CIFG is liable under the City Law as plaintiff's "employer."

98.    Rolfo is liable under the City Law as plaintiff's "employer" and is also liable under the City Law as an aider and abettor of the discrimination against plaintiff.

99.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

100.    Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's protected rights.

## FOURTH CAUSE OF ACTION

### (Retaliation Under Title VII)

101.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 100 of this Complaint with the same force and effect as if set forth herein.

102.    By the acts and practices described above, CIFG retaliated against plaintiff for her opposition to unlawful employment practices in violation of Title VII.

103.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of CIFG's retaliatory acts.

104.    CIFG acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

241733 v1

23

## FIFTH CAUSE OF ACTION

### (Retaliation Under the Executive Law)

105.    Plaintiff repeats and realleges paragraphs 1 through 104 of the Complaint with the same force and effect as if set forth herein.

106.    By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful employment practices in violation of the Executive Law.

107.    CIFG is liable under the Executive Law as plaintiff's "employer."

108.    Rolfo is liable under the Executive Law as plaintiff's "employer" and is also liable under the Executive Law as an aider and abettor of the retaliation against plaintiff.

109.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

## SIXTH CAUSE OF ACTION

### (Retaliation Under the City Law)

110.    Plaintiff repeats and realleges paragraphs 1 through 109 of the Complaint with the same force and effect as if set forth herein.

111.    By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful employment practices in violation of the City Law.

112.    CIFG is liable under the Executive Law as plaintiff's "employer."

113.    Rolfo is liable under the Executive Law as plaintiff's "employer" and is also liable under the Executive Law as an aider and abettor of the retaliation against plaintiff.

114.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

115.    Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's protected rights.

## SEVENTH CAUSE OF ACTION

### (Breach of Contract)

116.    Plaintiff repeats and realleges paragraphs 1 through 115 of the Complaint with the same force and effect as if set forth herein.

117.    By altering the rules of CIFG's LTI compensation programs after plaintiff announced her intention to retire from CIFG, defendants have breached their agreements with plaintiff. Defendants also breached their agreements with plaintiff concerning the terms under which she would remain employed in 2006.

118.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of defendants' breach of their contractual agreements.

## EIGHTH CAUSE OF ACTION

### (Breach of Obligation of Good Faith and Fair Dealing

119.    Plaintiff repeats and realleges paragraphs 1 through 118 of the Complaint with the same force and effect as if set forth herein.

120.    By their course of conduct, defendants have breached their obligations of good faith and fair dealing toward plaintiff.

121.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of defendants' breach of their obligation of good faith and fair dealing.

## NINTH CAUSE OF ACTION

### (In the Alternative – Promissory Estoppel)

122.    Plaintiff repeats and realleges paragraphs 1 through 121 of the Complaint with the same force and effect as if set forth herein.

123.    Defendants made clear and definite promises to Cully concerning the terms of receipt of awards under the LTI plans and the compensation that would be paid Cully if she remained employed by defendants through the end of 2006.

124.    Plaintiff reasonably relied upon defendants' promises.

125.    Defendants did not fulfill the promises they made to plaintiff.

126.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of defendants' failure to fulfill their promises to plaintiff

## TENTH CAUSE OF ACTION

### (In the Alternative – Unjust Enrichment)

127.    Plaintiff repeats and realleges paragraphs 1 through 126 of the Complaint with the same force and effect as if set forth herein.

128.    Plaintiff rendered work, service, and labor to defendants as alleged above.

129.    Defendants accepted, benefited and profited from plaintiff's work, services and labor.

130.    Defendants have been unjustly enriched by their failure to allow plaintiff the full benefit of the LTI compensation plans.

241733 v1

## ELEVENTH CAUSE OF ACTION

### (Fraudulent Inducement)

131.    Plaintiff repeats and realleges paragraphs 1 through 130 of the Complaint with the same force and effect as if set forth herein.

132.    Defendants made the false representations described above concerning the terms of the transition and the award of LTI compensation to fraudulently induce plaintiff to remain employed until a new General Counsel could be hired.

133.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of defendants' breach of their contractual agreements

134.    Defendants acted with malice and/or reckless indifference to plaintiff's rights.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a)    declaring that the acts and practices complained of herein are in violation of Title VII, the Executive Law, the City Law, New York common law and French law;

(b)    enjoining and permanently restraining these violations of the Title VII the Executive Law, the City Law, New York common law and French law;

(c)    directing defendants to place plaintiff in the position she would have occupied but for defendants' discriminatory and retaliatory treatment of her, and make her whole for all earnings she would have received but for defendants' discriminatory treatment, including, but not limited to, wages, bonuses, pension, LTI compensation, and other lost benefits;

(d)  directing defendants to pay plaintiff compensatory damages and damages for her mental anguish and humiliation, as provided by Title VII, the Executive Law and the City Law;

(e)  directing defendants to pay plaintiff punitive damages as provided by Title VII, the City Law, and New York common law;

(f)  issuing whatever orders are necessary to restore to plaintiff all of her LTI compensation, including options she was forced to exercise, and ensuring her full rights under the plans;

(g)  awarding plaintiff attorney's fees and costs, pursuant to Title VII and the City Law;

(h)  awarding plaintiff interest and damages relating to adverse tax consequences; and

(i)  awarding such other and further relief as this Court may deem necessary and proper.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
      September 19, 2007

                VLADECK, WALDMAN, ELIAS &
                ENGELHARD, P.C.

By:

                Anne L. Clark (AC 6456)
                Attorneys for Plaintiff
                1501 Broadway, Suite 800
                New York, New York  10036
                (212) 403-7300

241733 v1