UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KATHLEEN G. CULLY,

                Plaintiff,

       - against -

CIFG HOLDING, CIFG
GUARANTY, CIFG EUROPE,
CIFG SERVICES, INC., CIFG
ASSURANCE  NORTH  AMERICA,
INC., and JACQUES ROLFO

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

07 Civ. 8195 (PKC)

ECF CASE

PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS

VLADECK, WALDMAN, ELIAS &
  ENGELHARD, P.C.
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York  10036
(212) 403-7300

Of Counsel:
    Anne L. Clark[*]

[*]  Jeremiah J. Iadevaia, who is scheduled to be admitted to the New York bar on January 16, 2008, contributed to this Memorandum.

249006 v1

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 2

ARGUMENT.................................................................................................................... 13

     I.     VENUE AS TO THE STOCK PLANS IS PROPER IN THIS COURT.............. 13

          A.     The 2003 Stock Option Plan Provision is Not Enforceable...................... 14

          B.     Plaintiff Did Not Agree to Other Forum Selection Clauses .................... 17

     II.    PLAINTIFF CANNOT BE COMPELLED TO ARBITRATE
           HER CLAIMS CONCERNING HER PERFORMANCE UNITS...................... 19

          A.     The Modified Plans Do Not Constitute Enforceable Contracts............... 20

          B.     Plaintiff Did Not Agree to Arbitrate Any Disputes Under
           the Earlier Draft Plans............................................................................. 21

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

### CASES

Albrecht Chem. Co. v. Anderson Trading Corp.,
    298 N.Y. 437, 84 N.E.2d 625 (1949)...........................................................................23

Bailey v. Fed. Nat'l Mortgage Ass'n,
    209 F.3d 740 (D.C. Cir. 2000)...................................................................................23

Baldeo v. Darden Rests., Inc.,
    No. 04 Civ. 2185 (JG), 2005 WL 44703 (E.D.N.Y. Jan. 11, 2005) ....................24

Bank of Am., N.A. v. Hensley Props., LP,
    495 F. Supp. 2d 435 (S.D.N.Y. 2007).....................................................................15

Brennan v. Bally Total Fitness,
    153 F. Supp. 2d 408 (S.D.N.Y. 2001).....................................................................22

Brennen v. Phyto-Riker Pharm., Ltd.,
    No. 01 Civ. 11815 (DLC), 2002 WL 1349742 (S.D.N.Y. June 20, 2002) .........21

Caley v. Gulfstream Aerospace Corp.,
    428 F.3d 1359 (11th Cir. 2005) ...............................................................................22

Carnival Cruise Lines, Inc. v. Shute,
    499 U.S. 585 (1991).................................................................................................14

Corinthian Media, Inc. v. Yelsey,
    No. 92 Civ. 0109 (LJF), 1992 WL 47546 (S.D.N.Y. Mar. 5, 1992)...................17

Cronas v. Willis Group Holdings Ltd.,
    No. 06 Civ. 15295 (GEL), 2007 WL 2739769 (S.D.N.Y. Sept. 17, 2007).........19

DeBono v. Wash. Mut. Bank,
    No. 05 Civ. 10333 (DC), 2006 WL 3538938 (S.D.N.Y. Dec. 8, 2006) ..............24

Dentsply Int'l, Inc. v. Benton,
    965 F. Supp. 574 (M.D. Pa. 1997)..........................................................................17

DuBois v. Macy's East, Inc.,
    No. 06 Civ. 6522 (NGG)(LB), 2007 WL 3193169 (E.D.N.Y. July 13, 2007)............23, 24

Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.,
    93 N.Y.2d 584, 693 N.Y.S.2d 857 (1999) .............................................................20

First Options of Chi., Inc. v. Kaplan,
    514 U.S. 938 (1995)..................................................................................19, 20

Full-Bright Indus. Co., Ltd. v. Lerner Stores, Inc.,
    No. 90 Civ. 5054 (CSH), 1991 WL 84541 (S.D.N.Y. May 14, 1991) .............................15

Gold v. Deutsche Aktiengesellschaft,
    365 F.3d 144 (2d Cir. 2004)...........................................................................24

Gonzalez v. Toscorp Inc.,
    No. 97 Civ. 8158 (LAP), 1999 WL 595632 (S.D.N.Y. Aug. 5, 1999) .............................22

Goodman v. Hill-Rom Co., Inc.,
    No. 96-759-CIV-T-17, 1996 WL 685840 (M.D. Fla. Nov. 25, 1996)..............................17

J. Gerber & Co., Inc. v. M/V Amer Shanti,
    No. 89 Civ. 6122 (RO), 1991 WL 8468 (S.D.N.Y. Jan. 18, 1991)...................................15

Maffea v. Ippolito,
    247 A.D.2d 366, N.Y.S.2d 653 (2d Dep't 1998)................................................20

Manigault v. Macy's East, LLC,
    506 F. Supp. 2d 156 (E.D.N.Y. 2007) .................................................19, 20, 24

Massen v. Cliff,
    No. 02 Civ. 9282 (HBP), 2003 WL 2012404 (S.D.N.Y. May 1, 2003) ...........................19

Metzger v. Aetna Ins. Co.,
    227 N.Y. 411, 125 N.E. 814 (1920)..................................................................24

New Moon Shipping Co. v. MAN B&W Diesel AG,
    121 F.3d 24 (2d Cir. 1997)............................................................................13

North Amer. Hyperbaric Ctr. v. City of N.Y.,
    198 A.D.2d 148, 604 N.Y.S.2d 56 (1st Dep't 1993).........................................8

Opals on Ice Lingerie v. Bodylines, Inc.,
    320 F.3d 362 (2d Cir. 2003)...........................................................................20

PaineWebber, Inc. v. Bybyk,
    81 F.3d 1193 (2d Cir. 1996)...........................................................................20

Phillips v. Audio Active Ltd.,
    494 F.3d 378 (2d Cir. 2007).................................................................13, 14, 17

Red Bull Assocs. v. Best Western Int'l, Inc.,
862 F.2d 963 (2d Cir. 1988)...................................................................................................1

Register.com, Inc. v. Verio, Inc.,
    356 F.3d 393 (2d Cir. 2004)...........................................................................................20

Rey-Willis v. Citibank, N.A.,
    No. 03 Civ. 2006 (SAS), 2003 WL 21714947 (S.D.N.Y. July 23, 2003) .........................13

Shearson/Am. Express, Inc. v. McMahon,
    482 U.S. 220 (1987)......................................................................................................19

Sherr v. Dell, Inc.,
    No. 05 Civ. 10097 (GBD), 2006 WL 2109436 (S.D.N.Y. July 27, 2006) .................22, 23

Spatz v. Ridge Lea Assocs., LLC,
    309 A.D.2d 1248, 765 N.Y.S.2d 84 (4th Dep't 2003) .....................................................19

Stemcor USA, Inc. v. Trident Steel Corp.,
    471 F. Supp. 2d 362 (S.D.N.Y. 2006).............................................................................20

Unity Creations, Inc. v. Trafcon Indus., Inc.,
    137 F. Supp. 2d 108 (E.D.N.Y. 2001) .............................................................................16

## STATUTES

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. .............................................1

Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ................................................................... passim

New York City Human Rights Law § 8-107 et seq. ...................................................................1-1

New York State Human Rights Law, Executive Law § 296 et seq. ...............................................1

## PRELIMINARY STATEMENT

Plaintiff Kathleen Cully ("plaintiff" or "Cully") submits this Memorandum of Law in opposition to the motion of defendants CIFG Holding and CIFG Services, Inc. to dismiss certain of plaintiff's claims relating to Long-Term Incentive compensation ("LTI"). Plaintiff brought this case against defendants CIFG Holding, CIFG Guaranty, CIFG Europe, CIFG Services, Inc., CIFG Assurance North America, Inc. ("CIFG NA" and, together with the other corporate defendants, "CIFG"), and Jacques Rolfo ("Rolfo") (collectively "defendants") to remedy discrimination on the basis of her sex in the terms, conditions, and privileges of employment, and to remedy retaliation for her opposition to unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., ("Title VII"); the New York State Human Rights Law, Executive Law § 296 et seq., ("Executive Law"); and the New York City Human Rights Law § 8-107 et seq. ("City Law"), as well as to remedy defendants' breach of contract and violation of the duty of good faith and fair dealing, or, in the alternative, for promissory estoppel and unjust enrichment, and to remedy defendants' fraudulent inducement.

Defendants' motion seeks dismissal of the aspects of plaintiff's non-statutory claims that relate to LTI that CIFG awarded to Cully.[1] While defendants' motion is premised on alleged agreements to litigate claims concerning her stock options and restricted stock in Paris and to arbitrate her claims concerning her performance units, defendants have not provided the

---

[1] Defendants do not seek dismissal of all of the LTI-related claims, as the defendants' motion does not address plaintiff's retaliation claims (Fourth, Fifth and Sixth Causes of Action). (Memorandum of Defendants CIFG Holding and CIFG Services, Inc. in Support of Motion to Dismiss Claims Relating to Long-Term Incentives ("Def. Br.") 2) Indeed, enforcement of a forum selection clause involving a civil rights claim could violate public policy. Cf. Red Bull Assocs. v. Best Western Int'l, Inc., 862 F.2d 963 (2d Cir. 1988).

Plaintiff also notes that her breach of contract cause of action (Seventh Cause of Action) encompasses more than agreements governing LTI.

Court with a single agreement signed by plaintiff containing any such provisions. Perhaps that is because the only executed LTI agreement does not contain any forum selection provision.

Unlike the normal scenario in which an employer awards employees incentive compensation under an existing plan and provides a governing agreement at the time of the award, as set forth in more detail below, CIFG made awards under "plans" that existed only in concept or at most draft form then, contrary to the terms of the draft plans, provided details of the award a year or more after the award, and only years later – after the employee had earned the award and taken action in reliance on the terms of the draft plans and CIFG's management had approved both the terms of the draft plans and the action taken in reliance thereon – "finalized" the plans and provided governing agreements to the employee.[2]  This extraordinary procedure not only provided the conditions for some of the wrongdoing at the heart of the merits of this case, but furnishes the guise under which defendants now seek to enforce provisions that were not part of any agreements between Cully and CIFG.  When the full sequence of events is examined, it becomes clear that there are no agreements to enforce against plaintiff with respect to forum or arbitration, and no basis to dismiss or compel arbitration of any of her claims.

<u>STATEMENT OF FACTS</u>

In 2002, Cully was General Counsel of the American Capital Access group of companies ("ACA"), which included the bond insurer ACA Financial Guaranty Corporation. (Declaration of Kathleen Cully in Opposition to Defendants' Motion to Dismiss ("Cully Dec.") ¶2)  Cully had held that position since January 1998, and her job was secure.  (<u>Id.</u>)  In 2002, Michael Freed ("Freed"), who was then CIFG's General Counsel, recruited Cully to join CIFG with the title of Managing Director and General Counsel of CIFG NA, performing the equivalent

---

[2]  As there were three different types of LTI, several different award years, and dates spanning several years that are relevant to the grant made in each year, plaintiff has prepared a chart summarizing the LTI awards, attached as Exhibit A to this Memorandum.

function for CIFG Europe. (Cully Dec. ¶3)  Freed assured Cully that although she would be formally reporting to him, in practice they would act as partners, with Freed having primary responsibility for corporate and licensing matters and Cully having primary responsibility for transactions and related regulatory matters. (Id.)  Cully remained an employee of CIFG until December 31, 2006, although she was barred from the CIFG premises as of November 8, 2006. (Cully Dec. ¶4)

### Stock Options

### 2003 Plan

When CIFG was recruiting Cully, the parties negotiated that, like other management-level CIFG employees, Cully would be eligible for bonuses and LTI. (Cully Dec. ¶5)  At the time, CIFG's LTI was still in the planning stages, and no plans were in effect or even in draft form. (Id.)  CIFG later developed and, as far as Cully knows, now has three primary types of LTI: stock options, restricted stock, and performance or participation units. (Id.)

Another item of negotiation between CIFG and Cully was the amount of CIFG stock options to be granted Cully to replace stock options she had been awarded as part of her compensation at ACA, which she would forfeit by leaving ACA for CIFG.[3]  (Cully Dec. ¶6)

The final result of the negotiations between CIFG and Cully is reflected in CIFG's employment agreement, dated December 17, 2002, and signed by Cully and Rolfo ("Employment Agreement"). (Cully Dec. ¶7, Ex. 1)  With respect to the LTI granted to replace the lost ACA stock options, the Employment Agreement states Cully would be granted the

---

[3]  Cully held both vested and unvested ACA options. The unvested options were forfeited upon her resignation; the vested options could be exercised only within 90 days following her resignation.  While the vested options were "in the money" at that time, the stock was not transferable, and Cully did not have the funds to exercise the options absent the ability to sell the resulting stock.  As a result she forfeited – and CIFG knew she would forfeit – both her vested and unvested options. (Cully Dec. ¶6)

option to "purchase a minimum of 0.27% of the outstanding shares of the common stock of CIFG Holding." (Cully Dec., Ex. 1 ¶3)  The stock options were to be granted 1/3 in March 2003, 1/3 in March 2004, and 1/3 in March 2005.  (Id.)  The Employment Agreement also stated: "The stock options shall be governed by a stock option agreement and plan, which shall contain customary terms and provisions, such as the Company's right of first refusal."  (Id.)  Cully was not given any stock option plan or agreement at that time, as no such plan or agreement then existed.  (Cully Dec. ¶8)  Cully did not expect that either the plan or agreement would contain a forum selection clause providing for exclusive jurisdiction in Paris, as, to her knowledge, it was not "customary" to deny U.S.-based employees a forum in their own country.  (Id.)

Cully began her employment with CIFG in January 2003.  (Cully Dec. ¶9)  In the fall or winter of 2004, CIFG finally granted Cully the full stock options it had promised her in the Employment Agreement, effective as of January 30, 2004.  (Id.)  The stock options were given a notional value of $450,000 by CIFG.  (Cully Dec. ¶9, Ex. 2)  At that time, CIFG gave Cully a Stock Option Agreement Pursuant to 2003 Stock Option Plan of CDC IXIS Financial Guaranty Holding, which Stock Option Agreement governed CIFG's award to Cully ("2003 Stock Option Agreement"), and a copy of the CDC IXIS Financial Guaranty Holding 2003 Stock Option Plan ("2003 Stock Option Plan").  (Cully Dec. ¶10, Ex. 3; Declaration of Pamela Brown in Support of Defendant's Motion to Dismiss ("Brown Dec."), Ex. A)  Cully was not involved in the drafting of either the 2003 Stock Option Plan or the 2003 Stock Option Agreement.  (Cully Dec. ¶10)  Cully signed the 2003 Stock Option Agreement, but not the 2003 Stock Option Plan.  (Cully Dec., Ex. 3; Brown Dec., Ex. A)

Both the 2003 Stock Option Agreement and the 2003 Stock Option Plan state that respectively the Agreement and the Plan "will be governed by and construed in accordance with the laws of France."  (Cully Dec., Ex. 3 ¶20; Brown Dec., Ex. A ¶23)  The 2003 Stock Option

Agreement, however, omits the choice of forum clause that, in the plan, immediately followed the choice of law clause. (Cully Dec., Ex. 3 ¶20; Brown Dec., Ex. A ¶23) Only the 2003 Stock Option Plan states that "The Tribunal de Grande Instance of Paris shall be exclusively competent to determine any claim or dispute arising in connection herewith." (Brown Dec., Ex. A ¶23).

As the sole document signed by plaintiff and defendant, the 2003 Stock Option Agreement alone constitutes the agreement between the parties; the 2003 Stock Option Plan is only an ancillary document providing further details as to the options granted by the Agreement. In the event of any inconsistency between the 2003 Stock Option Agreement and the 2003 Stock Option Plan, the terms of the 2003 Stock Option Agreement must prevail.[4]

The 2003 Stock Option Plan (which does not specify a form of option agreement) states only that an option agreement is "subject to" the Plan's terms and conditions. (Brown Dec., Ex. A ¶2(s)) Those terms and conditions permitted the Executive Board, among other things, "to approve and amend forms of agreement for use under the Plan," "to determine the terms and conditions of Options granted hereunder" and "to modify or amend the terms and conditions of the Options" (subject to certain limitations that do not apply here). (Brown Dec., Ex. A ¶4(b)) Further, the 2003 Stock Option Plan also provided that the "Option Agreement shall be provided to each Optionee within a reasonable time after the Date of the Grant," and that "no amendment, alteration, suspension or termination of the Plan shall impair the rights of any Optionee, unless mutually agreed between the Optionee and the Executive Board, which

---

[4]    The statement in ¶16 of the 2003 Stock Option Agreement that the terms of the Plan will prevail over the terms of the Agreement (Cully Dec., Ex. 3) is (and must be) an error. To read it otherwise is to eliminate the Executive Board's ability (described below) to determine, amend and modify the terms and conditions of the options; is inconsistent with the inclusion in haec verba of or reference to many provisions of the plan, which would be unnecessary if the entire plan were not only incorporated by reference but could not be varied by agreement; and contradicts the fact that parties are bound by their signed agreement rather than by an ancillary document.

agreement must be in writing and signed by an Optionee and the Company." (Brown Dec., Ex. A ¶¶14, 15)

Cully believes that the Executive Board exercised its authority under the 2003 Stock Option Plan to enter into individual option agreements (including her 2003 Stock Option Agreement) that contained terms specific to each such option agreement. (Cully Dec. ¶12) It is, therefore, the terms of the 2003 Stock Option Agreement, rather than those of the 2003 Stock Option Plan, that constitute the agreement between plaintiff and defendants.

Thus, claims and disputes under Cully's 2003 Stock Option Agreement are not subject to the forum selection clause applicable to the 2003 Stock Option Plan as a whole. This conclusion is consistent with the provision of her Employment Agreement specifying "customary" terms and conditions for her 2003 stock options. If and to the extent the 2003 Stock Option Agreement were deemed nonetheless to incorporate the forum selection clause contained in the 2003 Stock Option Plan, Cully had no option but to sign the 2003 Stock Option Agreement because by the time she was presented with the plan and agreement she had forfeited her ACA stock options close to two years earlier in reliance on the grant of the CIFG stock options. (Cully Dec. ¶13)

Although other CIFG employees were granted stock options in 2004 for their performance in 2003, Cully was not granted any options in 2004 for 2003. (Cully Dec. ¶14) Instead, she was awarded only the "sign-on" options guaranteed in her Employment Agreement. (Cully Dec. ¶14, Ex. 4)

### 2004 Plan

In March 2005, CIFG awarded Cully LTI with a notional value of $100,000 for her performance in 2004. (Cully Dec. ¶15, Ex. 5) At that time, CIFG did not tell Cully how the award would be broken down among stock options, restricted stock, and performance units. (Id.)

In March 2006, CIFG provided Cully with a statement detailing the distribution of the award, stating that of the $100,000 of LTI, $35,566, consisting of 7,474 shares, would be in stock options. (Cully Dec., Ex. 2)  During Cully's employment, the CIFG Holding Calendar 2004 Stock Option Plan ("2004 Stock Option Plan") existed only in draft form. (Cully Dec. ¶16)  At the time Cully's retirement was agreed upon in October 2005, the draft 2004 Stock Option Plan was the same in most material respects as the 2003 Stock Option Plan, except it did not contain a choice of forum provision, nor did the draft 2004 Restricted Stock Agreement. (Cully Dec. ¶17; see Cully Dec., Exs. 16, 17))  It also did not have an arbitration provision. (Id.)

Subsequently, Cully had discussions with Sophie Viller ("Viller"), Juriste Droit des Affaires of CIFG Europe, about changing any forum selection clause included in the 2004 Stock Option Plan from that in the 2003 Stock Option Plan as, according to Viller, the *Tribunal de Grande Instance* would not be the proper court to hear disputes under an employee stock option plan. (Cully Dec. ¶18)  Accordingly, the forum selection clause that was added in 2006 stated that, "For so long as the Company is domiciled in France, . . . the court of competent jurisdiction within the Court of Appeal of Paris shall be exclusively competent to determine any claim or dispute arising in connection herewith that is not or cannot be resolved by mediation or arbitration as provided herein." (Id.)  This provision was included in the last draft of the 2004 Stock Option Plan of which Cully was aware prior to her departure from CIFG at the end of 2006. (Id.)

Cully in this lawsuit alleges that material changes were unlawfully made to the draft 2004 Stock Option Plan after she announced her forced retirement and that those changes not only were, but were intended to be, to her detriment and were unlawful under both New York and French law.  (See, e.g., Complaint ¶¶1, 65, 71-84)  Essentially, defendants were taking advantage of their own dilatoriness in finalizing the LTI plans to deprive Cully of benefits she

had earned and on which she had relied.  Defendants concede that the 2004 Stock Option Plan

upon which they rely ("Modified 2004 Stock Option Plan") was not "finalized" until sometime in

December 2006.  (Brown Dec. ¶8)  CIFG did not provide Cully with a copy of the "final"

Modified 2004 Stock Option Plan until April 2007.  (Cully Dec. ¶19)  The Modified 2004 Stock

Option Plan provided to Cully in April 2007 contained a provision requiring mediation of any

disputes,[5] followed by (if the Plan were governed by French law) litigation in any competent

court within the Court of Appeals of Paris.  (Brown Dec., Ex. B ¶22)  Unlike the 2003 Stock

Option Agreement, the Option Agreement of CIFG Holding Pursuant to CIFG Holding Calendar

2004 Stock Option Plan ("2004 Stock Option Agreement"), also contained the forum selection

provision contained in the plan.  (Cully Dec., Ex. 6 ¶13(G))

       Cully, relying upon the opinion of Professor George A. Bermann ("Bermann"),

the Jean Monnet Professor of Law and Director of European Legal Studies Center at Columbia

University School of Law, believed that the Modified 2004 Stock Option Plan and 2004 Stock

Option Agreement she was provided in April 2007 made material changes to the stock option

plan that were invalid under French law under, *inter alia*, the principles of "tacit renewal," "fair

and reasonable" interpretation of the contracts, customary usage and, above all, performance "in

good faith."  (Cully Dec. ¶ 20, Ex. 7)[6]  Had Cully signed the 2004 Stock Option Agreement in

the form presented to her, she would have essentially agreed to give up almost all of the options

---

[5]  While a mediation was conducted prior to the filing of this lawsuit, counsel for plaintiff made
it clear that plaintiff would agree to participate in a mediation without waiver of her argument
that defendants did not have authority to make material changes in the plans, including the
insertion of the mediation provision.  (Declaration of Anne L. Clark in Opposition to Defendants'
Motion to Dismiss ("Clark Dec."), Ex. 1)

[6]  Such changes would also have been illegal under New York law, which provides that, absent a
new agreement, parties to an expired agreement who continue to perform their obligations do so
as if the previous agreement had not expired.  See North Amer. Hyperbaric Ctr. v. City of N.Y.,
198 A.D.2d 148, 149, 604 N.Y.S.2d 56, 56 (1st Dep't 1993).  In Cully's case, the provisions of
the draft plans having been approved by CIFG, she had no reason to expect subsequent changes.

that she had earned in 2004. (Cully Dec. ¶21)  Cully made changes to the 2004 Stock Option

Agreement to bring it into compliance with French law as to those points, signed the amended

agreement, and sent it back to CIFG, along with Bermann's opinion letter dated April 6, 2007

and a copy of his curriculum vitae establishing that he was, as defendants now acknowledge

(Def. Br. 7[7]), "an expert in French law." (Cully Dec. ¶21, Exs. 7-10)  By letter dated June 12,

2007, counsel for CIFG replied that it considered Cully's amendments to the 2004 Stock Option

Plan to be a rejection of the agreement, as well as a rejection of the award of 2004 stock options.

(Clark Dec., Ex. 2)

<u>Restricted Stock</u>

In 2004, CIFG did not award Cully any restricted stock for her performance in

2003.  (Cully Dec. ¶22)  As stated above, in March 2005, CIFG awarded Cully LTI with a

notional value of $100,000 for her performance in 2004. (Cully Dec. ¶23)  On March 2, 2006,

CIFG notified Cully that her award for 2004 included restricted stock with a notional value of

$53,007, consisting of 3,713 shares. (Cully Dec., Ex. 2)  During Cully's employment with CIFG,

no restricted stock plan was ever finalized.[8]  (Cully Dec. ¶24)  Drafts of the 2004 Restricted

Stock Plan were very similar to the 2003 Stock Option Plan, except for differences to reflect the

differences between stock options and restricted stock under French law.  (<u>Id.</u>)  Because of the

similarities, only one plan was worked on at any given time, with the knowledge that any

---

[7] It is, to say the least, ironic that defendants now acknowledge that Bermann is an expert in French law, considering that they formerly dismissed his opinion without so much as an explanation for doing so.

[8] As defendants allege (Def. Br. 5), plaintiff was familiar with the contents of the draft LTI plans as they existed "prior to December 2005." In fact, she relied on those provisions, which had been approved by CIFG, in making the decision to retire that was also approved by CIFG. (Cully Dec. ¶25)  In and after December 2005, however, when the plans were revised so as to deprive plaintiff of her benefits thereunder, defendants either concealed such revisions from the plaintiff or instructed her, over her objections, to draft the plans to make such revisions.  (<u>Id.</u>)  Obviously, her compliance with those instructions does not in any way indicate her agreement with them, whether in general or as to her own LTI.

changes would be incorporated into the other plan. (Id.) Thus, at the time Cully's retirement was agreed to, the draft restricted stock plans in existence contained a choice-of-law provision stating the plan was governed by French law, but no forum selection clause or arbitration clause, and the same forum selection clause that was added to the draft 2004 Stock Option Plan in 2006 either was added, or considered added, in 2006 to the draft 2004 Restricted Stock Plan. (Id.; see Cully Dec., Exs. 16, 17))

As with the 2004 Stock Option Plan, the CIFG Holding Calendar 2004 Restricted Stock Plan ("Modified 2004 Restricted Stock Plan"), upon which defendants rely, was not "finalized" until sometime in December 2006 (Brown Dec. ¶9) and was not provided to Cully until April 2007. (Cully Dec. ¶26) As with the Modified 2004 Stock Option Plan, the Modified 2004 Restricted Stock Plan contained material changes from the draft plan, which Bermann determined were invalid under French law. The Modified 2004 Restricted Stock Plan and the Restricted Stock Agreement Pursuant to CIFG Holding Calendar 2004 Restricted Stock Plan ("2004 Restricted Stock Agreement"), also provided to Cully in April 2007, contained forum selection clauses that were the same as in the Modified 2004 Stock Option Plan and 2004 Stock Option Agreement. (Cully Dec. ¶27, Ex. 12 ¶14(F); Brown Dec., Ex. C ¶20) Due to CIFG's unlawful changes, had Cully signed the 2004 Restricted Stock Agreement as presented to her, she would have been giving up her entire 2004 award of restricted stock. (Cully Dec. ¶29) Cully marked changes to the 2004 Restricted Stock Agreement to bring it into compliance with French law as to those points, and sent it to CIFG with the 2004 Stock Option Agreement and Bermann's opinion letter and curriculum vitae. (Cully Dec. ¶29, Exs. 7-9, 13) Defendants' counsel's letter of June 12, 2007, in which CIFG repudiated the amended 2004 Stock Option Agreement, also repudiated the amended 2004 Restricted Stock Agreement. (Clark Dec., Ex. 2)

<u>2004 Performance Units</u>

CIFG had a Performance Unit Plan for 2003, but Cully was not awarded any units under that plan in 2004. (Cully Dec. ¶30) As stated above, CIFG awarded Cully LTI of $100,000 in March 2005 for her performance in 2004. CIFG's March 2006 memorandum to Cully specified that the award for 2004 included 11,247 performance units with a notional value of $11,427. (Cully Dec., Ex. 2) CIFG's award to Cully for 2004 was made pursuant to the CIFG Services, Inc. Master Performance Unit Plan ("Master PUP"), which, as defendants concede, even now exists only in draft form. (Brown Dec. ¶10). Thus, Cully has never been presented with a purportedly "final" plan, or with any agreement governing the performance unit award. The draft Master PUP provided by defendants (Brown Dec., Ex. D) ("Modified Master PUP") is materially different from the drafts in existence during Cully's employment; in particular, like the draft stock plans, the draft PUP did not contain either an arbitration provision or a forum selection clause at the time Cully's retirement was agreed upon. (Cully Dec. ¶32, Ex. 14) Indeed, the intention when Cully was employed by CIFG was to conform the PUP to the stock plans as much as possible. (<u>Id.</u>) As stated above, the draft stock plans in effect until Cully's agreement to retire did not contain any forum selection clause, nor did they contain any arbitration provision.

<u>Award for 2005</u>

In March 2006, CIFG notified Cully that she was awarded LTI with a notional value of $100,000 for her performance in 2005. (Cully Dec. ¶35, Ex. 15) CIFG has never provided notice to Cully of the composition of the award, provided any plans governing the award,[9] or provided any agreements for the award. (<u>Id.</u>) In defendants' motion papers,

---

[9] During Cully's employment the stock option and restricted stock plans for 2005 existed only in draft form and were the same as the respective drafts for 2004, as it was CIFG's intention to

defendants state that Cully's entire award for 2005 is in the form of performance units. (Brown Dec. ¶11)  Plaintiff has no knowledge when that decision was made, nor has she seen any documentation confirming it. (Cully Dec. ¶37)  Performance units are less desirable than stock options or restricted stock because they have a term of only three years (compared to ten years for stock options and restricted stock) and their value depends solely on CIFG meeting the targets specified for such three-year period.[10]  (Id.)  Cully will not know until she receives discovery she requested from defendants, but she suspects that other CIFG employees did not receive LTI awards for 2005 consisting solely of performance units, and that designating her entire 2005 award as such is yet another act of retaliation taken by defendants.[11]  (Cully Dec. ¶38)  Moreover, the Modified Master PUP provides that grants of performance units "shall be made not later than 120 days after the beginning of a specified Performance Period." (Brown Dec., Ex. D ¶5(a)).  No such grants were made during the 120-day period beginning January 1, 2005. (Cully Dec. ¶41)

Award for 2006

In March 2006, Rolfo sought to induce Cully to delay her forced retirement until the end of December 2006. (Cully Dec. ¶42)  Part of Rolfo's inducement was a promise to Cully that in 2007 she would be awarded LTI for her performance in 2006 with a notional value of

---

establish forms of master plans to be renewed annually or to apply to annual LTI awards. (Cully Dec. ¶36, Exs. 16, 17)

[10]  To Cully's knowledge, the targets have not yet been announced for any performance units she has or may have, even for the period beginning January 1, 2005, and ending December 31, 2007. (Cully Dec. ¶40)  This is, of course, contrary to the purpose of a performance unit plan, which requires that employees be given performance targets prior to the period for which performance is to be evaluated.

[11]  Cully believes, based on informal conversations while she was employed by CIFG and market conditions thereafter, that CIFG has not satisfied its performance targets for any of the relevant periods. (Cully Dec. ¶39)  This would, of course, materially reduce the value of the performance units she was awarded, which purported awards were made after CIFG was aware that the targets had not been, or probably would not be, satisfied.

$120,000. (<u>Id.</u>) CIFG has never provided notice to Cully of the composition of the award, provided any plans governing the award, or provided any agreements for the award. (<u>Id.</u>)

ARGUMENT

I.    <u>VENUE AS TO THE STOCK PLANS IS PROPER IN THIS COURT</u>

Defendants ignore many crucial aspects of the analysis of application of a forum selection clause, as well as several important factual issues. When the appropriate tests are applied to all the material facts, plaintiff should not be forced to litigate some of her claims in Paris.

As an initial matter, it is unsettled in the Second Circuit whether, when a contract contains a foreign choice of law provision as well as a choice of forum provision, the chosen foreign law or federal law governs analysis of the choice of forum provision. <u>Phillips v. Audio Active Ltd.</u>, 494 F.3d 378, 384-86 (2d Cir. 2007). However, as set forth below, the result is the same under either U.S. or French law.

Under U.S. law, although plaintiff must make a strong showing to overcome the enforceability of a forum selection agreement, plaintiff is "entitled to have the facts viewed in the light most favorable to [her], and no disputed fact should be resolved against [her] until [she] has had an opportunity to be heard." <u>New Moon Shipping Co. v. MAN B&W Diesel AG</u>, 121 F.3d 24, 29 (2d Cir. 1997); see <u>Rey-Willis v. Citibank, N.A.</u>, No. 03 Civ. 2006 (SAS), 2003 WL 21714947, at *3 (S.D.N.Y. July 23, 2003).

Defendants ignore the initial part of the analysis – whether there is an agreement binding on the parties. In fact, the proper test for determining whether to dismiss a claim based on a forum selection clause is: (1) "whether the clause was reasonably communicated to the party resisting enforcement"; (2) whether the clause is mandatory or permissive; (3) "whether the claims and parties involved in the suit are subject to the form selection clause"; and (4) if the first

three steps establish that the clause is presumptively enforceable, "whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching'" or because "trial in the selected forum will be so difficult and inconvenient that the plaintiff will effectively be deprived of [her] day in court." Phillips, 494 F.3d at 383-84, 392 (citations omitted).  Plaintiff does not dispute that the forum selection clauses presented by defendants are phrased to be mandatory, but does dispute other elements of the test, as well as the most fundamental issue – whether there was any agreement.

A.    The 2003 Stock Option Plan Provision is Not Enforceable

Cully cannot be bound by a forum selection clause to which she did not agree, or at the very least of which she was not provided proper notice.  Forum selection clauses that are not the subject of arms-length negotiations are "subject to judicial scrutiny for fundamental fairness." Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595 (1991).  An important part of that analysis is whether the person against whom the clause is sought to be enforced received notice of the forum provision at a time when she "retained the option of rejecting the contract with impunity." Id.

In the instant case, when Cully agreed to leave ACA, thereby forfeiting all of her her ACA stock options, and join CIFG, she relied upon CIFG's promise of CIFG stock options to substitute for the forfeited ACA shares.  (Cully Dec. ¶¶6, 13)  The Employment Agreement signed by CIFG and Cully states that the stock options will be subject to "customary" provisions, including CIFG's right of first refusal, but makes no mention of a forum selection clause requiring the litigation of any disputes in Paris.  (Cully Dec., Ex. 1)  No plan documents existed at the time that would have alerted Cully to the existence of any forum selection clause.  As such, at the time the essential contract was formed, it contained no notice of any forum selection

provision.  See Bank of Am., N.A. v. Hensley Props., LP, 495 F. Supp. 2d 435, 438-39 (S.D.N.Y. 2007) (finding lack of notice where forum selection clause was not contained in original agreement signed by parties); Full-Bright Indus. Co., Ltd. v. Lerner Stores, Inc., No. 90 Civ. 5054 (CSH), 1991 WL 84541, at *2 (S.D.N.Y. May 14, 1991) (refusing to enforce a forum selection clause not contained in any agreement signed by the plaintiff); J. Gerber & Co., Inc. v. M/V Amer Shanti, No. 89 Civ. 6122 (RO), 1991 WL 8468, at *2 (S.D.N.Y. Jan. 18, 1991) (refusing to enforce forum selection clause; even if document containing clause was ever received by the plaintiff, it would have been an additional term materially altering the already-formed contract that was not explicitly agreed to by both parties).  Moreover, had Cully been aware of such an exclusive forum selection provision, she would have objected to it at the time as being unfairly biased in favor of her prospective employer. (Cully Dec. ¶8)

The 2003 Stock Option Agreement executed by CIFG and Cully contains the terms governing the stock options Cully was awarded, including the choice of law provision, but not the forum selection provision.  (Cully Dec., Ex. 3)  The Executive Committee had the authority to enter into individualized stock option agreements (with certain limitations), and it was Cully's understanding that there was some variation among option agreements.  (Cully Dec. ¶12; Brown Dec., Ex. A)  Thus, Cully's 2003 Stock Option Agreement, in conformity with the "customary terms" agreed to in the Employment Agreement, contained no forum selection clause (Cully Dec., Ex. 3) and defendants can provide no other document in which Cully agreed that such a provision would govern her award of 2003 stock options. Defendants are therefore wrong when they argue that plaintiff is seeking to enforce only the terms of the plan favorable to her while refusing to abide by the forum provision (Def. Br. 9); plaintiff, in fact, is seeking to

enforce the 2003 Stock Agreement.[12]  If the Court finds any ambiguity as to whether it is the terms of the 2003 Stock Option Agreement that governs, such ambiguity must be construed against CIFG as the drafters of the plan and agreement.  See Unity Creations, Inc. v. Trafcon Indus., Inc., 137 F. Supp. 2d 108, 111 (E.D.N.Y. 2001)

Under French law,[13] as explained by Emmanuel Noirot ("Noirot"), a French attorney who practices employment law in Paris, Cully's agreement with CIFG did not contain the forum selection clause found only in the plan.  (Id. ¶¶10-22)  In particular, under French law, a forum selection clause will be enforced only if the party against whom enforcement is being sought signed a document that actually contains the clause, or at least makes specific reference to the provision.  (Id.)  The forum selection clause is thus invalid and not enforceable in the very court that is purported to be the exclusive forum.

In the alternative, if, despite its absence from the option agreement, the Court finds that the forum selection clause in the 2003 Stock Option Plan was included in Cully's 2003 Stock Option Agreement, the inclusion should be found to constitute overreaching.  By the time CIFG gave Cully the 2003 Stock Option Plan in the fall or winter of 2004, close to two years had elapsed since she had joined CIFG, forfeiting her ACA stock options in reliance on the receipt of comparable options from CIFG.  (Cully Dec. ¶13)  The forum selection clause was a material term not included in the original Employment Agreement between CIFG and Cully, and was presented to Cully at a time when she had no option but to sign the 2003 Stock Option Agreement or give up the benefit of the bargain and lose a very substantial amount of money.

---

[12]  Thus, one of the principal cases upon which defendants rely, Brennen v. Phyto-Riker Pharm., Ltd., No. 01 Civ. 11815 (DLC), 2002 WL 1349742 (S.D.N.Y. June 20, 2002), is inapplicable, as the plaintiff in that case was suing pursuant to an employment agreement he executed that contained a forum selection clause.

[13]  As a procedural matter, a French court would apply French law to a forum selection clause when, as here, the contract selects French law as the governing law.  (Declaration of Emmanuel Noirot ("Noirot Dec.") ¶¶12-13)

See Dentsply Int'l, Inc. v. Benton, 965 F. Supp. 574, 578-79 (M.D. Pa. 1997) (finding a forum selection clause unenforceable on the ground of overreaching where it was offered to employee several years into employment relationship on a take-it-or-leave-it basis).[14]  Enforcing the clause under such circumstances would be inequitable and unjust, as well as contravening the Employment Agreement.

In addition, there is a substantial question as to whether Cully would be able to be heard in the designated forum, the *Tribunal de Grande Instance* of Paris, given that the *Conseils de Prud'hommes* is vested with exclusive jurisdiction over employment disputes, including any related stock option plans.  (Noirot Dec. ¶¶2-8)  Forum selection clauses are unenforceable when a chosen forum is so inconvenient as to "effectively" deny the litigant her day in court, Phillips, 494 F.3d at 392; in this case, there is a significant risk that the designated forum would actually deny plaintiff her day in court.  (Noirot Dec. ¶9)  As CIFG has chosen an improper forum, its selection cannot be enforced, and plaintiff is entitled to pursue her claims in any appropriate venue, including this Court.

Therefore, even if there had been agreement between the parties to limit the LTI claims to a specific forum, that provision is unenforceable.

B.    Plaintiff Did Not Agree to Other Forum Selection Clauses

At the time CIFG and Cully agreed to her retirement in October 2005, the draft 2004 Stock Option Plan and 2004 Restricted Stock Plans contained no forum selection clause.

---

[14]  In Dentsply, the court cited to two cases in which forum selection clauses were enforced against employees.  Id. at 579.  In one of those cases, Goodman v. Hill-Rom Co., Inc., No. 96-759-CIV-T-17, 1996 WL 685840 (M.D. Fla. Nov. 25, 1996), it is unclear whether the agreement was entered after the employment relationship began.  In the other, Corinthian Media, Inc. v. Yelsey, No. 92 Civ. 0109 (LJF), 1992 WL 47546 (S.D.N.Y. Mar. 5, 1992), the court found that the employees could have refused to sign the agreements containing forum selection clauses and sought other jobs.  As unappealing as that option may be, it is more choice than Cully had at the time she was given the 2003 Stock Option Agreement, when her ACA stock options were irretrievably forfeited.

(Cully Dec. ¶¶17, 24; see Cully Dec., Exs. 16, 17)  The Plans were also materially different from the Modified 2004 Stock Option Plan and Modified 2004 Restricted Stock Plan upon which defendants rely.  (Cully Dec. ¶¶20, 26)  Defendants have declared the 2004 Stock Option Agreement and 2004 Restricted Stock Agreement signed by Cully to be void.  (Clark Dec., Ex. 2)  There is thus simply no forum selection agreement between CIFG and Cully to enforce.

Plaintiff is not, as defendants suggest (Def. Br. 9), seeking to enforce the Modified 2004 Stock Option Plan or the Modified 2004 Restricted Stock Plan.  Plaintiff's position is that those plans have been invalidly altered.  Plaintiff's claims for breach of contract concerning the 2004 stock options and restricted stock is that she was promised the awards as part of her compensation; that she understood, based on CIFG's representations, the stock awards to have certain values and certain vesting and exercise conditions; and that after plaintiff, relying on CIFG's representations as to the terms of the stock award programs, made decisions about how long to remain employed, including the decision agreed to by CIFG to retire, CIFG unlawfully changed their bargain.  (Complaint ¶¶65, 71-84)  When Cully made these decisions, the plans did not contain a forum selection clause.  (Cully Dec. ¶¶17, 24)  Moreover, Cully could have expected, based on the 2003 Stock Option Agreement, that any such general plan provision would not be included in her individual agreement.  (Cully Dec., Ex. 3 ¶20; Cully Dec., Ex. 11)

For Cully's awards for 2005 and 2006, there are no final plans in existence, no agreements even presented to Cully, a dispute as to the make-up of the award for 2005, and uncertainty as to the composition of the 2006 award.  (Cully Dec. ¶¶35, 37, 42)  Defendants do not even purport to possess a forum selection clause governing stock options or restricted stock after the invalidly altered 2004 plans.  While there were no forum selection agreements for these awards, there were enforceable agreements:  Cully has asserted that the award of LTI was a material part of her compensation and that she was, as promised, awarded LTI with stated

notional values and certain material terms and conditions governing vesting and exercise, and that CIFG breached those agreements as to the terms and conditions of the LTI.[15]  (Complaint ¶¶35, 67-70, 74-82)

Absent an agreement of the parties designating a different forum as the exclusive forum, this Court should not disturb plaintiff's selection of this Court for resolution of her claims.

## II.    PLAINTIFF CANNOT BE COMPELLED TO ARBITRATE HER CLAIMS CONCERNING HER PERFORMANCE UNITS

Defendants contend that under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"), the Court should dismiss some of plaintiff's LTI claims relating to her performance units and compel the parties to resolve these disputes through arbitration.  (Def. Br. 15)[16]  The Court, however, should deny defendants' motion because Cully never agreed to arbitrate any of her LTI claims.

The FAA establishes a federal policy favoring enforcement of arbitration clauses in contracts.  See Cronas v. Willis Group Holdings Ltd., No. 06 Civ. 15295 (GEL), 2007 WL 2739769, at *9 (S.D.N.Y. Sept. 17, 2007) (citing Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 225-26 (1987)).  An employee, however, "cannot be compelled to arbitrate a dispute in the absence of an agreement to do so."  Manigault v. Macy's East, LLC, 506 F. Supp. 2d 156, 160 (E.D.N.Y. 2007).  "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration."  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995).  Therefore, a court

---

[15]  In the alternative, if the Court were to later find no enforceable contracts, plaintiff would be seeking relief under the Ninth and Tenth Causes of Action, under the theories of promissory estoppel and unjust enrichment.

[16]  Contrary to defendants' contention, if the Court determines that arbitration is required to resolve any of plaintiff's LTI claims, dismissal is not the appropriate remedy.  Rather, pursuant to Section 3 of the FAA, the Court should stay the claims pending arbitration.  Massen v. Cliff, No. 02 Civ. 9282 (HBP), 2003 WL 2012404, at *2-*3 (S.D.N.Y. May 1, 2003); Spatz v. Ridge Lea Assocs., LLC, 309 A.D.2d 1248, 1249, 765 N.Y.S.2d 84, 86 (4th Dep't 2003).

presented with a motion to compel arbitration under the FAA must engage in a limited review to ensure that the parties actually agreed to arbitrate. See Stemcor USA, Inc. v. Trident Steel Corp., 471 F. Supp. 2d 362, 365 (S.D.N.Y. 2006) (citing PaineWebber, Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996)).

In determining whether an agreement to arbitrate exists, courts should apply ordinary state law principles governing the formation of contracts. Manigault, 506 F. Supp. 2d at 160 (citing First Options, 514 U.S. at 944). Under New York law, an enforceable contract "requires mutual assent to the essential terms and conditions thereof." Opals on Ice Lingerie v. Bodylines, Inc., 320 F.3d 362, 372 (2d Cir. 2003) (citation omitted); see Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857 (1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms . . . ."). "The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) (emphasis in original) (citing Maffea v. Ippolito, 247 A.D.2d 366, 367, 668 N.Y.S.2d 653 (2d Dep't 1998)). "If there is no meeting of the minds on all essential terms, there is no contract." Opals on Ice Lingerie, 320 F.3d at 372.

A.    The Modified Plans Do Not Constitute Enforceable Contracts

Defendants argue strenuously that under the Modified Master PUP, plaintiff must arbitrate claims regarding her performance unit awards for calendar years 2004, 2005, and 2006. Cully, however, has never been presented with, much less signed, an agreement governing her performance units awards, nor has she signed any other documents in which she agreed to arbitrate any claims relating to her performance units. (Cully Dec. ¶¶31, 34) Moreover, the Modified Master PUP contains materially different terms from the drafts in existence during

plaintiff's employment. (Cully Dec. ¶32) Most significantly, at the time Cully agreed to retire, the draft PUP contained no forum selection or arbitration provision, and CIFG's intent was to conform the draft PUP to the draft stock plans, which at that time contained no forum selection or arbitration provisions. (Cully Dec. ¶32, Ex. 14) Cully never signed or otherwise consented to CIFG's later modifications (Cully Dec. ¶33), nor do defendants contend that plaintiff entered into any such agreement. There was no meeting of the minds as to these modifications, so no contract was formed. See Brennan v. Bally Total Fitness, 153 F. Supp. 2d 408, 415-16 (S.D.N.Y. 2001) (holding that plaintiff not bound to arbitration clause in modified version of agreement that she never signed).

Contrary to defendants' contention (Def. Br. 11, 14), plaintiff is not seeking to enforce the Modified Master PUP as a binding contract. As noted above, Cully is asserting that the changes made to the plan were invalid, thereby precluding the modified plan itself from functioning as an enforceable contract. Rather, CIFG's obligation to provide Cully with LTI arose out of its promises, made over the course of several years, to award Cully LTI. At the time of these awards, CIFG made representations regarding their value and vesting requirements. Relying on these representations, plaintiff remained at CIFG, on the assumption that CIFG would not renege on its repeated pledges to award her LTI, to award her specified amounts, and to do so under certain conditions. As alleged throughout the Complaint, CIFG unlawfully changed its bargain.

    B.    <u>Plaintiff Did Not Agree to Arbitrate Any Disputes Under the Earlier Draft Plans</u>

Plaintiff is not obligated to arbitrate her LTI claims under the earlier draft PUP. At no time during Cully's employment did CIFG provide plaintiff with a final plan or an agreement governing an LTI award that contained an arbitration clause, and even the draft PUP plans contained no arbitration clause (and were intended to be brought into conformity with the

stock plans). With respect to the performance units awarded to plaintiff for calendar year 2004, CIFG has never finalized the Master PUP or provided plaintiff with an agreement governing that award. Finally, for the 2005 and 2006 LTI awards, plaintiff did not receive either final plans or agreements governing these awards. In fact, CIFG did not even inform Cully of the composition of these awards.[17] For all Cully knew through the date of her retirement, the agreements governing these awards could have omitted the arbitration provisions added to the plans after her retirement was agreed to, just as the 2003 Stock Option Agreement omitted the forum selection clause contained in the 2003 Stock Option Plan. In sum, throughout the duration of Cully's employment, there was no arbitration agreement for her to enter into with CIFG.

In addition, plaintiff never indicated, expressly or through her conduct, that she intended to bind herself to the arbitration clauses contained in some of the drafts of the PUP. This is not a case where the employer made continued employment contingent on the employee agreeing to its arbitration policy. See Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1374-76 (11th Cir. 2005) (holding that employees remaining in defendant's employ after notice of the arbitration policy "was an unambiguous act of acceptance of the [policy]," where policy specified manner of acceptance as continued employment and announced that policy was a condition of employment) (collecting cases); Gonzalez v. Toscorp Inc., No. 97 Civ. 8158 (LAP), 1999 WL 595632, at *1, *2 (S.D.N.Y. Aug. 5, 1999) (holding that continued employment constituted acceptance of the arbitration policy where policy explicitly provided that "[a]ll team members who continue employment after May 1, 1997 will be deemed to have accepted [the arbitration policy]"); see also Sherr v. Dell, Inc., No. 05 Civ. 10097 (GBD), 2006 WL 2109436, at *1, *3 (S.D.N.Y. July 27, 2006) (holding that, by keeping product purchased from defendant,

_____

[17]  As detailed above, Cully finds defendants' current statement that all of her 2005 award was performance units to be a further act of retaliation.

plaintiff voluntarily accepted defendant's terms and conditions, including its binding arbitration provision, where terms and conditions provided that "acceptance of the product's delivery also serves as an acceptance of the binding terms and conditions"). Accordingly, the mere fact that plaintiff continued working for CIFG does not amount to any sort of consent by plaintiff to be bound by some of the draft plans' arbitration provisions. See Manigault, 506 F. Supp. 2d at 164-65 (finding that continued employment did not constitute acceptance of arbitration policy where defendant did not condition the continuation of its current employees' employment on requiring them to agree to arbitration); Bailey v. Fed. Nat'l Mortgage Ass'n, 209 F.3d 740, 746-47 (D.C. Cir. 2000) (concluding that plaintiff signaled nothing when he remained in the employ of defendants following the issuance of the arbitration policy).

Where, as here, there is no express agreement and no conduct signifying an intent to accept the terms of an agreement, a party's silence does not, standing alone, establish mutual assent to the proposed agreement. In situations "'[w]here the recipient of an offer is under no duty to speak, silence, when not misleading, may not be translated into acceptance merely because the offer purports to attach that effect to it.'" Manigault, 506 F. Supp. 2d at 161 (quoting Albrecht Chem. Co. v. Anderson Trading Corp., 298 N.Y. 437, 440, 84 N.E.2d 625 (1949)). Plaintiff was not under an affirmative duty to reject the arbitration clauses added to the draft plans after her retirement had been agreed upon, so her silence in this regard cannot be construed as assent to be bound by the arbitration clauses. See id. at 165 (holding that defendant's employees' "silence and inaction cannot constitute acceptance of its offer to arbitrate"); see also Bailey, 209 F.3d at 746 (finding that there was no meeting of the minds because plaintiff did nothing whatsoever to embrace employer's arbitration proposal).[18]

---

[18]  In DuBois v. Macy's East, Inc., No. 06 Civ. 6522 (NGG)(LB), 2007 WL 3193169, at *5 (E.D.N.Y. July 13, 2007) (Report & Recommendation), also cited by defendants, the court held that, although plaintiff never expressly agreed to the defendant's arbitration policy, his conduct

Several cases cited by defendants in support of their argument that the court should compel arbitration are inapposite, because the plaintiffs in those cases undisputedly agreed to arbitration. See Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 146 (2d Cir. 2004) (noting that plaintiff signed Form U-4, which contained an arbitration clause, before he started employment with defendants); DeBono v. Wash. Mut. Bank, No. 05 Civ. 10333 (DC), 2006 WL 3538938, at *2 (S.D.N.Y. Dec. 8, 2006) ("[I]t is undisputed that plaintiff signed the [binding arbitration] Agreement."); Baldeo v. Darden Rests., Inc., No. 04 Civ. 2185 (JG), 2005 WL 44703, at *4 (E.D.N.Y. Jan. 11, 2005) (plaintiff conceding that there was "mutual assent to the proposition that employment discrimination claims would be subject to arbitration"). Under these circumstances, plaintiffs had to show fraud, duress, or other wrongful acts in the formation of the contract in order to overcome the presumption of a valid arbitration agreement. See Gold, 365 F.3d at 148-49 (noting that "in the absence of fraud or other wrongful act on the part of another contracting party, a party 'who signs or accepts a written contract . . . is conclusively presumed to know its contents and to assent to them . . . .'" (quoting Metzger v. Aetna Ins. Co., 227 N.Y. 411, 416, 125 N.E. 814 (1920)); DeBono, 2006 WL 3538938, at *2 (same); Baldeo, 2005 WL 44703, at *4 (same). None of these cases address the situation presented here, where the plaintiff claims that she did not, in the first instance, enter into an agreement to arbitrate.

Plaintiff, in this case, never agreed to arbitrate any disputes regarding her LTI claims. Accordingly, the Court should deny defendants' motion seeking to compel arbitration of Cully's LTI claims.

---

signified that he had accepted its terms. In that case, the court found that "[p]laintiff's act in writing to ask for assistance from [the dispute resolution program] to resolve a job related dispute demonstrate[d] plaintiff's assent to participate in the arbitration program." Id.

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss should be denied in its

entirety.

Dated: New York, New York
        January 8, 2008

                                    VLADECK, WALDMAN, ELIAS &
                                    ENGELHARD, P.C.


                        By:    _____
                                    Anne L. Clark (6456)
                                    Attorneys for Plaintiff
                                    1501 Broadway, Suite 800
                                    New York, New York  10036
                                    (212) 403-7300

# EXHIBIT A

**Cully v. CIFG Holding, et al, 07 Civ. 8195 (PKC)**

**Long-Term Incentive ("LTI") Compensation[*]**

| AWARD | DETAILS OF THE AWARD | PLANS | AGREEMENTS |
|---|---|---|---|
| 12/17/02:  In offer letter, defendants promised award of stock options constituting 0.27% of the outstanding shares; later plaintiff was notified by defendant that the aggregate notional value of the award was $450,000. | Details of the award provided in offer letter, dated 12/17/02: <br> - All stock options | "CDC IXIS Financial Guaranty Holding 2003 Stock Option Plan" <br> - Received in fall/winter 2004. <br> - Plan stated that it was effective 1/30/04. <br> - Plan stated that it expired 6/28/04. | "Stock Option Agreement Pursuant to 2003 Stock Option Plan of CDC IXIS Financial Guaranty Holding" <br> - Received in fall/winter 2004. <br> - Plan stated that it was effective 1/30/04. <br> - Plaintiff signed agreement as of 1/30/04 (signature undated; actually signed in fall/winter 2004). |
| 3/05:  Plaintiff was awarded LTI with aggregate notional value of $100,000 for calendar year 2004. | Details of award provided 3/2/06: <br> - 36% Stock Options <br> - 53% Restricted Stock <br> - 11% PUP | Plaintiff has not received a Participation Unit Plan governing the award; she only has copies of drafts prepared during her employment. <br><br> Stock Option and Restricted Stock Plans existed in draft form during plaintiff's employment.  Defendants identify as final plans the "CIFG Holding Calendar 2004 Stock Option Plan" and "CIFG Holding Calendar 2004 Restricted Stock Plan" <br> - Plaintiff received both "final" plans 4/07. <br> - Both "final" plans stated that they were effective 12/30/05, but were not "finalized" until December 2006. <br> - Both "final" plans stated that they expired | Plaintiff has not received a Participation Unit Plan Agreement. <br><br> "Option Agreement of CIFG Holding Pursuant to CIFG Holding Calendar 2004 Stock Option Plan" and "Restricted Stock Agreement Pursuant to CIFG Holding Calendar 2004 Restricted Stock Plan" <br> - Plaintiff received both agreements 4/07. <br> - Both agreements stated that they were effective 12/30/05. <br> - Plaintiff signed and returned agreements with modifications to conform the agreements to French Law (signatures undated; signed 4/07). <br> - Defendants rejected plaintiff's acceptance and modifications in a letter dated 6/12/07, declaring |

[*]  All of the information summarized herein is derived from the Declaration of Kathleen Cully in Opposition to Defendants' Motion to Dismiss, with exhibits, and from the exhibits to the Declaration of Pamela Brown in Support of Defendants' Motion to Dismiss.

| AWARD | DETAILS OF THE AWARD | PLANS | AGREEMENTS |
|---|---|---|---|
| | | 12/30/06. | the agreements void. |
| 3/06: Plaintiff awarded LTI with aggregate notional value of $100,000 for calendar year 2005. | Plaintiff has not received details of the award. | Plaintiff has not received any plans governing the award that purport to be final. | Plaintiff has not received any agreements governing the award. |
| 3/14/06: Jacques Rolfo promised that plaintiff would receive LTI for calendar year 2006, to be awarded in 2007, with an aggregate notional value of $120,000. | Plaintiff has not received details of the award. | Plaintiff has not received any plans governing the award that purport to be final. | Plaintiff has not received any agreements governing the award. |