UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

KATHLEEN G. CULLY,

        Plaintiff,

- against -

CIFG HOLDING, CIFG
GUARANTY, CIFG EUROPE,
CIFG SERVICES, INC., CIFG
ASSURANCE NORTH AMERICA,
INC., and JACQUES ROLFO

        Defendants.

----------------------------------X

07 Civ. 8195 (PKC)

ECF CASE

DECLARATION OF KATHLEEN
CULLY IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

        KATHLEEN CULLY, under penalty of perjury, affirms and states as follows:

        1.    I am the plaintiff in this action against defendants CIFG Holding, CIFG Guaranty, CIFG Europe, CIFG Services, Inc., CIFG Assurance North America, Inc. ("CIFG NA") (collectively "CIFG"), and Jacques Rolfo ("Rolfo") (collectively "defendants"). I submit this Declaration in response to the motion of defendants CIFG Holding and CIFG Services, Inc. to dismiss certain of my claims relating to Long Term Incentive compensation ("LTI").

        2.    In 2002, I was General Counsel of the American Capital Access group of companies ("ACA"), which included the bond insurer ACA Financial Guaranty Corporation. I had held that position since January 1998, and my job was secure.

        3.    In 2002, Michael Freed ("Freed"), who was then CIFG's General Counsel, recruited me to join CIFG with the title of Managing Director and General Counsel of CIFG NA, performing the equivalent function for CIFG Europe. Freed assured me that although I would be formally reporting to him, in practice we would act as partners, with Freed having primary

249115 v1

1

responsibility for corporate and licensing matters and me having primary responsibility for transactions and related regulatory matters.

4.      I remained an employee of CIFG until December 31, 2006, although I was barred from the CIFG premises as of November 8, 2006.

Stock Options

2003 Plan

5.      When CIFG was recruiting me, we negotiated that, like other management-level CIFG employees, I would be eligible for bonuses and LTI. At the time, CIFG's LTI was still in the planning stages, and no plans were in effect or even in draft form. CIFG later developed and, to my knowledge, now has three primary types of LTI: stock options, restricted stock, and performance or participation units.

6.      Another item of negotiation between CIFG and me was the amount of CIFG stock options to be granted to me to replace stock options I had been awarded as part of my compensation at ACA, which I would forfeit by leaving ACA for CIFG. I held both vested and unvested ACA options. The unvested options were forfeited upon my resignation; the vested options could be exercised only within 90 days following my resignation. While the vested options were "in the money" at that time, the stock was not transferable, and I did not have the funds to exercise the options absent the ability to sell the resulting stock. As a result I forfeited – and CIFG knew I would forfeit – both my vested and unvested options.

7.      The final result of the negotiations between CIFG and me is reflected in CIFG's employment agreement, dated December 17, 2002, and signed by Rolfo and me ("Employment Agreement"). A copy of the Employment Agreement is attached as Exhibit 1.

8.  At the time we executed the Employment Agreement, I was not given any stock option plan or agreement, as no such plan or agreement then existed. I did not expect that either the plan or agreement would contain a forum selection clause providing for exclusive jurisdiction in a court in Paris, as in my experience, it was not "customary" to deny U.S.-based employees a forum in their own country. Moreover, had I been aware of such an exclusive forum selection provision, I would have objected to it at the time as being unfairly biased in favor of my prospective employer.

9.  I began my employment with CIFG in January 2003. In the fall or winter of 2004, CIFG finally granted me the full stock options it had promised me in the Employment Agreement, effective as of January 30, 2004. The stock options were given a notional value of $450,000 by CIFG. A copy of a Memorandum regarding Long Term Incentives, dated March 2, 2006, from Pamela Brown to me is attached as Exhibit 2.

10. In the fall or winter of 2004, CIFG gave me a Stock Option Agreement Pursuant to 2003 Stock Option Plan of CDC IXIS Financial Guaranty Holding, which Stock Option Agreement governed CIFG's award to me ("2003 Stock Option Agreement"), and a copy of the CDC IXIS Financial Guaranty Holding 2003 Stock Option Plan ("2003 Stock Option Plan"). I was not involved in the drafting of either the 2003 Stock Option Plan or the 2003 Stock Option Agreement. A copy of the 2003 Stock Option Agreement is attached as Exhibit 3.

11. I signed the 2003 Stock Option Agreement, but not the 2003 Stock Option Plan.

12. I believe that the Executive Board exercised its authority under the 2003 Stock Option Plan to enter into individual option agreements (including my 2003 Stock Option Agreement) that contained terms specific to each such option agreement.

13. If and to the extent the 2003 Stock Option Agreement were deemed nonetheless to incorporate the forum selection clause contained in the 2003 Stock Option Plan, I had no option but to sign the 2003 Stock Option Agreement because by the time I was presented with the plan and agreement I had forfeited my ACA stock options close to two years earlier in reliance on the grant of the CIFG stock options.

14. Although other CIFG employees were granted stock options in 2004 for their performance in 2003, I was not granted any options in 2004 for 2003. Instead, I was awarded only the "sign-on" options guaranteed in my Employment Agreement. A copy of CIFG's statement of my 2004 compensation, including bonus and LTI for 2003, is attached as Exhibit 4.

### 2004 Plan

15. In March 2005, CIFG awarded me LTI with a notional value of $100,000 for my performance in 2004. At that time, CIFG did not tell me how the award would be broken down among stock options, restricted stock, and performance units. A copy of CIFG's statement of my 2005 compensation, including bonus and LTI for 2004, is attached as Exhibit 5.

16. During my employment, the CIFG Holding Calendar 2004 Stock Option Plan ("2004 Stock Option Plan") existed only in draft form.

17. At the time my retirement was agreed upon in October 2005, the draft 2004 Stock Option Plan was the same in most material respects as the 2003 Stock Option Plan, except it did not contain a choice of forum provision. It also did not have an arbitration provision. The provisions of the draft plans in existence at the time were approved by CIFG.

18. Subsequently, I had discussions with Sophie Viller ("Viller"), Juriste Droit des Affaires of CIFG Europe, about changing any forum selection clause included in the 2004

249115 v1

Stock Option Plan different from that in the 2003 Stock Option Plan as, according to Viller, the *Tribunal de Grande Instance* would not be the proper court to hear disputes under an employee stock option plan. Accordingly, the forum selection clause that was added in 2006 stated that, "For so long as the Company is domiciled in France, . . . the court of competent jurisdiction within the Court of Appeal of Paris shall be exclusively competent to determine any claim or dispute arising in connection herewith that is not or cannot be resolved by mediation or arbitration as provided herein." This provision was included in the last draft of the 2004 Stock Option Plan of which I was aware prior to my departure from CIFG at the end of 2006.

19.   CIFG did not provide me with a copy of the "final" 2004 Stock Option Plan ("Modified 2004 Stock Option Plan") until April 2007. Unlike the 2003 Stock Option Agreement, the Option Agreement of CIFG Holding Pursuant to CIFG Holding Calendar 2004 Stock Option Plan ("2004 Stock Option Agreement"), also contained the forum selection provision contained in the plan. A copy of the 2004 Stock Option Agreement is attached as Exhibit 6.

20.   Relying upon the opinion of Professor George A. Bermann ("Bermann"), the Jean Monnet Professor of Law and Director of European Legal Studies Center at Columbia University School of Law, I believed that the Modified 2004 Stock Option Plan and 2004 Stock Option Agreement I was provided in April 2007 made material changes to the stock option plan that were invalid under French law under, *inter alia*, the principles of "tacit renewal," "fair and reasonable" interpretation of the contracts, customary usage and, above all, performance "in good faith." A copy of Bermann's Opinion, dated April 6, 2007, is attached as Exhibit 7 and a copy of his curriculum vitae is attached as Exhibit 8.

21.    Had I signed the 2004 Stock Option Agreement in the form presented to me, I would have essentially agreed to give up almost all of the options that I had earned for 2004. I made changes to the 2004 Stock Option Agreement to bring it into compliance with French law as to those points, signed the amended agreement, and sent it back to CIFG, along with Bermann's opinion letter dated April 6, 2007 and a copy of his curriculum vitae. A copy of my cover letter to Pamela Brown, Head of CIFG's Human Resources department, dated April 17, 2007, is attached as Exhibit 9. A copy of the 2004 Stock Option Agreement marked with my changes is attached as Exhibit 10.

Restricted Stock

22.    In 2004, CIFG did not award me any restricted stock for my performance in 2003. My first award of restricted stock was for 2004.

23.    As stated above, in March 2005, CIFG awarded me LTI with a notional value of $100,000 for my performance in 2004.

24.    During my employment with CIFG, no restricted stock plan was ever adopted. Drafts of the 2004 Restricted Stock Plan were very similar to the 2003 Stock Option Plan, except for differences to reflect the differences between stock options and restricted stock under French law. Because of the similarities, only one plan was worked on at any given time, with the knowledge that any changes would be incorporated into the other plan. Thus, at the time my retirement was agreed to, the draft restricted stock plans in existence contained a choice-of-law provision stating the plan was governed by French law, but no forum selection clause, and the same forum selection clause that was added to the draft 2004 Stock Option Plan in 2006 either was added, or considered added, in 2006 to the draft 2004 Restricted Stock Plan. The basic agreement for the restricted stock plan also existed only in draft form through December

2005, and also did not contain a forum selection clause. An undated copy of the draft restricted stock agreement as of July 29, 2005, is attached as Exhibit 11.

25. I was familiar with the contents of the draft LTI plans as they existed prior to December 2005. In fact, I relied on those provisions, which had been approved by CIFG, in making the decision to retire that was also approved by CIFG. In and after December 2005, however, when the plans were revised so as to deprive me of my benefits thereunder, defendants either concealed such revisions from me or instructed me, over my objections, to draft the plans to make such revisions.

26. As with the 2004 Stock Option Plan, the CIFG Holding Calendar 2004 Restricted Stock Plan ("Modified 2004 Restricted Stock Plan"), upon which defendants rely, was not provided to me until April 2007. As with the Modified 2004 Stock Option Plan, the Modified 2004 Restricted Stock Plan contained material changes from the draft plan, which Bermann determined were invalid under French law.

27. I also received the Restricted Stock Agreement Pursuant to CIFG Holding Calendar 2004 Restricted Stock Plan ("2004 Restricted Stock Agreement") in April 2007. A copy of the 2004 Restricted Stock Agreement is attached as Exhibit 12.

28. The 2004 Restricted Stock Agreement contained a forum selection clause that was the same as in the 2004 Stock Option Agreement.

29. Due to CIFG's unlawful changes, had I signed the 2004 Restricted Stock Agreement as presented to me, I would have been giving up my entire 2004 award of restricted stock. I marked changes to the 2004 Restricted Stock Agreement to bring it into compliance with French law as to those points, and sent it to CIFG with the 2004 Stock Option Agreement

and Bermann's opinion letter and curriculum vitae. A copy of the 2004 Restricted Stock Agreement marked with my changes is attached as Exhibit 13.

### 2004 Performance Units

30. CIFG had a Performance Unit Plan for 2003, but I was not awarded any units under that plan in 2004. My first award of performance units was for 2004.

31. CIFG's award to me for 2004 was made pursuant to the CIFG Services, Inc. Master Performance Unit Plan ("Master PUP"), which even now exists only in draft form. Thus, I have never been presented with a purportedly "final" plan, or with any agreement governing the performance unit award.

32. The draft Master PUP provided by defendants ("Modified Master PUP") is materially different from the drafts in existence during my employment. Indeed, the intention when I was employed by CIFG was to conform the PUP to the stock plans as much as possible. As stated above, the draft stock plans in effect until my agreement to retire did not contain any forum selection clause, nor did they contain any arbitration provision. A copy of the draft Master PUP in French, dated July 8, 2004, is attached as Exhibit 14. I understand French and can attest that this draft does not contain an arbitration provision.

33. I never signed or otherwise consented to the 2003 Performance Unity Plan or to CIFG's modifications to the draft Master PUP.

34. I have never signed any other documents in which I agreed to arbitrate any claims relating to my performance units.

### Award for 2005

35. In March 2006, CIFG notified me that I was awarded LTI with a notional value of $100,000 for my performance in 2005. CIFG has never provided notice to me of the

249115 v1                                8

composition of the award, provided any plans governing the award, or provided any agreements for the award. A copy of CIFG's statement of my 2006 compensation, including bonus and LTI for 2005, is attached as Exhibit 15.

36. During my employment the stock option and restricted stock plans for 2005 existed only in draft form and were the same as the respective drafts for 2004, as it was CIFG's intention to establish forms of master plans to be renewed annually or to apply to annual LTI awards. A copy of the draft 2005 Restricted Stock Plan, dated June 10, 2005, is attached as Exhibit 16, and a copy of the draft 2005 Restricted Stock Plan, dated October 31, 2005, is attached as Exhibit 17. The draft 2004 Restricted Stock Plan would have been the same.

37. In defendants' motion papers, defendants state that my entire award for 2005 is in the form of performance units. I have no knowledge when that decision was made, nor have I seen any documentation confirming it. Performance units are less desirable than stock options or restricted stock because they have a term of only three years (compared to ten years for stock options and restricted stock) and their value depends solely on CIFG meeting the targets specified for such three-year period.

38. I will not know until I receive discovery I requested from defendants, but I suspect that other CIFG employees did not receive LTI awards for 2005 consisting solely of performance units, and that designating my entire 2005 award as such is yet another act of retaliation taken by defendants.

39. I believe, based on informal conversation while I was employed by CIFG and market conditions thereafter, that CIFG has not satisfied its performance targets for any of the relevant periods. This would, of course materially reduce the value of the performance units

249115 v1

9

I was awarded, which purported awards were made after CIFG was aware that the targets had not been, or probably would not be, satisfied.

40. To my knowledge, the targets have not yet been announced for any performance units I have or may have, even for the period beginning January 1, 2005, and ending December 31, 2007.

41. No such performance units grant were made to me during the 120-day period beginning January 1, 2005.

Award for 2006

42. In March 2006, Rolfo sought to induce me to delay my forced retirement until the end of December 2006. Part of Rolfo's inducement was a promise to me that in 2007 I would be awarded LTI for my performance in 2006 with a notional value of $120,000. CIFG has never provided notice to me of the composition of the award, provided any plans governing the award, or provided any agreements for the award.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 8, 2008 in New York, New York.

*Kathleen Cully*
KATHLEEN CULLY