# EXHIBIT 6

# CIFG HOLDING

*Société Anonyme à Directoire et Conseil de Surveillance
au capital de 450.078.480 €
Siège social :* 31 - 33, rue de Mogador - 75009 Paris
439 357 302 R.C.S. Paris

## OPTIONEES OF CIFG SERVICES, INC.

## OPTION AGREEMENT OF CIFG HOLDING
## PURSUANT TO CIFG HOLDING CALENDAR 2004 STOCK OPTION PLAN

**THIS OPTION AGREEMENT**, the effective date of which is December 30, 2005 (the "**Effective Date**" or "**Date of Grant**"), is concluded by and between CIFG Holding, a French company (hereafter the "**Company**"), and **Kathleen Cully**, an individual employee of the Company or a CIFG Affiliate (hereafter the "**Optionee**"). Capitalized terms not defined herein shall have the meanings ascribed to them in the CIFG Holding Calendar 2004 Stock Option Plan (the "**Plan**"). This Agreement and the terms of the Options will be governed by the terms and conditions of the Plan, which is attached hereto ("**Annex 1**") and incorporated in its entirety herein. In the event of any conflict between this Agreement and the Plan, the terms of the Plan shall govern.

**1.     Grant of Options.** The Company hereby grants to Optionee Options to subscribe to **7,474** Shares of the Company, to be issued in accordance with Section 3 of the Plan (the "**Options**"). Prior to the Listing Date, the securities subject to Options shall be P Category Shares. On and after the Listing Date, or such other date as may be determined by the Executive Board subject to the approval of the Supervisory Board, the securities subject to the Options shall be Ordinary Shares.

**2.     Exercise Price of Options.** The exercise price is 10,47 Euros per Share.

**3.     Date of Grant and Term of Options (or Expiration Date).** The Date of Grant of the Options is December 30, 2005. The Term of the Options is ten years, and the Options will expire on the tenth anniversary of the Date of Grant at 12:00 a.m. (Paris time), December 30, 2015 (the "**Expiration Date**"), unless sooner terminated as provided in this Agreement or the Plan.

**4.     Vesting and Date of Permitted Exercise.** The Options will vest according to the following vesting schedule:

December 30, 2005: 18.75% Vested

December 30, 2006: 25% (cumulative 43.75%)

December 30, 2007: 25% (cumulative 68.75%)

December 30, 2008: 25% (cumulative 93.75%)

December 30, 2009 6.25% (cumulative 100%)

The Date of Permitted Exercise is the fourth anniversary of the Date of Grant, i.e. December 30, 2009. The Options may not be exercised unless Optionee complies with the requirements provided for the provisions of "**Continuous Status as a Beneficiary**."

5. **Termination of Continuous Status as a Beneficiary with the Company or a CIFG Affiliate.**

A) <u>Reason other than Death, Willful or Serious Misconduct or Voluntary Termination</u>. If Optionee's Continuous Status as a Beneficiary is terminated by Optionee or the Company or a CIFG Affiliate for a reason other than death, willful or serious misconduct or voluntary termination by Optionee on or after the Date of Permitted Exercise, Optionee may exercise vested Options for a period of ninety (90) days after the date of such termination, but in no event later than the Expiration Date. If Optionee's Continuous Status as a Beneficiary is terminated by Optionee or the Company or a CIFG Affiliate for a reason other than death, willful or serious misconduct or voluntary termination by Optionee prior to the Date of Permitted Exercise, Optionee may exercise the portion of the Options that are vested as of the termination date for a period of ninety (90) days from and after the Date of Permitted Exercise, but in no event later than the Expiration Date.

B) <u>Willful or Serious Misconduct</u>. If Optionee's Continuous Status as a Beneficiary is terminated by the Company or a CIFG Affiliate for willful or serious misconduct (as defined in the Plan) on or after the Date of Permitted Exercise, Optionee may exercise vested Options for a period of fifteen (15) days after the date of such termination, but in no event later than the Expiration Date. If Optionee's Continuous Status as a Beneficiary is terminated by the Company or a CIFG Affiliate for willful or serious misconduct prior to the Date of Permitted Exercise, Optionee may exercise the portion of the Options that are vested as of the termination date for a period of fifteen (15) days from and after the Date of Permitted Exercise, but in no event later than the Expiration Date.

C) <u>Voluntary Termination</u>. If Optionee's Continuous Status as a Beneficiary is terminated by Optionee due to voluntary termination on or after the Date of Permitted Exercise, Optionee may exercise vested Options for a period of ninety (90) days after the date of such termination, but in no event later than the Expiration Date. If Optionee's Continuous Status as a Beneficiary is terminated by Optionee due to voluntary termination prior to the Date of Permitted Exercise, Optionee may exercise the portion of the Options that are vested as of the termination date for a period of ninety (90) days from and after the Date of Permitted Exercise, but in no event later than the Expiration Date.

Notwithstanding the foregoing, in the event of: (a) Optionee's retirement from the Company or a CIFG Affiliate under Section 2(l)(iii)(2) of the Plan, which,

notwithstanding anything in the Plan to the contrary shall mean the Optionee's cessation of employment or service from the Company or a CIFG Affiliate upon attainment of age 55 with no less than six (6) years of service with the Company or a CIFG Affiliate; or (b) Optionee's transfer(s) among affiliates of the Company, as set forth in Section 2(l)(iv) of the Plan; unvested Options shall continue to vest according to the Vesting Schedule herein and vested Options shall be exercisable from and after the Date of Permitted Exercise, but in no event later than the Expiration Date. Notwithstanding the foregoing, to be eligible for any continued vesting of Options upon Optionee's retirement, as defined above, Optionee shall not engage in any paid consulting or employment activity (including without limitation any Prohibited Actions), unless he or she shall have given prior written notice of such activity to the Company and the Executive Board shall not have disapproved of his or her engaging in such activity in writing within four (4) full calendar weeks of receipt of such notice; and shall certify, no later than January 31 of each year thereafter, that he or she is not engaging and did not engage in any such activity during the current and preceding calendar years. If Optionee's retirement, as defined above, does not meet the requirements set forth above and under the Plan, the Optionee shall be deemed to have terminated employment due to a voluntary termination by Optionee, in which event the provisions of this Agreement relating to voluntary termination shall be in effect.

D)   Death. In the event of the death of the Optionee while employed by the Company or a CIFG Affiliate, unvested Options shall become immediately vested on the date of death and all Options shall become exercisable and may be exercised by Optionee's estate or by a person who acquires the right to exercise such Options by bequest or inheritance at any time within six (6) months after the date of death, even if the Expiration Date occurs before the expiration of the six (6) month period. Notwithstanding the foregoing, if death occurs prior to the Date of Permitted Exercise, any references to the date of death in the preceding sentence shall be deemed to refer to the Date of Permitted Exercise.

6.   **Exercise of Options.** The Options may be exercised by notice to the Company in such form as shall be specified by the Company, at the following address: CIFG Holding – 31-33, rue de Mogador – 75009 Paris, or at such other address as may be specified by the Company, to be duly given by the person entitled to exercise the Options, specifying the number of related Shares to be purchased. Notice must be sent by registered or certified mail, overnight courier, telefacsimile or by personal delivery, in each case with evidence of receipt. An Option must not be exercised for a fraction of a Share. The purchase price of the Shares as to which the Option is exercised must be paid in full at the time of exercise in Euro currency or the equivalent amount in United States dollars or pounds sterling at the closing spot rate of exchange for Euros on the date of exercise, in cash, by check or wire transfer, at the option of the Executive Board, offset against receivables or by means of Cashless Exercise. Shares to be issued upon the exercise of Options shall be issued in the name of the Optionee. Upon exercise of the Options, the Shares issued to the Optionee shall be entitled to dividends for the fiscal year during which the Options are exercised.

Cashless Exercise shall be effected by means of a properly executed notice, together with such other documentations as the Executive Board (and the broker, if applicable) shall require to effect the exercise of the Options. Prior to the Listing Date, Cashless Exercise will require the exercise of the Option and the Put Option on the same day, resulting in a cash payment to Optionee equal to the difference between the Fair Market Value of the Shares on the date of exercise and the exercise price. From and after the Listing Date, the Executive Board may determine in its discretion whether Cashless Exercise will require the same day sale of Shares or whether Optionees will be permitted to elect to receive payment in cash or Shares.

**7.    Rights as a Holder of Options.** Optionee will not have any rights as a holder of Shares subject to the Options prior to the issuance to Optionee of such Shares. P Category Shares have no voting rights and are governed by article 6.2 of the by-laws of the Company, which is attached as Annex B to the Plan, as amended from time to time pursuant to the Plan and applicable law. In the event that any legal or regulatory provision prevents the issuance of the Shares subject to the Options, the Optionee acknowledges that the Company shall not be held liable for the non issuance of Shares.

**8.    Non-Transferability.** Options may not be transferred or disposed of in any manner other than by will or by laws of descent or distribution and shall not otherwise be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, hypothecation, encumbrance, or charge, and any such attempted action shall be void. Notwithstanding the foregoing, if permitted by applicable law, the Options and/or any related rights or benefits may be transferred to a trust or similar arrangement for the benefit of one or members of an Optionee's immediate family (including without limitation his or her domestic partner). Options may be exercised, during the lifetime of an Optionee, only by the Optionee.

**9.    Change in Control or Redomiciliation.** In the event of a Change in Control, whether or not such an event is the result of the Listing of the Company, all of the Options shall become fully vested and exercisable for the duration of the Term as of the effective date of such Change in Control. Optionee hereby acknowledges that, according to the Plan and this Agreement, the Options and related Shares acquired as a result of exercise of the Options may be adjusted, replaced, substituted, surrendered or cancelled, as the case may be, as a result of a Change in Control. In the event of a Redomiciliation of the Company or the Group (as defined in the Plan), whether or not resulting in a Change in Control, the Executive Board may effect a replacement of the Options by issuing new rights or entitlements in exchange for the Options, provided that Optionee will be offered the right to refuse the substitution and retain the Options to the extent vested as of the Redomiciliation (unvested Options will be forfeited).

**10.    Other Adjustments.** Optionee hereby acknowledges that according to the Plan, and this Agreement, the Options and the related Shares acquired as a result of exercise of the Options shall be adjusted, replaced, substituted, surrendered or cancelled, as the case may be, as a result of a change in capitalization (as provided for under the provisions of the Plan) or in the event of a proposed dissolution or liquidation of the Company (as provided for under the provisions of the Plan).

**11.     Redemption Rights.**

A)     <u>Call Option</u>.  At any time prior to the Listing Date, particularly in the event of the termination of Optionee's Continuous Status as a Beneficiary, and subject to any restriction under French corporate laws or other laws, the Company shall have the right for a period of one hundred and fifty (150) days from the later of the termination date or the Date of Permitted Exercise: (i) to redeem any P Category Shares issued to Optionee pursuant to this Agreement; or (ii) to be substituted in such right by a Substituted Party (as defined in the Plan).  Upon the exercise by the Company or a Substituted Party of its right of redemption, Optionee agrees to sell Optionee's P Category Shares to the Company or to a Substituted Party for a redemption price equal to the Fair Market Value of the P Category Shares on the date of redemption.

B)     <u>Put Option</u>.  From and after the Date of Permitted Exercise but prior to the Listing Date, Optionee may require the Company (or a Substituted Party that notified Optionee) to repurchase the P Category Shares that Optionee may have acquired under the Plan, in accordance with the provisions of the Plan.  The Put Option is exercisable for a period of thirty (30) days following notice of the Fair Market Value of P Category Shares as set forth in Section 18 of the Plan.  Notwithstanding the (15) fifteen-day period set forth in Section 5(B) of this Agreement for the exercise of Options by an Optionee following an event of termination of Continuous Status as a Beneficiary due to dismissal for willful or serious misconduct, in the event the (15) fifteen-day period begins subsequent to the foregoing (30) thirty-day period, an Optionee intending to exercise Options within said (15) fifteen-day period shall have the right to exercise the Put Option within a (10) ten-day period commencing on the date of the next following notification by the Executive Board of the Fair Market Value.  Rights under this Section 11(B) will terminate as of the Listing Date.

**12.     Tax and Social Security Matters.**

A)     <u>Tax and Social Security Withholding</u>.  As a condition to the delivery of Shares upon the exercise of the Option, Optionee agrees to pay to the Company an amount sufficient to satisfy any applicable tax and social security withholding obligations.  Optionee agrees that the Company and/or CIFG Affiliate which is Optionee's employer is expressly authorized, to the extent permitted by applicable law, to deduct from Optionee's remuneration, if any, such amounts as may be required to satisfy the Company's or any CIFG Affiliate's tax or social security withholding obligations as a result of the exercise by Optionee of Options and/or the sale of P Category Shares or Ordinary Shares.  If the Company or CIFG Affiliate does not withhold an amount from the Optionee's remuneration, if any, sufficient to satisfy the Company's or CIFG Affiliate's tax or social security withholding obligations as set forth above, the Optionee agrees to reimburse the Company or the relevant CIFG Affiliate on demand for the amount not withheld but paid by the Company or CIFG Affiliate.

B)     <u>Compliance with Section 409A of the Code</u>.  The Plan and this Agreement are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended,

(the "Code") and shall be administered, operated and interpreted accordingly. The Company reserves the right in its sole discretion to unilaterally amend this Agreement for purposes of complying with Section 409A of the Code and any guidance issued thereunder. Notwithstanding the foregoing, the Company does not guarantee the tax treatment of any benefits or payments hereunder, including without limitation pursuant to the Code or any applicable international, federal, state or local laws.

**13.    General Provisions.**

A)    <u>No Right to Continued Employment or Future Benefits</u>.  Neither the Option nor this Agreement confers upon Optionee any right to continue to be an employee of the Company or any of its subsidiaries or interferes in any way with the right of the Company or any of its subsidiaries to terminate Optionee's employment at any time. In addition, the Plan and the benefits offered thereunder are provided by the Company on an entirely discretionary basis, and the Plan creates no vested rights in participants other than as specifically set forth in this Agreement and in the Plan. Optionee understands and agrees that the benefits offered under this Agreement and the Plan are not part of Optionee's salary and that the grant of Options does not create any contractual or other right to receive a grant of stock options or benefits in lieu of stock options in the future. Future grants, if any, will be at the sole discretion of the Company, including, but not limited to, the timing of any grant, the number of options, vesting provisions and the exercise price

C)    <u>Amendment and Termination</u>.  This Agreement may only be amended in a writing signed by Optionee and the Company. Subject to certain exceptions, the Plan may be amended, altered, suspended or terminated by the Executive Board at any time in any manner (as provided for under the provisions of the Plan). No amendment, alteration, suspension or termination of the Plan shall impair Optionee's rights under the Option without Optionee's written consent.

D)    <u>Stock Ownership Risks</u>.  The future value of the underlying P Category Shares or Ordinary Shares is unknown and cannot be predicted. In the event that the underlying P Category Shares or Ordinary Shares do not increase in value in relation to the Exercise Price, or if such P Category Shares or Ordinary Shares decrease in value, the value of the Options could be of negligible value. Optionee is responsible for obtaining all necessary exchange control approvals or filings, where required, in order to remit payment for the purchase price of P Category Shares or Ordinary Shares subject to the Options to the Company.

E)    <u>Data privacy</u>.  Optionee authorizes Optionee's employer to furnish the Company and any agent of the Company administering the Plan or providing Plan record-keeping services with such information and data as it requests in order to facilitate the grant of Options and the administration of the Plan. In addition, Optionee agrees that certain routine data concerning Optionee and Optionee's participation in the Plan might be transmitted and communicated outside the country of Optionee's place of employment or residence to enable the Company and it agent, if any to administer the Plan. Optionee shall

have access to the data collected and shall be able to amend or rescind this authorization upon thirty (30) days written notice to the Company.

F)   <u>Entire Understanding</u>.   This Agreement and the Plan constitute the entire understanding between the Optionee and the Company regarding these Options. In addition, any prior agreement, commitments or negotiations between the Optionee and the Company, including those contained in any offer letter or employment contract, concerning the terms under which options are granted are superseded by this Agreement and the Plan.

G)   <u>Governing Law and Mediation</u>.   This Agreement will be governed by and construed in accordance with the governing law of the Plan, which, for so long as the Company is domiciled in France, is the law of France. The court of competent jurisdiction within the Court of Appeal of Paris shall be exclusively competent to determine any claim or dispute arising in connection with this Agreement and the Plan that is not or cannot be resolved by mediation or arbitration as set forth in this Agreement and the Plan. In the event of any claim or dispute arising out of or relating to this Agreement or the Plan, or the breach thereof, and unless the parties shall have resolved such claim or dispute within ninety (90) days after written notice from one party to the other setting forth the nature of such claim or dispute, such claim or dispute shall be submitted to a mediator jointly selected by the parties for nonbinding, confidential mediation. If such mediation does not result in resolution of such claim or dispute within one hundred and eighty (180) days from the date of such notice: (i) in the event the Plan is governed at that time by French law, the parties may proceed to any and all remedies available to them in law or equity; or (ii) in the event is no longer governed at that time by French law, the parties will submit to binding arbitration in London, England or New York, New York in the case of employees located in, respectively, Europe and the United States, in accordance with the arbitration rules then generally in effect in such location for such disputes and judgment upon an award rendered by such arbitrator(s) shall be entered in any court having jurisdiction thereof upon the application of either party.

IN WITNESS WHEREOF, this Agreement has been duly executed by the undersigned as of March 26, 2007, and shall be effective as of the Effective Date.

CIFG HOLDING

By: _____

Jacques Rolfo
President of the Executive Board


OPTIONEE HEREBY ACKNOWLEDGES RECEIPT OF THE PLAN AND AGREES TO BE BOUND BY ITS TERMS AND THE TERMS OF THIS AGREEMENT.

OPTIONEE


_____

**Kathleen Cully**

8