# EXHIBIT 7

**OPINION**

of

Professor George A. Bermann,
Jean Monnet Professor of Law and Director of the European Legal Studies Center
Columbia University School of Law

---

1.  I have been asked to provide an opinion on two questions: (A) whether the employees of a company may, in exercising their rights under long-term incentive plans, invoke the benefits found in the terms and conditions of the stock option plan in effect throughout their employment, even though that plan has expired and no current stock option plan has officially been adopted and even though the company's draft plans currently under consideration for adoption do not afford those benefits; and (B) whether a company may validly redefine the term "retirement" within the meaning of continuing post-retirement benefits under stock option and restricted stock plans after an employee announced her retirement, with the result that the employee loses post-retirement benefits.

2.  For each question, I set out below a set of assumed facts provided to me by Kathleen Cully, followed by my opinion on the question presented, based on those sets of facts.

### Assumed Facts regarding CIFG's Stock Option Plan

3.  The CIFG Group (the "Group") consists of (a) a holding company, CIFG Holding, a French *société anonyme*; (b) its wholly owned subsidiary, CIFG Guaranty, a dedicated reinsurer that is also a French *société anonyme*; (c) CIFG Europe, a primary financial guaranty insurance company that is also a French *société anonyme* and a wholly owned subsidiary of CIFG Guaranty; (d) CIFG Services, Inc., a Delaware corporation that is a wholly owned subsidiary of CIFG Guaranty; and (e) CIFG Assurance North America, Inc., a New York financial guaranty insurance company that is a wholly owned subsidiary of CIFG Services.[1]

4.  The Group hired its first employees in 2001 and began operations in 2002. At that time, the Group was a subsidiary of CDC (Caisse des Dépôts et Consignations). Together with CDC's other capital markets operations, the Group was sold to CNCE (Caisse Nationale des Caisses d'Epargne) in mid-2004.

5.  All of the Group's senior employees were eligible to participate in the Group's long-term incentive plans, which included stock options, restricted stock and performance units. Most if not all of them were promised specific amounts of long-term incentive compensation.

---

[1]     See http://www.cifg.com/about/corp_structure.shtml

1

6.  The first grants were made pursuant to stock option agreements entered into under the 2003 Stock Option Plan (the "2003 Stock Option Plan"). Authorization to issue options under the 2003 Stock Option Plan expired on June 28, 2004; by that date substantially all the options authorized to be issued had been awarded. Grants of performance units were also made in 2004 pursuant to a performance unit plan (the "2004 Performance Unit Plan") that expired at the end of that year.  No awards of restricted stock were made in 2004.

7.  Awards of stock options, restricted stock and performance units were subsequently also made in 2005 and 2006, and have been committed to be made in 2007.  The related stock option, restricted stock and participation unit plans, however, exist only in draft form; no long-term incentive plan has been adopted since the 2003 Stock Option Plan and 2004 Performance Unit Plan, and none is currently in effect.

8.  Drafting of the plans for 2005 and thereafter began in late 2004. The drafts were highly confidential, available to Group employees only on a "need-to-know" basis. Management's intention was that subsequent stock option and restricted stock plans would conform in substance to the 2003 Stock Option Plan, with only such changes to the restricted stock plan as were required to reflect the different treatment of stock options and restricted stock under French law.

9.  Drafts of the restricted stock plan and the stock option plan that were drawn up through December 30, 2005 did in fact conform very closely to the 2003 Stock Option Plan, except for a change – described separately below – in the definition of "retirement."

10. On December 30, 2005, CNCE, as sole shareholder of CIFG Holding, approved the forms of the stock option and restricted stock plans.

11. In spring 2006, CNCE announced an agreement with Banque Populaire ("BP") under which CNCE would acquire an equal interest in BP's then-subsidiary Natexis.[2]  Natexis would be renamed Natixis and would acquire all of CNCE's investment banking operations, including CIFG.

12. Prior to this announcement, the specific provisions of the draft plans relating to a "change in control" of CIFG were substantially similar to those found in the 2003 Stock Option Plan, under which a "change in control" would occur if (among other things) an entity or group acquired a majority interest in CIFG, with the CNCE acquisition being explicitly excluded.[3]

13. The consequences of a change in control are beneficial to the holders of stock options and restricted stock, since vesting and exercisability are accelerated to the date of the

---

[2]     More precisely, as a result of the transaction, CNCE and BP each own 34.4% of Natixis, the remainder being sold to the public in an initial public offering resulting in the listing of Natixis.

[3]     The 2004 Performance Unit Plan did not contain a "change of control" provision, but for the sake of consistency with the draft stock option and restricted stock plans, such a provision was added to the draft participation unit plan.

change in control.[4] Such acceleration could, however, cause French holders to lose certain preferential tax and social security benefits.

14. Following the announcement of the agreement with Banque Populaire, the draft "change of control" provisions were revised so that the Natixis transaction would not constitute a change in control under the draft plans.

15. The Natixis transaction was consummated on November 18, 2006.

**Assumed Facts regarding Kathleen Cully's Eligibility under the Stock Option and Restricted Stock Plans**

16. Kathleen Cully joined CIFG on January 13, 2003.

17. In 2004, Ms. Cully was awarded options under a stock option agreement pursuant to the 2003 Stock Option Plan to fulfill CIFG's obligations under her offer letter. That agreement was dated as of January 30, 2004.

18. In March 2005, Ms. Cully was awarded long-term incentive compensation in the aggregate notional amount of $100,000. On March 2, 2006, the details of this same award were provided, allocating specific awards of stock options, restricted stock and performance units, each with a specific price or value and a specific vesting schedule.

19. In March 2006, Ms. Cully was awarded long-term incentive compensation in the aggregate notional amount of $100,000. Details of this award have not yet been provided.

20. On March 14, 2006, Ms. Cully was promised long-term incentive compensation in the aggregate notional amount of $120,000, to be awarded in 2007.

21. In late September 2005, Ms. Cully informed Jacques Rolfo, the chief executive officer of the CIFG Group, by e-mail that she was planning to retire. She was then over 55 years of age. On October 6, 2005, Mr. Rolfo met with Ms. Cully and approved her retirement.[5] Mr. Rolfo, as president of the Executive Board of CIFG Holding, is authorized by the plan to act for the Executive Board in making determinations under the Plan.

22. The 2003 Stock Option Plan specifically defines "retirement" as referring, in the case of a United States resident, "to a Beneficiary who is at least 55 years of age at the time that he or she voluntarily ceases to be an employee" of the Group. In addition, the term

---

[4]    See ¶13 of the 2003 Stock Option Plan.

[5]    In the course of the meeting, Mr. Rolfo inquired as to what Ms. Cully would do after retirement; and she responded that she would probably provide consultations or perform like work. (At that point, Mr. Rolfo inquired whether Ms. Cully would be willing to consult for CIFG.)

"termination" of employment is defined to exclude "any . . . retirement approved by the Executive Board . . . ."[6] (Definition of "Continuous Status as a Beneficiary").

23. The 2004 Performance Unit Plan contains the same provisions, except that it adds a provision to the effect that a retiree is not permitted to engage in specified actions that are deemed to compete with CIFG.

24. Under both the 2003 Stock Option Plan and 2004 Performance Unit Plan, a retiree's options continue to vest and become exercisable as if he or she were still employed.

25. On the Monday after Thanksgiving 2005, in accordance with Mr. Rolfo's instructions, Ms. Cully announced her retirement to members of the management committee of CIFG.

26. Until December 30, 2005, the draft stock option and restricted stock plans contained the same provisions relating to retirement as the 2003 Stock Option Plan.

27. On December 30, 2005, the draft plans were revised to require approval by the Executive Board of any paid post-retirement activity, approval to be based on a finding that such activity did not compete with CIFG.

28. Upon learning of this change, Ms. Cully notified Mr. Rolfo that she did not consider the new provision as applicable to her, since her retirement had been approved under the provision relating to retirement contained in the draft stock option and restricted stock plans that had been produced at the time of that approval and that mirrored the relevant provision of the 2003 Stock Option Plan.

29. On February 15, 2006, Mr. Rolfo announced Ms. Cully's retirement to all CIFG employees.

30. In July 2006, Mr. Rolfo took the position that engaging in any paid activity was inconsistent with retirement, and that the vesting of Ms. Cully's rights under the stock option plan terminated upon her obtaining other paid employment or self-employment. Mr. Rolfo reiterated this position on several occasions over a period of several months thereafter, most recently by a letter dated January 4, 2007.

31. Ms. Cully's retirement took effect on December 31, 2006.

32. On February 13, 2007, Mr. Rolfo changed his position, stating that Ms. Cully's vesting had terminated effective the last day of her employment (December 31, 2006) under all long-term incentive plans, irrespective of whether she engaged in any activity, paid or otherwise. Under this view, unless the Natixis transaction accelerated vesting under the stock option and restricted stock plans, none of Ms. Cully's 2006 long-term incentive compensation would vest and the amount of her long-term incentive compensation for previous years would be reduced by at least 50%. Moreover, the long-

---

[6]      Definition of "Executive Board."

term incentive compensation that was promised to be awarded in 2007 would be worthless.

33. On April 3, 2007, CIFG sent for Ms. Cully's signature proposed stock option and restricted stock agreements related to her 2005 stock option and restricted stock awards, together with the purported final versions of the 2004 stock option and restricted stock plans. These plans each contained the new definitions of "change in control" (with relatively minor changes not relevant to this opinion) and of "retirement." The definition of "retirement" had been further modified to authorize the Executive Board to add to an option agreement "any service requirement that [it] approved in its sole discretion," and each of Ms. Cully's proposed agreements included a six-year length-of-service requirement. Since Ms. Cully's service was for a period of slightly less than four years, this modification would implement Mr. Rolfo's position of February 13, 2007 by causing Ms. Cully's vesting to terminate effective the last day of her employment under the proposed 2004 stock option and restricted stock plans.

34. In correspondence with Ms. Cully, Mr. Rolfo asserted that he was entitled to determine what constituted "retirement" by virtue of the Executive Board's authority to construe, interpret, and make determinations under the terms of the plans, and by virtue of the fact that such determinations are "final and binding on all Optionees."[7]

**Opinion regarding CIFG's Stock Option Plan**

35. The principal question in regard to the stock option plan is whether CIFG can validly deprive employees of a benefit that they enjoyed under the 2003 Stock Option Plan, but of which they would be deprived under draft revised stock option plans that the company only began considering in 2005 and has still not adopted. The benefit in question, found in the 2003 Stock Option Plan (as well as in the early drafts of 2004 and 2005), consisted, as noted above, in the fact that, upon a "change in control," as defined in the plan, the vesting and exercisability of rights would be accelerated to the date of the change of control. The company began considering making this change to the draft document only after the Natixis acquisition was announced in spring, 2006, and the change is reflected for the first time in a draft dated in June or July of 2006. The effect of the change was precisely to exclude from the definition of "change in control" Natixis' acquisition of CIFG – a transaction that subsequently took place in November of 2006.

36. The answer to this question depends on whether, under French law, (a) the draft plans, as changed in 2006, are binding and enforceable, despite their not having been adopted until after the acquisition had been announced and even consummated, and (b) employees are entitled to invoke the "change of control" benefit found in the 2003 Stock Option Plan.

37. In this case, it cannot be disputed – and I understand is not – that there exists a contract between CIFG and the employees, and that the contract includes a provision on

---

[7]        Sections 4(b) & (c) of the 2003 Stock Option Plan.

the benefit of accelerated vesting and exercisability upon "change of control." Therefore, the only question is which "change of control" provision governs.

38. I conclude that the employees are entitled to invoke the original "change of control" provisions, and do so for the following reasons.

39. First, French law recognizes the principle of "tacit renewal" (*tacite reconduction*), according to which a renewed contract is presumed to contain the same clauses and main conditions as the original contract.[8] The change of control provisions of the last adopted and effective stock option plan (i.e., that of the 2003 Stock Option Plan) therefore govern.

40. Second, French law additionally follows the principle that, if there clearly exists an agreement between the parties, but the "obscurity" or "contradiction" of the terms on a given issue is too great to arrive with confidence at a common understanding, then the judge must "fashion" the contract as a fair and reasonable man would have done.[9] According to a leading authority:

> It is rare for the judge to remake or modify a contract whose stipulations are precise. But it will be otherwise when the contract is fully imprecise, the parties being assumed to have referred to what was previously established by legislative provision, custom or case law. In such a situation, the parties, finding themselves bound to one another by an agreement whose content is in no way precise, ... it is clear that it is for the judge, in case of a dispute over the existence of one or another obligation ... to determine the 'implicit' content of the contract.[10]

41. A principal source of contract interpretation in such situations is usage between the parties. This is expressly provided for in the French Civil code, Article 1160:

> Terms which are customary shall be supplemented in the contract, even though they are not expressed there.[11]

42. To the same effect is Article 1135 of the Civil Code:

> Agreements are binding not only as to what is therein expressed, but also as to all the consequences which equity, *usage* or statute gives to the obligation according to its nature.[12]

---

[8]     J. Carbonnier, Droit Civil (tome 4, les obligations) (Thémis, 22d ed. 2000), p. 275, citing Cour de Cassation decision of May 6, 1953, Bull. No. 160.
[9]     J. Carbonnier, Droit Civil, *supra* note 8, p. 284.
[10]    C. Larroumet, Droit Civil (tome 3, les obligations, le contrat) (Economica, 3d ed. 1996), p. 129.
[11]    Also, according to Article 1159, "What is ambiguous shall be interpreted by what is in use in the region where the contract was made."
[12]    Emphasis added. See also Encyclopédie Dalloz, « Contrats et Conventions, » para. 222: "Moreover, there is inserted in the contract with supplementary value ... the usages to which Article 1135 refers." "The judge must take account of these, not only when the parties expressly refer to them, but even in the absence of that."

6

43. Accordingly, when a court looks outside the terms of a contract to discern the genuine intention or will of the parties – as it is indeed required to do[13] – it looks with particular emphasis at usage between the parties.[14] In this case, that usage is clearly reflected in the "change of control" terms such as are found in the stock option plans under which the employees were granted and could exercise their stock options in the past.

44. Third, it is a longstanding principle of French law that the party that was in a position to dictate the terms of a contract is bound to bear the risk of unclarity within the contract.[15] CIFG is clearly such a party, and the employees are not.

45. Finally, French law regards the requirement of good faith between the parties as an overriding legal principle of the law of obligations, of which contract law forms a part.[16] According to Civil code, Articles 1134:

> Agreements lawfully entered into take the place of the law for those who have made them.
>
> They may be revoked only by mutual consent, or for causes authorized by law.
>
> They must be performed in good faith.

46. As noted, Article 1135 provides that agreements are binding, among other things, as to "all the consequences which equity ...give[s] to the obligation according to its nature."[17]

47. Given not only the usage between the parties, but also the obvious reliance by the employees on the "change of control" terms found in the stock plans under which they had been awarded options in the past and in the only stock plan documents they had ever

---

[13]    C. Larroumet, *supra* note 10, pp. 102, 129.

[14]    "Of course it can happen that the disagreement of the parties as to the meaning of the contract is such that one may doubt whether there was ever really a meeting of the minds. In this situation, the contract only exists in appearance and the judge is supposed to destroy this appearance by declaring the contract null, provided he is certain that the will of the parties did not meet over that which is essential. But most often, the judge does not have such certainty and the disagreement between the parties relates only to the meaning that a particular contractual provision should have. If the search for the common intention of the parties … does not permit determining what they really meant, the judge will limit himself to those provisions that the parties may be deemed to have adopted, in light of all the elements – subjective and objective alike – available to him. .. The Code Civil refers expressly in Articles 1135, 1158 and 1159 to the fact that usage, fairness and the objective economic logic of the contract are elements necessary for making the content of the contract precise and for giving a meaning to provisions that are not sufficiently clear." C. Larroumet, *supra* note 10, pp. 131-133.

[15]    J. Carbonnier, *supra* note 8, pp. 279, 284, with citations.

[16]    C. Larroumet, *supra* note 10, p. 589.

[17]    Article 1156 goes on to provide: "One must in agreements seek what the common intention of the contracting parties was, rather than pay attention to the literal meaning of the terms."

Article 1157 states: "Where a clause admits of two meanings, one shall rather understand it in the one with which it may have some effect, than in the meaning with which it could not produce any."

Finally, Article 1158 states: "Terms which admit of two meanings shall be taken in the meaning which best suits the subject matter of the contract."

been shown, good faith in the execution of a contract clearly requires that CIFG honor the original "change of control" provisions.

48. In sum, every guiding legal principle under French law leads to the conclusion that, under the circumstances of the present case, the CIFG employees are entitled to invoke and rely upon the original "change of control" provisions, and the benefits flowing from them.

**Opinion regarding Kathleen Cully's Eligibility under the Stock Plan**

49. The question here is whether Mr. Rolfo is correct in asserting that he is entitled to determine what constituted "retirement" by virtue of the Executive Board's authority to construe, interpret, and make determinations under the terms of the plans, and by virtue of the fact that such determinations are final and binding on all Optionees.

50. A threshold question is, once again, whether the draft plans as revised in and after December 2005 (*i.e.*, after Ms. Cully's retirement had been approved), are binding and enforceable, despite their not having been adopted until April 2007, or whether the terms of the 2003 Stock Option Plan with respect to retirement govern Ms. Cully's subsequent options and restricted stock awards as well as those granted under that plan. This is substantially the same question considered above, except that Ms. Cully became aware of the changes to the draft plans; since, however, she did not agree but instead consistently objected to the applicability of the changes to her, the analysis is the same as before, with the result that the revisions are inapplicable and the governing terms are those of the 2003 Stock Option Plan. This is so *a fortiori* in Ms. Cully's case, where the draft provisions would not merely deprive her of a benefit but would inflict actual harm on her, since her decision to retire was made in reliance on the provisions of the draft plans that were in effect at the time (and which were substantively the same as those of the 2003 Stock Option Plan).

51. It is true that Section 4(b)(vi) of the 2003 Stock Option Plan gives the Executive Board the authority "to construe and interpret the terms of the Plan and Options granted pursuant to the Plan," and that Section 4 (c) describes the executive Board's "decisions, determinations and interpretations" as "final and binding on all Optionees."

52. Under the facts as set out above, Ms. Cully has satisfied all of the conditions for "retirement" as defined by the 2003 Stock Option Plan. Therefore, her employment was not terminated for purposes of that plan. Mr. Rolfo's subsequent positions, which add conditions not contained in the plan, constitute a redefinition (rather than a clarification) of "retirement." The central question that remains is thus whether a redefinition of "retirement" within the meaning of the Plan constitutes a decision, determination or interpretation, as those terms are used in Sections 4(b) and (c). For three reasons, I conclude that such redefinition exceeds any proper understanding of the authority conferred by Sections 4(b) and (c).

53. First, it is critical to note that Section 15 of the 2003 Stock Option Plan expressly prohibits any modification or amendment of the plans without the written consent of the Optionee. As radical a redefinition of "retirement" as that proposed by Mr. Rolfo can only properly be regarded as a modification of the plans rather than a mere exercise in their application.

54. Second, there is an additional reason why limitations must be placed on the Executive Board's authority to freely construe, interpret or make determinations under the plans. That authority, by the very terms of Section 4(b) of the 2003 Stock Option Plan itself, is expressly stated to be "[s]ubject to the provisions . . . of the Plan." Such a proviso would be rendered meaningless if the Executive Board (or Mr. Rolfo acting in its place) were free to construe, interpret or make determinations under the plans that are contrary to the very provisions of the plans.

55. Finally, as noted in a previous section of this Opinion, French law imposes an overriding requirement of good faith in the performance of all contracts. In deciding whether a party's performance under a contract (including the determinations that a party purports to make under the contract), a French court applying French contract law would ask whether such performance deviated substantially from the understandings and expectations that had been created between the parties on account of their prior course of dealings and introduced into the relationship an important element of unfair surprise.

56. The French law requirement of good faith is reinforced by the general precept in all of French private law that, notwithstanding the rights that a party may have acquired under French law (via contract or otherwise), the law forbids any exercise of such rights in a fashion that, under the circumstances of the case, would be regarded as "abusive." I refer to the paramount French civil law doctrine of abuse of rights.[18]

**Conclusions**

57. I conclude that the employees in the present case are entitled, under the French law of contracts, to invoke the benefit of the "change of control" provisions found in the 2003 Stock Option Plan, rather than be deprived of those benefits by the company's having drafted, but not adopted, modified stock plans that would disentitle them to the benefit they assert.

58. I further conclude that, with respect to Ms. Cully, the Executive Board's power to interpret the contract does not include the power to redefine the contractual definition of retirement for the purposes of post-retirement benefits under the company's stock option and restricted stock plans, that Ms. Cully has retired for such purposes, and therefore that her "continuous status as a beneficiary" has not been terminated and her stock options and restricted stock continue to vest accordingly.

---

[18]     On the notion of abuse of rights, and more particularly the principle that a contracting party will not be permitted to invoke or exercise his contractual rights abusively, see Encyclopédie Dalloz, « Contrats et Conventions, » para. 241.

George A. Bermann

April 6, 2007