# EXHIBIT 17

*Translation from the French for information purposes only*

# CIFG HOLDING

## RESTRICTED SHARE DISTRIBUTION PLAN 2005

(*PLAN D'ATTRIBUTION GRATUITE D'ACTIONS 2005*)

### REGULATIONS

**RECITALS**

Pursuant to a resolution dated [●] 2005, the extraordinary shareholders' meeting of CIFG Holding SA (the *Company*), authorized the Executive Board (*Directoire*) to effect a restricted share distribution (*attribution gratuite d'actions*) to employees of the Company or to certain classes of such employees and to managers, of [●] shares in the Company, whether existing or to be issued, in compliance with the provisions specified under Articles L. 225-197-1 to L. 225-197-5 of the *Code de Commerce* (French Commercial Code).

The purpose of these Regulations fixed by the Executive Board as of [●] 2005, is to set forth the rules applicable to the restricted share distribution plan (*plan d'attribution gratuite d'actions* - the *Plan*) within the framework of the authorization given by the aforementioned shareholders' meeting.

The objectives of the Plan are:

- to motivate and retain the best available personnel for positions of substantial responsibility within the Company or any companies related or affiliated to it;

- to align in so far as possible the interests of employees and managers with those of the shareholders of the Company;

- to promote the success of the Company.

It is intended that the gains realized in connection with the shares distributed in the form of a bonus share distribution under this Plan, shall qualify, in France, for preferential treatment in relation to income tax and social security contributions (as provided under Articles 80 *quaterdecies* and 200 A-6 *bis* of the *Code Général des Impôts* (French General Tax Code) and L. 242-1, last paragraph, of the *Code de la Sécurité Sociale* (French Social Security Code)) and, as the case may be, in any other jurisdiction in which the Plan applies.

The Grantees are reminded that the restricted share distribution, the vesting of irrevocable rights over such shares and the disposal of any bonus shares distributed shall have varying consequences on their tax and personal social security position, depending on their country of residence. The Company recommends that Grantees take advice from their tax advisers in such respect.

**DRAFT OCTOBER 31, 2005**

*Translation from the French for information purposes only*

1. DEFINITIONS

In these Regulations, the following words and expressions shall have the following meaning:

**Restriction Period** shall mean the *[two]*[1] year period commencing from the Date of Grant and during which the Vesting Requirements must be satisfied where applicable, in a continuous manner, in accordance with the resolution passed in extraordinary shareholders' meeting on [●];

**Date of Grant** (*Date d'Attribution*) shall mean the date on which the Executive Board has resolved to effect a restricted share distribution of Shares to the Grantees and specified the terms and conditions applicable to such distribution;

**Grantee** (*Bénéficiaire*) shall mean any person to whom the Executive Board has allotted one or more Share(s) (or his or her heirs, successors and assigns where he or she has died);

**Authorization Date** shall mean the day on which the shareholders of the Company sitting in extraordinary general meeting authorized the Executive Board to implement the Plan, namely [?];

**Beneficiary** (*Éligible*) shall mean all and any employed member of staff or certain classes of such employees of the Company or any Related Company to the Company, or all and any corporate representatives (*mandataire social*) carrying out the duties specified under Article L. 225-197-1, II of the *Code de Commerce* in the Company or, where the Shares of the Company are listed for trading on a regulated securities exchange market, in a Related Company to the Company, who, as of the Date of Grant, do not hold more than 10 % of the share capital in the Company and to whom the allotment of Shares would not result in a holding of more than 10% in the share capital;

**Call Option** shall have the meaning given thereto under Clause 12.1;

**Change in Control** shall refer to the occurrence of any of the following events which aims to alter the "control" of the Company, as such expression is defined under Article L. 233-3 of the *Code de Commerce*:

- an acquisition by an individual or a legal entity directly or indirectly, of an ownership interest in the Company, giving to such individual or legal entity the majority of voting rights of the Company in the Company's shareholders' meetings; or

---

[1] Minimum duration imposed by law. Shareholders may impose a longer duration and directors may even go beyond the shareholders' decision.

- an acquisition by an individual or a legal entity, of the majority of voting rights of the Company as a result of an agreement entered into with the Company's shareholders, or

- an acquisition by an individual or a legal entity of voting rights enabling such individual or legal entity *de facto* to determine the outcome of material matters to be decided in a meeting of the Company's shareholders.

As used herein, the term "Change in Control" shall exclude an acquisition of an interest in the Company, a Related Company, or a company which holds at least 50% of the share capital or the voting control of the Company, by a company in the Group following a merger, split-off (*scission*) or partial asset transfer governed by the rules relating to split-offs under French law.

***Closed Periods*** shall mean specific periods during which shares cannot be allotted by companies whose shares are listed on a regulated securities exchange market, in accordance with the rules applying to French listed companies;

***Code de Commerce*** shall mean the French Commercial Code;

***Common Stock*** shall mean shares of common stock in the Company that are listed for trading on a regulated securities exchange market;

***Company*** shall mean CIFG Holding SA;

***Compensation Committee*** shall mean a committee composed of two or more members of the Supervisory Board (*Conseil de Surveillance*) of the Company, to be consulted by the Executive Board with respect to the administration of the Plan.

***Continuous Status as a Beneficiary*** shall mean that there shall have been no termination of (i) the term of office of a Beneficiary who is a member of the Executive Board or (ii) the employment relationship (within the meaning of the law) between a Beneficiary and the Company or any Related Company.

As used herein, the term "termination" (of Continuous Status as a Beneficiary) shall not include [*CIFG to confirm*]:

- any permitted leave of absence or retirement in accordance with and as authorized by the *Code du Travail* (French Labour Code) with respect to tax residents of France or a Beneficiary to whom the French *Code du Travail* is applicable;

- any permitted leave of absence or retirement authorized by the Executive Board with respect to tax residents of jurisdictions other than France with specific reference to the Plan, or whose relationship with the Company or a Related Company is not governed by the French *Code du Travail*. [With specific reference to residents of the United States, "leave of absence" shall include medical leave, military leave, or other authorized leave; "retirement" shall refer to a Beneficiary who is at least 55 years of age at the time that he or she voluntarily ceases to be an employee of the

***Translation from the French for information purposes only***

　　　　Company or a Related Company];

- [transfers (of staff) between establishments of the Company and a Related Company, transfers among Related Companies, or transfers from the Company or a Related Company to the Caisse Nationale des Caisses d'Épargne or the Caisse des Dépôts et Consignations, or to a company or other legal entity, at least 50% of which is directly or indirectly held by the Caisse Nationale des Caisses d'Épargne or the Caisse des Dépôts et Consignations;] ***[CIFG to confirm]***

- any other form of departure decided on a discretionary basis by the Executive Board;

**Disability** shall mean a disability that totally prevents a Beneficiary from fulfilling his or her obligations as a corporate representative carrying out the duties or as an employee of the Company or of a Related Company to the Company;

**Executive Board** shall mean the executive board (*directoire*) of the Company. The Executive Board may, to the extent legally permissible, delegate the Executive Board's powers to administer the Plan to the President of the Executive Board. In the event of such delegation and for the duration thereof, the term "Executive Board" shall also be deemed to refer to the President of the Executive Board;

**Fair Market Value** (*Valeur de Marché*) shall mean:

- until the Listing Date, the value of Shares, as determined in accordance with financial methods and procedures approved by Shareholder Authorization and applied by the Executive Board from time to time and, in particular, in accordance with objective share evaluation methods taking into account, according to an appropriate weighting in each case, the net worth, profitability and business prospects of the company (and where applicable, such criteria shall be assessed on a consolidated basis, or failing that, by taking into account any financial data obtained with regard to any material subsidiaries). Where such methods do not seem appropriate, the Fair Market Value of a Share may be obtained by dividing, by the number of existing shares, the amount of the adjusted net asset value, calculated on the basis of the most recent balance sheet[2]. In the event of a Merger or a Change in Control, the price (or value) of the Shares used for the purposes of such transactions shall be deemed to correspond to the Fair Market Value for a period of three months following the date of actual completion of the Merger or Change in Control. The foregoing shall also apply in the event of a transaction that results in the acquisition by one or more third parties of at least 10% of the common stock of the Company, and

- after the Listing Date, the quoted price of the Shares on the stock exchange;

---

[2] There is no valuation method imposed by law in relation to restricted shares. We have adopted a prudent approach consisting of referring to the methods imposed in connection with share options granted by non listed companies.

*Translation from the French for information purposes only*

*Group* shall mean the Company, as well as its Related Companies;

*Holding Period* shall mean the [*two*]³ year period that starts from the Vesting Date and during which the Grantees shall not be entitled to dispose of the Shares, in accordance with the resolution passed in extraordinary shareholders' meeting on [●];

*Listing Date* shall mean the date on which the shares of the Company become listed for trading on a regulated securities exchange market;

*Plan* shall mean this restricted share distribution plan of Shares in the Company;

*Preference Share* shall mean a preference share without any voting rights in the Company the characteristics of which are described under Article 8 of the Company's Articles of Association (class "P" share).

*Put Option* shall have the meaning given thereto under Clause 13.1;

*Related Company* (*Société Liée*) shall mean, pursuant to Articles L. 225-197-1 and 225-197-2 of the *Code du Commerce*:

- prior to the Listing Date, a company of which at least 50% of the share capital or voting rights are held directly or indirectly by the Company, and

- after the Listing Date, a company of which at least 50% of the share capital or voting rights are held directly or indirectly by the Company, a company which holds at least 10% of the share capital or voting rights in the Company, or a company, 50% of the share capital or voting rights of which are held, directly or indirectly, by a company that itself holds, directly or indirectly, at least 50% of the Company;

*Sale of Assets* shall have the meaning given thereto under Clause 9.3;

*Share* shall mean (i) a Preference Share in so far as the shares of the Company are not listed for trading on a regulated securities exchange market (*marché réglementé*) or (ii) Common Stock with effect from the shares of the Company becoming listed for trading on a regulated securities exchange market;

*Share Certificate* shall have the meaning given thereto under Clause 5.3;

*Share Distribution Certificate* shall have the meaning given thereto under Clause 2.7;

*Shareholder Authorization* shall mean the authorization given by the shareholders of the Company in an extraordinary general meeting held on [●], permitting the Executive Board to effect a restricted share distribution comprising a maximum number of [●] Shares representing [●] % of the share capital in the Company, for a period of [●] months as from the date of the said extraordinary general meeting;

---

³ Minimum duration imposed by law. Shareholders may impose a longer duration and directors may even go beyond the shareholders' decision.

*Translation from the French for information purposes only*

**Stock Market Listing** (*Cotation en Bourse*) shall mean the listing of the shares issued by the Company on a regulated securities exchange market;

**Substituted Party** shall have the meaning given thereto under Clause 12.1;

**Trading Day** (*Séance de Bourse*) shall mean, with effect from the listing of Shares for trading on a regulated securities exchange market, each day on which such market is open for trading;

**Vesting Date** (*Date d'Acquisition*) shall mean the date on which a Grantee's ownership of all or a portion of the Shares allotted to him or to her becomes unforfeitable, subject to the terms and conditions specified herein;

**Vesting Requirements** (*Conditions d'Acquisition*) shall mean the terms and conditions specified under Clause 4 below that must be satisfied in order for a Grantee to acquire a vested and irrevocable ownership right over all or any portion of Shares that have been allotted to him or her.

2.  **TERMS AND CONDITIONS RELATING TO THE GRANT OF SHARES**

2.1  Subject to the provisions of the *Code de Commerce*, the Shareholder Authorization and the Plan, the Executive Board shall have the authority, in its discretion, to decide to effect the restricted share distribution of Shares to the Grantees that it shall nominate, on the terms and conditions specified under this Plan. The number of Shares granted shall be determined by the Executive Board within the limits fixed by the Shareholder Authorisation.

2.2  The Executive Board shall define the terms and conditions of grant and, as the case may be, any criteria for grant of the Shares.

2.3  The Shares may be granted by the Executive Board at any time as from the date on which the Plan is adopted and prior to the expiration of a period of thirty eight (38) months commencing from the Authorization Date.

2.4  The Executive Board shall consult with the Compensation Committee of the Supervisory Board (*Conseil de Surveillance*) prior to granting any Shares or taking any other decision that would have a significant effect on the Plan or on the Shares granted.

2.5  At the time of granting Shares, the Executive Board shall be entitled to make the grant of Shares subject to any other objective condition that it deems appropriate, in addition to the conditions set forth under Clause 4 below.

2.6  The Executive Board's decisions, determinations and interpretations, concerning in particular the determination of the Fair Market Value, shall be binding on all Grantees.

*__Translation from the French for information purposes only__*

2.7   The restricted share distribution of Shares shall be evidenced by Share Distribution Certificate issued by the Company. A Share Distribution Certificate shall contain the following information:

(a)   the Date of Grant of the relevant Shares;

(b)   the number of Shares granted subject to conditions;

(c)   the Vesting Requirements upon which irrevocable acquisition of the Shares depends and the Vesting Date.

The Plan shall be attached to the Share Distribution Certificate.

2.8   The grant of Shares shall be for no consideration and shall not give rise to any payment by the Grantee.

2.9   Grantees who are granted Shares shall be entitled to waive all or any part of their rights, prior to the Vesting Date, by informing the Company by way of registered letter with return receipt requested. The letter must reach the Company no later than the day preceding the Vesting Date.

**3.   LIMITATIONS ON THE GRANT OF SHARES**

3.1   The following limitations shall apply to the grant of Shares to Beneficiaries:

(a)   No Beneficiary shall be granted Shares if he or she holds directly or indirectly more than 10% of the share capital of the Company or where the grant of Shares would result in his or her holding more than 10% of the capital in the Company.

(b)   Subject to any adjustments as specified under Clause 8, the maximum number of Shares that may be granted under the Plan shall be limited to a total of [●] Shares. Shares in respect of which the allotment has not become a vested interest owing to a failure to satisfy any Vesting Requirements, a termination of the Continuous Status as a Beneficiary of the Grantee prior to the Vesting Date or a waiver by the Grantee on the terms and conditions set forth under Clause 2.9 above, shall be deducted from the number of Shares granted and may thus be the subject of a further grant.

(c)   As from the Listing Date, no Shares shall be granted by the Company during the Closed Periods.

3.2   The Shares shall be granted on a strictly personal basis to a Grantee and, except in the event of the Grantee's death as provided under Clause 3.3 below, the rights arising from the restricted share distribution of Shares cannot be assigned, or be used as any form of security whatsoever until termination of the Restriction Period. Consequently, no Share may vest in the Grantee where the rights resulting from the

*Translation from the French for information purposes only*

restricted share distribution of a Share have been (i) assigned, (ii) seized or (iii) pledged to or by a third party.

3.3     In the event of a Grantee's death prior to the expiration of the Restriction Period, his or her heirs shall be entitled to request allotment of the Shares within six months following the death, to the extent that the Vesting Requirements were satisfied as at the date of the Grantee's death. [The number of Shares allotted to the Grantee's heirs may, at the Executive Board's discretion, be reduced on a pro rata basis in order to take into account the period having elapsed between the Date of Grant and the date of death as compared to the normal length of the Restriction Period.] In any event, in order to be allotted the Shares of the deceased Grantee, the heirs must undertake to comply with the obligations by which the Grantee is bound under the Plan.

**4.     VESTING REQUIREMENTS RELATING TO SHARES[4]**

4.1     A Grantee shall only acquire an ownership right over all or any portion of the Shares allotted to him or her on termination of the Restriction Period, subject however to the following Vesting Requirement having been satisfied as at such date or, as the case may be, in a continuous manner since the Date of Grant. Such Vesting Requirement provides that the Grantee's Continuous Status as a Beneficiary shall not have terminated.

4.2     Where the conditions referred to under Clause 4.1 are not satisfied on the last day of the Restriction Period, the Grantee shall lose the right to acquire the allotted Shares and such Shares, unless the Executive Board should decide otherwise.

4.3     The Company shall inform a Grantee whose Continuous Status as a Beneficiary has not terminated whether, at the end of the Restriction Period, such Grantee has forfeited all rights to the Shares as a result of failing to comply with certain other conditions specified under Clause 4.1.

**5.     TERMS AND CONDITIONS RELATING TO VESTING OF SHARES**

5.1     Where the conditions referred to under Clause 4 are satisfied, the Company shall ensure that the Shares in which a Grantee has acquired a vested interest, are issued or transferred as the case may be[5], to the Grantee, as soon as possible from the Vesting Date.

5.2     On the issue or transfer of Shares, a Share Certificate shall be issued by the Company. A Share Certificate shall contain the following information:

(a)     the Vesting Date of the relevant Shares;

---

[4]     Please advise if you wish the Restricted Shares to vest by tranches.

[5]     Restricted Shares can consist of either existing (« treasury ») shares or newly issued shares. At this stage, we have kept both alternatives to allow CIFG maximum flexibility.

**DRAFT OCTOBER 31, 2005**

*__Translation from the French for information purposes only__*

(b) the number of vested Shares and their characteristics, and

(c) the expiration date of the Holding Period.

## 6. RIGHTS ATTACHED TO THE SHARES

6.1 In the event there is no Stock Market Listing, the Shares issued or transferred to the Grantees shall be Preference Shares the characteristics of which shall be those described under Article 8 of the Company's Articles of Association (class "P" shares).

6.2 The Shares issued or transferred as from the Listing shall be Common Stock identical to Common Stock that has already been issued as at such date.

6.3 In the event of a Stock Market Listing, the Preference Shares shall be transformed into Common Stock on the terms and conditions provided under the Company's Articles of Association.

## 7. NON-TRANSFERABILITY OF SHARES

7.1 The Shares may not be assigned or be used as any form of security whatsoever during the Holding Period. In such respect, the Shares shall be recorded in a registered share account, in the name of the Grantee, administered by the Company, annotated to the effect that they are unavailable.

7.2 In addition, with effect from the Listing Date, the Shares cannot be assigned during certain periods in which disposal is prohibited by law[6].

7.3 All and any taxes and social security contributions legally due and payable by the Grantee and by the Company or a Related Company, as a result of the disposal of Shares during the Holding Period shall be the Grantee's responsibility. The Company may, where applicable and to the extent permitted by law, withhold from the Grantee's remuneration, such amounts that are sufficient to satisfy the Company's or a Related Company's tax or social security withholding obligations as a result of the disposal of Shares. If the Company or a Related Company does not withhold an amount from the Grantee's remuneration, in an amount sufficient to satisfy the Company's or a Related Company's tax or social security withholding obligations as set forth above, such Grantee shall reimburse the Company or the relevant Related Company, within one month, for the amount not withheld but nevertheless paid by the Company or by the said Related Company.

---

[6] The law prohibits the sale of restricted shares, when the shares are listed, during certain periods. There is uncertainty however as to how the prohibition may apply in practice (the law refers to periods that the employees may well not be aware of). We thus recommend the use of the "vague" wording referring to the statutory provisions (rather than inserting the provisions themselves in the plan) in order to avoid having to amend the plan when the law is clarified.

*__Translation from the French for information purposes only__*

8. **ADJUSTMENTS UPON CHANGES IN CAPITALIZATION**[7]

In the event of any of the following transactions prior to the Vesting Date, the Executive Board may take any measures necessary in order to protect the interests of the Grantees including, in particular, by adjusting the number of Shares:

(a)  an issuance of new shares for cash consideration reserved to the Company's existing shareholders;

(b)  a capitalization of retained earnings, profits, or issuance premiums;

(c)  (an issuance of convertible or exchangeable bonds reserved to the Company's existing shareholders;

(d)  a distribution of reserves by payment in cash or shares;

(e)  a cancellation of shares in order to absorb losses; or

(f)  the purchase by the Company, when listed, of its own shares at a price higher than the current quotation price.

Adjustment measures may consist in particular of, but shall not be limited to, an additional allotment of Shares in favor of the Grantees such that the Grantees are once more placed in a position equivalent to the position which they were in prior to the relevant transaction having been carried out.

As a result of such adjustment measures, a Grantee may become ineligible for certain preferential tax and social security treatment that may be available in France and in other jurisdictions, particularly with regard to the additionally allotted Shares are held.

9. **ADJUSTMENTS IN THE EVENT OF DISSOLUTION, LIQUIDATION, MERGER, SALE OF ASSETS OR CHANGE IN CONTROL**

9.1  In the event of a proposed dissolution or liquidation, the Executive Board may decide to immediately terminate, prior to the consummation of such event, the grant of Shares in respect of which the Restriction Period has not yet been completed. Where no such decision is taken, the Shares shall only be allotted to the Grantees in a final manner as of the Vesting Date, subject however (i) to the latter date occurring prior to the date on which the Company is dissolved and (ii) to compliance with the terms and conditions set forth under Clause 4.1 as at such date.

---

[7]  Unlike share options, the law relating to restricted shares does not provide for such adjustments. They are however merely technical (with the view taken that the beneficiaries of the shares should be no better or worse off where certain transactions are carried out by the company). This provision may have to be amended once the law is clarified (in particular, when the French tax authorities issue their statement of practice). In that regard, please see Article 10.3.

*Translation from the French for information purposes only*

9.2   In the event of any of the following events prior to the Vesting Date of the Shares:

- a merger of the Company with or into another company as a result of which the shareholders of the Company cease to own 50% or more of the surviving company in terms of voting rights or share capital (*Merger*); or

- the disposal of substantially all of the assets of the Company or any Related Company, including the portfolio of insured risks [*to be confirmed by CIFG*] (*Sale of Assets*), or

- a Change in Control,

whether or not such an event is the result of the Listing of the Company, all Shares shall become fully vested on the effective date of such Merger, Sale of Assets or Change in Control. The successor company or purchaser(s) of control of the Company in a Merger, Sale of Assets or Change in Control, shall assume the rights and obligations of the Company in accordance with the terms of the Plan.

Notwithstanding the foregoing, said successor company or purchaser(s), as a result of a Merger, Sale of Assets or Change in Control, may replace the Plan by issuing other rights or plans that such party or parties determine(s) in good faith to be of a value that is equal to or greater than the Shares then granted to the Grantees, respectively, as valued by a third party jointly chosen by the Executive Board and the successor company or purchaser(s) of control of the Company. In the event of the aforesaid replacement of the Plan, the rights resulting from the grant of the Shares shall become null and void as of the effective date of the Merger, Sale of Assets or Change in Control. The Grantees shall be given a further distribution of restricted shares in proportion to their respective rights created under the Plan at such time, as determined with reference to the then-remaining term under the Restriction Period.

9.3   In the event of a Listing of the Company not resulting in a Change in Control, there shall be no alteration in the terms and conditions of the restricted share distribution of Shares, subject however to the terms set forth under Clause 6.3 above.

9.4   As a consequence of the accelerated vesting of a restricted share or substitution of a restricted share distribution for the restricted share distribution of Shares, a Grantee may become ineligible for certain preferential tax and social security treatment that may be available in France and in other jurisdictions.

**10.   INTERPRETATION, ALTERATION AND TERMINATION OF THE PLAN**

10.1   The Executive Board is authorized to construe and interpret the terms of the Plan at its discretion.

10.2   The Executive Board may at any time amend, alter, suspend or terminate the Plan, provided, however, that no amendment, alteration, suspension or termination of

the Plan shall impair the rights of any Grantee (or Grantees), unless agreed in writing between such Grantee(s) and the Company.

10.3   The Executive Board may at any time, without having to obtain the Grantees' consent, alter the rules under the Plan for the purpose of enabling the Grantees to be eligible, with regard to the gains realized in connection with the Shares, for the favorable tax and social security treatment available in France or in any other jurisdiction in which the Plan is intended to apply. Such alterations may concern, in particular, the following rules:

(a)   determination of the Fair Market Value of the Shares;

(b)   terms and conditions relating to the vesting of Shares (and, as the case may be, terms and conditions applicable to an accelerated vesting of Shares);

(c)   non-transferability of Shares (and, as the case may be, situations in which an exception might be made to the obligation to hold the Shares),

(d)   adjustment of the number of Shares granted.

11.   **LEGAL COMPLIANCE**

11.1   The Shares may only be issued with effect from the Vesting Date provided that such issue complies with all relevant provisions of the *Code de Commerce* and, subsequent to the Listing Date, the requirements of any stock exchange or quotation system whatsoever on which the Shares are then listed or quoted.

11.2   *To the extent that the Shares are subject to Section 16 of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company shall use reasonable efforts to ensure that the Plan is exempt from Section 16(b). The Company shall use all its endeavors to satisfy and comply with, in good faith, all such requirements in order to enable the Shares to be issued in accordance with the provisions under the Plan.*

12.   **REDEMPTION BY THE COMPANY**

12.1   Right to redeem Shares

With effect from the expiration of the Holding Period, but prior to the Listing Date, particularly, in the event of termination of a Grantee's Continuous Status as a Beneficiary, and subject to any restrictions under French corporate law or other applicable laws, the Company shall have the right (i) to redeem any Share issued to a Grantee pursuant to the terms of the Plan, or (ii) to be substituted by one or more of its shareholders or by one or more third parties (the ***Substituted Party***) in such right (the ***Call Option***). Upon the exercise by the Company (or a Substituted Party) of its Call Option, the Grantee shall sell his or her Shares to the Company or to the Substituted Party respectively.

DRAFT OCTOBER 31, 2005

*Translation from the French for information purposes only*

12.2   Redemption price

The redemption price for the Shares to be paid to a Grantee by the Company or a Substituted Party shall be the Fair Market Value of the Shares, calculated on a fully diluted basis, according to the most recent valuation of the Company as of the date on which notice is given of the exercise of the Call Option.

12.3   Redemption procedure

The Company or a Substituted Party may exercise its Call Option by sending a written notice to a Grantee, specifying the number of Shares to be redeemed. The notice shall be given if sent to the last known address of the Grantee, as shown on the books and records of the Company. The Company or a Substituted Party shall promptly pay the total redemption price to the Grantee.

**13.   RIGHT OF A GRANTEE TO REQUIRE THE COMPANY TO REPURCHASE**

13.1   Put Option

With effect from the expiration of the Holding Period and until the Listing Date, a Grantee may require the Company (or one or more of its shareholders or any third party as substituted by the Company and as communicated to the Grantee) to repurchase the Shares that such Grantee may have acquired under the Plan, in accordance with the provisions set forth in this Clause 14 (or in a separate agreement entered into with the Grantee) (the *Put Option*).

13.2   Put price

Where a Grantee exercises the Put Option, the repurchase price to be paid by the Company or a Substituted Party for the Shares shall be equal to the Fair Market Value in effect at the time that the Company receives notice of exercise of the Put Option from such Grantee. Price to be paid is calculated on a fully diluted basis.

13.3   Put procedure

A Grantee shall exercise the Put Option by the giving of written notice to the Company, specifying the number of Shares to be repurchased by the Company or a Substituted Party. Such notice shall be made by way of registered letter with return receipt requested sent to the Company. The Company shall pay to the Grantee the total put price within [*one month*] following the notice. In the event of a Grantee's death, his or her Put Option shall be exercisable by the legal representative of his or her heir.

13.4   Termination of Put Option

The right of a Grantee to require the Company to repurchase his or her Shares shall automatically terminate with effect from the Listing Date.

*Translation from the French for information purposes only*

13.5  Put Option Exercise Period

From the expiration of the Holding Period and until the Listing Date, the Put Option shall be exercisable for a period of thirty (30) days following the delivery to the Supervisory Board of the Company of the quarterly report determining the Fair Market Value of the Shares.

**14.  LIABILITY OF THE COMPANY**

If any legal or regulatory provision were to prevent the Shares from being issued, the Company may not be held liable as against the Grantees.

**15.  NOTICES**

Any notice from a Grantee to the Company must be sent to the following address by way of registered letter with return receipt requested, unless a different address or method is notified to the Grantee:

> CIFG HOLDING
>
> 31-33 rue de Mogador
> 75009 Paris
> France

**16.  GOVERNING LAW**

The Plan shall be governed by and must be construed in accordance with the provisions of French law.