UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KATHLEEN G. CULLY,

                Plaintiff,

    - against -

CIFG HOLDING, CIFG
GUARANTY, CIFG EUROPE,
CIFG SERVICES, INC., CIFG
ASSURANCE NORTH AMERICA,
INC., and JACQUES ROLFO

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

07 Civ. 8195 (PKC)

<u>AMENDED COMPLAINT</u>

<u>ECF CASE</u>

PLAINTIFF DEMANDS
A TRIAL BY JURY

Plaintiff Kathleen G. Cully ("plaintiff" or "Cully"), through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendants CIFG Holding, CIFG Guaranty, CIFG Europe, CIFG Services, Inc., CIFG Assurance North America, Inc. (collectively "CIFG" or the "CIFG Group"), and Jacques Rolfo ("Rolfo") (collectively "defendants") as follows:

<u>NATURE OF THE ACTION</u>

1.    Cully, an accomplished and experienced attorney who was formerly CIFG's General Counsel, found that CIFG had a "glass ceiling" that limited the advancement of women, and interfered with her ability to do her job.  Because Rolfo was uncomfortable with a woman in the position of General Counsel, among other things he concealed information affecting CIFG's legal affairs, putting Cully in an untenable position because of her ethical and legal obligations to CIFG as its General Counsel, to CIFG's counterparties who relied on her opinions, and to CIFG's independent accountants, who relied upon her certifications.  After Cully

complained about gender discrimination, Rolfo made it even more difficult for Cully to perform her duties, forcing her to announce her retirement. Despite the manner in which CIFG treated Cully, she made every effort to ensure a smooth transition. However, CIFG frustrated her efforts by reneging on its agreements concerning the transition. CIFG also attempted to make improper changes to plans governing Long-Term Incentive compensation ("LTI") that had previously been awarded or promised to Cully. Many of the purported changes appear designed specifically to deny Cully the benefit of her LTI, and one change improperly denied Cully as well as many other employees the benefits resulting from a change in control of CIFG.

2.     As a result of defendants' actions, plaintiff brings this action against defendants to remedy discrimination on the basis of her sex in the terms, conditions, and privileges of employment, and to remedy retaliation for her opposition to unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., ("Title VII"); the New York State Human Rights Law, Executive Law § 296 et seq., ("Executive Law"); and the New York City Human Rights Law § 8-107 et seq. ("City Law"). In addition, plaintiff brings this action to remedy CIFG's breach of contract and violation of the duty of good faith and fair dealing, or in the alternative, for promissory estoppel and unjust enrichment, and to remedy defendants' fraudulent inducement.

3.     Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Title VII, the Executive Law, the City Law, New York common law and French law.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and Title VII, 42 U.S.C. § 2000e-5(f)(3).  The Court has jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367.

5.     Venue is proper in this District pursuant to Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful practices complained of herein occurred within, and defendants regularly do business within, the Southern District of New York.

6.     On or about June 14, 2006, plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC").  On or about May 22, 2007, the EEOC issued to plaintiff notice of her right to sue.  The parties thereafter entered into an agreement tolling the filing deadline.  Plaintiff has complied fully with the administrative prerequisites to the filing of this action.

7.     Pursuant to § 8-502(c) of the Administrative Code, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## PARTIES

8.     Cully was employed by CIFG from January 2003 until her employment ended on December 31, 2006, as a result of a constructive discharge.  Cully was paid through CIFG Services, but worked for all of the CIFG entities through various service agreements between the companies.

9.     CIFG Holding, a French corporation, is the parent corporation of the other CIFG entities, and is an employer within the meaning of Title VII, the Executive Law, and the City Law.

10.    CIFG Services, Inc., is a Delaware corporation with its principal place of business in New York City, and is an employer within the meaning of Title VII, the Executive Law, and the City Law.

11.    CIFG Guaranty is a French reinsurer dedicated to the CIFG group, and an employer within the meaning of Title VII, the Executive Law, and the City Law.

12.    CIFG Europe is a French insurer and is an employer within the meaning of Title VII, the Executive Law, and the City Law.

13.    CIFG Assurance North America, Inc. ("CIFG NA"), is a New York financial guaranty insurance corporation and an employer within the meaning of Title VII, the Executive Law, and the City Law.

14.    Rolfo was the Chief Executive Officer ("CEO") of the CIFG Group, which is comprised of all of the CIFG entities, and was formally the CEO of CIFG NA, the President of CIFG Services, and the President of the Executive Board of CIFG Holding.  Rolfo was, at all relevant times, an employer within the meaning of the Executive Law and the City Law.  He was based in CIFG's New York City offices.

## FACTUAL ALLEGATIONS

### Facts Concerning Plaintiff's Employment

15.    Plaintiff has worked for more than twenty five years as an attorney involved in all types of transactions in the U.S. and international securities markets, including public and project finance, structured finance and credit default swaps, with a specialty in structured finance.  Before Cully began working at CIFG, she held the position of General Counsel of the American Capital Access group of companies ("ACA"), which included the bond insurer ACA Financial Guaranty Corporation, then the only U.S.-based single-A rated bond

insurer.  Cully had previously been Deputy General Counsel of one of the three largest rating agencies.

16.     Plaintiff began working for CIFG in January 2003, after being recruited by Michael Freed ("Freed"), who was then CIFG's General Counsel.  Freed and Cully agreed that although Cully would formally report to Freed, in practice they would act as partners, with Freed having primary responsibility for corporate and licensing matters and Cully having primary responsibility for transactions and related regulatory matters.  CIFG gave plaintiff the title of Managing Director and General Counsel of CIFG NA, and she performed the equivalent function for CIFG Europe.

17.     As set forth in more detail below, Cully discovered that there was a "glass ceiling" at CIFG.  Women were permitted to hold the title of Managing Director and to advance to the level just below senior management, but they could not serve as department heads or members of senior management.  Cully was briefly the exception to the rule, as described below. After her removal as General Counsel and replacement by a man, senior management once more consisted solely of men.

18.     Cully received an excellent performance appraisal for 2003, and a larger bonus than had been agreed to when she joined CIFG.  Despite plaintiff's excellent performance, CIFG did not award her any LTI compensation in 2004 for her work in calendar year 2003. Upon information and belief, plaintiff was the only Managing Director at CIFG who was not awarded LTI compensation in 2004.

19.     On or about May 13, 2004, while Freed was on vacation, Rolfo called Cully into his office and berated her for almost an hour.  Among other things, Rolfo referred to Freed and Cully as a "two-headed hydra," apparently because Freed often consulted Cully and

worked in tandem with her on various projects. Rolfo complained that Cully and Freed had not made a better offer to a male candidate for an open position for a junior lawyer, and said that he was uncomfortable that Freed and Cully had offered an administrative assistant position to a man, saying that a different position should be found for him. Throughout Cully's employment, all of the administrative assistants (other than a few temporary employee provided by agencies) at CIFG were women. The man was later offered a job as a junior analyst in another department. Rolfo also discussed his dissatisfaction with plaintiff's management decisions. Freed later told Cully that Rolfo had never raised these issues with him and had never spoken to him as he had spoken to Cully.

20.    In or about June 2004, Rolfo interviewed Robert Drillings ("Drillings") for a position within the Legal Department. At the time, there was an open position for a junior lawyer who would report to Freed and Cully. Drillings was too senior for the open position, and was unable to start until October 2004. Rolfo nonetheless decided to hire Drillings, although there were two more suitable candidates, one of whom Rolfo referred to only as "the (female) candidate." Rolfo also decided that Drillings would report only to Freed and not to Cully. As Cully remained General Counsel of CIFG NA, this created a situation in which she was responsible for Drillings' work as counsel for CIFG NA, but had no authority over him. Rolfo's "resolution" was to direct Freed to resolve any differences between Cully and Drillings.

21.    Drillings joined CIFG on October 1, 2004, as General Counsel of Public Finance for CIFG NA. Although Cully remained General Counsel of CIFG NA and retained responsibility for structured finance transactions, her public finance responsibilities were given to Drillings. The hiring of Drillings substantially reduced plaintiff's responsibilities.

22.    In December 2004, Freed resigned his position at CIFG to become CEO of a new financial guaranty insurer being formed.  Freed provided only a few days' notice prior to his departure from CIFG.  With no time to find a replacement, Rolfo offered the position of General Counsel of CIFG to plaintiff, who was the only person familiar enough with, and qualified to handle, Freed's ongoing projects to be able to step in and take over his responsibilities without causing any disruption to the business.  Cully was also the only qualified person for the General Counsel position because she was the only attorney at CIFG who could advise on financial guaranty law and manage structured and project finance transactions, as well as supervise public finance transactions.  Evidencing his discomfort that promoting Cully was the only choice available to him, Rolfo, when offering Cully the promotion, suggested that perhaps she might prefer not to accept it and asked her to consider it overnight.  Cully did accept the promotion, and became General Counsel for CIFG Holding, each of its subsidiaries, and all of its operations in North America and Europe.  At that time she became the only female member of senior management and the only female department head (other than Human Resources, which was headed by a Vice President, two levels below a Managing Director, who was not a member of the Management Committee).

23.    Early in 2005, Rolfo asked Cully to suggest her own compensation level.  Plaintiff's compensation was substantially less than that of the General Counsel of any other financial guaranty insurer, and she did not receive a raise in 2004.  Prior to his departure, Freed had suggested to Rolfo that Cully receive an eight percent increase.  In light of her promotion, plaintiff recommended to Rolfo that she receive an increase of approximately twenty two percent.  However, Rolfo refused, saying that CIFG, which began operations in 2002, was still a "start-up" and could not afford to pay market rates.  Rolfo limited Cully's raise to the one

recommended by Freed, even though Cully had taken on Freed's former responsibilities while retaining her own. At that time, plaintiff reminded Rolfo that she had not received an LTI award in 2004. Rolfo agreed to provide her with an award in 2005 for calendar year 2004, but did not make up for the lack of an award in 2004 for calendar year 2003. Plaintiff's total cash compensation for 2005 constituted only a 4.55 percent raise from her initial compensation, in spite of the substantial increase in her responsibilities.

24.    In or about May 2005, soon after a meeting with Drillings in which Drillings complained that he was not being treated as a member of senior management, Rolfo transferred a significant part of plaintiff's responsibilities to Drillings. For example, on or about May 1, 2005, Rolfo instructed Cully to arrange for Drillings to interview candidates for a structured finance attorney position. Drillings had no experience in structured finance and interviewing candidates was outside the scope of his responsibilities as counsel to the public finance business.

25.    On or about May 2, 2005, during a meeting, Rolfo berated plaintiff regarding several perceived flaws in her performance. None of the complaints he made were justified. One of the allegations made by Rolfo was that Cully had failed to include Drillings in the management of the Legal Department. However, prior to directing plaintiff to have Drillings interview candidates for the structured finance position, Rolfo had never expressed his desire for Drillings to have a management function. Indeed, this instruction contradicted Rolfo's objection to having to deal with a "two-headed hydra" when Freed was General Counsel.

26.    On or about May 2, 2005, Rolfo removed Cully from an important project affecting all of CIFG. Rolfo gave the project to Drillings and instructed him to keep it secret from plaintiff. Cully had substantially more experience in the issues involved in the project than

Drillings. Rolfo's conduct seriously undermined Cully's position because, as General Counsel, she was responsible for all legal matters affecting the CIFG Group and was required to give opinions and sign certificates as to the Group's legal affairs.

27.    In an exchange of e-mails that began on or about May 28, 2005, plaintiff complained to Rolfo that his actions constituted gender discrimination. Rolfo eventually reaffirmed that Cully was General Counsel and that Drillings would report to her.

28.    After Cully complained to Rolfo about gender discrimination, he began to retaliate against her. For example, Rolfo made unfounded complaints about Cully and communicated with her as little as possible. Rolfo continued to treat Drillings as if he were also General Counsel. and also discussed transactions with a newly hired male attorney in the structured finance department instead of with Cully. Cully was forced to defend and explain her actions and judgments against Rolfo's unfounded complaints.

29.    Cully concluded that Rolfo had made it impossible to do her job. He dealt with the junior male attorneys to her exclusion while holding plaintiff to an impracticable standard of performance. Most importantly, by excluding Cully from important legal matters, Rolfo was making it impossible for Cully to fulfill her professional responsibilities to CIFG as its General Counsel, effectively forcing her out of her job. Cully repeatedly tried to meet with Rolfo to address her concerns so that she could perform her job, but he refused to do so. Reluctantly, Cully concluded she had no alternative but to leave CIFG.

30.    On or about October 3, 2005, Cully informed Rolfo by e-mail that she intended to retire at the end of the year. Rolfo agreed to meet with Cully three days later to discuss her retirement. At the meeting Rolfo approved Cully's retirement.

31.    In or about November 2005, Cully spoke to Chuck Webster ("Webster"), the head of the Risk Department, who she learned had been told of her retirement before the official announcement. Cully told Webster that she was retiring because it was clear that Rolfo was uncomfortable with her as General Counsel, which made it untenable for her to remain at CIFG. Webster offered to speak to Rolfo. After Webster did so, he told Cully that Rolfo would like her to stay at CIFG as General Counsel for Structured Finance, reporting to a new General Counsel. As that would constitute a major demotion from her current position, and even from her initial position, Cully rejected it. Webster then told Cully that Rolfo wanted to work out an arrangement to keep her at CIFG, and Cully agreed to try to do so.

32.    In her discussions with Rolfo, it became clear to Cully that Rolfo was not willing to compromise and that Cully had three choices: accept a substantial demotion and report to a new General Counsel, continue in the current, untenable manner, or retire. On or about December 29, 2005, Cully informed Rolfo that she would retire at the end of March 2006, having delayed her retirement date at his request. He responded by asking her to stay through December 2006 or March 2007, offering to hire another attorney to assist plaintiff with her heavy workload. Cully agreed.

33.    On or about January 12, 2006, Rolfo and Cully met again to discuss her future with CIFG. Rolfo proposed that Cully consider a full-time employment position after her retirement at the end of March 2006. He stated that her job responsibilities would not change and agreed not to exclude Cully from any legal matters, other than the project he gave to Drillings in early May 2005, and promised to apprise Cully of material developments with respect to that project. Rolfo also promised to hire two additional attorneys. Cully accepted this offer by e-mail. Less than half an hour later, Rolfo responded with a different description of his

proposal, saying for the first time that the Legal Department would be divided into three sub-groups.

34.    Rolfo thereafter refused to discuss Cully's status or his proposal with Cully. Further discussions regarding Cully's new position were conducted through Pam Brown ("Brown"), head of Human Resources for CIFG. Brown, speaking for Rolfo, and Cully ultimately agreed that plaintiff would retain her position as General Counsel until the end of December 2006. During the remainder of her tenure with CIFG, Cully would focus on training her colleagues to assume her responsibilities. CIFG would institute a search for a new General Counsel during that time. Rolfo made a company-wide announcement of this agreement on February 15, 2006.

35.    In or about early March 2006, Rolfo informed plaintiff that she would receive a salary increase of less than one percent of her salary. This was contrary to Rolfo's earlier promise that Cully would receive a raise for 2006 on the same basis as the rest of the company, which was four percent. After Cully protested, Rolfo told her that he would not change her salary, but promised that her bonus and LTI compensation for calendar year 2006 would be at a higher rate if she remained for all of 2006. Cully relied upon the LTI awarded in 2006 for calendar year 2005 and the promised LTI compensation for calendar year 2006, to be awarded in 2007, as material inducements for her to stay to the end of December 2006, despite her low raise. Even with this adjustment, Cully's total compensation would increase only about 6.7 percent over two years, which was less than any male member of the Legal Department.

36.    In contrast, Drillings received an increase of about 35 percent, a far more generous increase than Cully had cumulatively received over the four years she had been with CIFG, including her promotion to General Counsel. Drillings had been with CIFG for only a

year and a half and had not been promoted. The reason given to Cully was that Drillings' compensation had to be brought up to the "market." As stated above, Rolfo had previously told Cully that CIFG could not pay market rates.

37.     Although Cully performed her job very well, Rolfo continued to ignore her except to criticize her. He began increasingly to manage the Legal Department by himself, leaving Cully once again concerned about whether she could carry out her duties as General Counsel.

38.     Plaintiff retained counsel who sent Rolfo a letter on April 5, 2006, advising him of Cully's claims of gender discrimination, retaliation and breach of contract.

39.     Only one month later, CIFG's outside counsel informed Cully's counsel that the Legal Department would be restructured at the end of May 2006, and that a new General Counsel for Structured Finance and Capital Markets, Michael Knopf ("Knopf"), had been hired from MBIA, another financial guaranty company, while plaintiff would become General Counsel "Emerita." Knopf is less experienced and qualified than Cully.

40.     However, a few days later, on May 8, 2006, Rolfo and Brown told plaintiff that a press release would be published the following day to announce the restructuring of the Legal Department, which was now scheduled to occur on May 10, 2006. Under the new structure, Drillings would become General Counsel for Public Finance, Project Finance and Infrastructure; three of the lawyers in the Department would report directly to Knopf; three other attorneys would report directly to Drillings; and plaintiff would have no direct reports, with her responsibilities limited to licensing, serving as an internal consultant, and helping the Risk Department develop CIFG's business. Rolfo disregarded Cully's objections that the restructuring

violated their earlier agreement that she would remain General Counsel until the end of December 2006. The next day, licensing was removed from Cully and reassigned to Drillings.

41.     As of May 10, 2006, other than work with Human Resources, plaintiff was not permitted to continue with any of the work she had been doing unless expressly requested to do so. While Cully continued to report to work, she was given little or no work to do.

42.     Even after the restructuring, Rolfo continued to retaliate against plaintiff. For example, in July 2006, Rolfo forced Cully to resign as corporate secretary and member of the Board of Directors.

43.     In or about November 8, 2006, a few days after Cully had rejected an unfavorable settlement offer from CIFG's outside counsel, and only ten days before the corporate restructuring described below as a change in control was consummated, Brown instructed Cully in person, confirmed by e-mail, to "work" from home until the end of 2006. Plaintiff was not given any work to do once she was sent home, but did continue to receive her salary through December 31, 2006.

44.     On July 12, 2007, CIFG announced that Knopf had been promoted to General Counsel, while Drillings had become Deputy Head of U.S. Public Finance. CIFG also announced the formation of a new Executive Committee, consisting only of men. Upon information and belief, CIFG's senior management continued to consist solely of men through its reorganization in or about February 2008, after which information concerning senior management was removed from its website.

Additional Facts Concerning Long-Term Incentive Plans

45.     Senior employees of CIFG were eligible to participate in various LTI plans, including stock options, restricted stock, and performance units. The stock option and

restricted stock plans were plans of CIFG Holding, and awards were made under a single plan to employees on the payrolls of CIFG Services and CIFG Europe. Thus, the restricted stock plan contained provisions for vesting and transferability required for French employees to obtain certain benefits under French law that were applied to (although irrelevant for) employees in other jurisdictions. Similarly, each plan was intended to be "rolled over" from year to year, substantive changes being limited to the amounts available each year, the employees participating for that year, and those arising from changes in applicable law. Each plan was also established in a specific language, translated as necessary for employees speaking a different language.

46.     The purpose of the LTI plans was not only to reward employees for their performance during the plan year, but, by vesting over a period of years, to give employees an incentive to remain employed by CIFG.

47.     Cully considered the LTI an important component of her compensation, as discussed in more detail below. It was a significant inducement for her to join CIFG.

Facts Concerning the 2003 Stock Option Plan

48.     When CIFG was recruiting Cully, she and CIFG negotiated that, like other management-level CIFG employees, she would be eligible for bonuses and LTI. At the time, CIFG's LTI was still in the planning stages, and no plans were in effect or even in draft form.

49.     One of the items negotiated by Cully and CIFG at the time she was hired was the amount of CIFG stock options to be granted to Cully to replace stock options she had been awarded as part of her compensation at ACA, which she would forfeit by leaving ACA for CIFG.

50.     The final result of the negotiations between Cully and CIFG was reflected in CIFG's employment agreement with Cully, dated December 17, 2002, signed by Rolfo and Cully ("Employment Agreement"). The Employment Agreement promised that Cully would be granted options to purchase a minimum of 0.27% of the outstanding common shares of CIFG Holding.

51.     In 2004, CIFG granted Cully the stock options it promised under the Employment Agreement. The stock options were given a notional value of $450,000 by CIFG.

52.     CIFG did not provide Cully with the CDC IXIS Financial Guaranty Holding 2003 Stock Option Plan ("2003 Stock Option Plan") and the Stock Option Agreement Pursuant to 2003 Stock Option Plan of CDC IXIS Financial Guaranty Holding ("2003 Stock Option Agreement") until the fall or winter of 2004. The 2003 Stock Option Agreement governed the award CIFG had made to Cully pursuant to the Employment Agreement.

53.     The 2003 Stock Option Plan was CIFG's first stock option plan, and it expired on June 28, 2004. The plan states that it is governed by French law.

54.     Although other CIFG employees were granted stock options in 2004 for their performance in 2003, Cully was not granted any options in 2004 for 2003. Instead she was awarded only the "sign-on" options guaranteed in the Employment Agreement.

55.     CIFG did not make any awards of restricted stock in 2004.

56.     The 2003 Stock Option Plan and 2003 Stock Option Agreement define "retirement" as referring, in the case of a United States resident, "to a Beneficiary who is at least 55 years of age at the time that he or she voluntarily ceases to be an employee" of CIFG.

57.     Under the 2003 Stock Option Plan and the 2003 Stock Option Agreement, a retiree's options continue to vest and become exercisable as if he or she were still employed.

58.     The 2003 Stock Option Plan and 2003 Stock Option Agreement contained a "change in control" provision under which the vesting and exercisabilty of the options were accelerated if, inter alia, an entity or group acquired a majority interest in CIFG.

59.     The Executive Board could not amend the 2003 Stock Option Plan or the 2003 Stock Option Agreement in any manner that would impair the rights of any optionee unless the amendment was mutually agreed to between the optionee and the Executive Board and the amendment was agreed to in writing and signed by the optionee and the Executive Board. Cully never agreed to any amendments of the 2003 Stock Option Plan or the 2003 Stock Option Agreement.

60.     Rolfo, as president of the Executive Board of CIFG Holding, was authorized to make determinations under the 2003 Stock Option Plan.

61.     In the fall of 2005, at the time Cully told Rolfo that she intended to retire and Rolfo accepted her retirement, she was over 55 years old.

62.     On or about March 12, 2006, CNCE, the sole shareholder of CIFG Holding, announced an agreement with Banque Populaire ("BP") under which CNCE would acquire an equal interest in BP's then-subsidiary Natexis. Natexis would be renamed Natixis and would acquire, among other entities, CIFG. The Natixis transaction was consummated on or about November 18, 2006.

63.     Prior to the time that Cully was ordered not to come to the office, on or about November 8, 2006, the information available to her was that the Natixis transaction would not constitute a change of control under the definition in the 2003 Stock Option Plan and 2003 Stock Option Agreement.

64.     In July 2006, Rolfo for the first time took the position that engaging in any paid activity was inconsistent with retirement, despite the lack of any such provision in the 2003 Stock Option Plan.  He informed Cully that the vesting of her rights under the LTI plans would terminate upon her obtaining any paid employment, including consulting or self-employment. Rolfo re-stated this position several times over the next few months, most recently in a letter to Cully dated January 4, 2007.

65.     By letter dated February 13, 2007, Rolfo, through counsel, informed Cully that CIFG considered the vesting of all of Cully's LTI, under all of the plans, to have terminated on December 31, 2006, regardless of whether or not Cully was engaging in any activity, paid or unpaid.  Under this interpretation, the LTI Rolfo promised Cully to induce her to remain to the end of 2006 was worthless, and the value of her prior LTI awards was substantially reduced.

66.     The February 13, 2007 letter from defendants' counsel specifically stated that Cully's "unvested" options awarded under the 2003 Stock Option Plan would cease vesting as of December 31, 2006, and that Cully should "take counsel" as to the time to exercise vested options.

67.     By letter dated March 2, 2007, Cully, through counsel, stated that, based upon Cully's review of the websites of Natixis, BP, and CNCE, she now believed that the Natixis transaction probably constituted a change in control under the LTI plans.  In the letter, Cully's counsel asked if CIFG was treating the transaction as a change in control under any of the plans.

68.     By letter dated March 14, 2007, defendants, through counsel, acknowledged for the first time that CIFG did consider the Natixis transaction to be a change in control under the 2003 Stock Option Plan.

69.     That the Natixis transaction constituted a change in control had significant repercussions.  It meant that even CIFG admitted that all of Cully's stock options awarded under the 2003 Stock Option Plan and 2003 Stock Option Agreement had become fully vested on November 18, 2006.  Also, had there been no change in control, Cully could not have exercised any of her vested 2003 stock options until January 2008 at the earliest.  However, with the change of control, under CIFG's position that Cully had not retired, CIFG's apparent position was that her time to exercise her options as a result of the change in control would have expired on March 31, 2007.  It is clear that CIFG's failure to inform Cully that the Natixis transaction constituted a change in control, together with the deliberately misleading February 13, 2007 letter referring to "unvested" 2003 stock options, was intended to deceive Cully into thinking that there was no change of control and thus cause her to miss its deadline for exercising her 2003 stock options, which consequently would have become worthless.

70.     Having been caught in this attempt to defraud Cully and not having provided her with material information (including the Fair Market Value (as defined in the 2003 Stock Option Plan) of the options), CIFG agreed to extend by three months (to June 30, 2007) Cully's time to exercise the options granted under the 2003 Stock Option Plan.  Cully accordingly exercised her options granted pursuant to the 2003 Stock Option Agreement on June 26, 2007, complying with all requirements in the 2003 Stock Option Plan and 2003 Stock Option Agreement for doing so.

71.     By letter from counsel dated June 29, 2007, CIFG then offered to rescind Cully's exercise and extend her time to exercise for an additional 90 days, to September 28, 2007.  Cully accordingly exercised her options on September 24, 2007, complying with all requirements in the 2003 Stock Option Plan and 2003 Stock Option Agreement for doing so.

CIFG, however, did not provide her with material information (including Fair Market Value of the options as of the applicable date, namely, June 30, 2007), in violation of United States securities laws as well as its obligations under the 2003 Stock Option Plan. Section 19(e) of the 2003 Stock Option Plan, explicitly incorporated into Section 12 of the 2003 Stock Option Agreement, requires CIFG to prepare quarterly reports determining the Fair Market Value of the options.

72.     By letter dated September 26, 2007, Cully's counsel notified CIFG's counsel of the exercise, preserving Cully's rights, and repeating earlier requests for the Fair Market Value as of June 30, 2007, which would be the basis for valuing the options Cully exercised.

73.     By letter dated October 5, 2007, counsel for CIFG stated that Cully's time to exercise was extended to December 31, 2007, and that Cully would have until one week after notification of the Fair Market Value to advise CIFG whether she wished to rescind her exercise of September 24, 2007. Cully never rescinded the September 24, 2007 exercise of her stock options.

74.     By letter dated April 3, 2008, counsel for CIFG provided a figure that he stated was the Fair Market Value as of June 30, 2007. Upon information and belief, CIFG had previously calculated such value to be higher than that provided in counsel's letter. By letter dated April 3, 2008, Cully, through counsel, stated that she did not wish to rescind her exercise as of September 24, 2007, and instructed CIFG to process that exercise immediately, reserving her right to challenge CIFG's determination of the Fair Market Value. By letter dated April 9, 2008, counsel for CIFG retracted his earlier statements, claiming instead that the Fair Market

Value as of June 30, 2007 was still being determined. To date, CIFG has not formally provided Cully with the Fair Market Value as of June 30, 2007.

75.     In April and May 2008, Cully, through counsel, repeatedly requested that CIFG process the September 24, 2007 exercise of her stock options granted pursuant to the 2003 Stock Option Plan and 2003 Stock Option Agreement. CIFG has not done so, stating through counsel that it cannot process the exercise because CIFG has not calculated the June 30, 2007 Fair Market Value. Upon information and belief, CIFG has in fact calculated that value. Upon information and belief, Natixis has reported financial information for the period including June 30, 2007 that included the information about the financial performance of CIFG that was required to calculate the Fair Market Value as of June 30, 2007.

76.     Upon information and belief, CIFG is revising the Fair Market Value based upon events occurring after June 30, 2007, and based upon information not available as of June 30, 2007. Such a practice would be contrary to the provisions of the 2003 Stock Option Plan and 2003 Stock Option Agreement, established business practices and the prior practices of CIFG.

<u>Facts Concerning Stock Option and Restricted Plans After 2003</u>

77.     In March 2005, CIFG awarded Cully LTI with a notional value of $100,000 for calendar year 2004. At that time, CIFG did not provide Cully with information as to how the award would be broken down among the various types of LTI.

78.     On or about March 2006, CIFG provided Cully with the details of the award for her work in 2004, which consisted of stock options, restricted stock, and performance units. CIFG did not provide Cully with any agreements governing the awards until April 2007,

when it provided agreements for the stock options and restricted stock that had been substantially revised in ways adverse to Cully, as described below.

79.     In March 2006, CIFG awarded Cully LTI with a notional value of $100,000 for calendar year 2005. To date, CIFG has not provided Cully with the details of this award or any agreements governing the award.

80.     Although awards of stock options, restricted stock and performance units were made in 2006, the related plans existed only in draft form.

81.     In March 2006, Rolfo promised Cully LTI with a notional value of $120,000 to be awarded in 2007 for calendar year 2006. To date, CIFG has not provided Cully with the details of this award or any agreements governing the award.

82.     Although awards of stock options, restricted stock and performance units were promised to be awarded in 2007, the related plans existed only in draft form.

83.     Drafting for the plans for awards made in 2005 for 2004 and thereafter began in late 2004. After Freed's departure at the end of 2004, Cully was responsible for drafting the plans. Management's intention was that subsequent stock option and restricted stock plans would conform in substance to the 2003 Stock Option Plan, with only such changes as were required to reflect the different treatment of stock options and restricted stock under French law.

84.     CIFG worked primarily on the draft for the restricted stock plan for 2004, as it was a new plan, restricted stock having only recently been authorized under French law. Drafts were exchanged in English and French. The intention was that the restricted stock and stock options plans would conform in substance with (as stated above) only such changes as were required to reflect the different treatment of stock options and restricted stock under French

law.  It was also CIFG's intention that the 2004 plans would be the models for the plans in subsequent years.

85.    Cully was familiar with the contents of the draft LTI plans as they existed through October 2005, when her retirement was approved by CIFG.

86.    Indeed, by October 2005, there was a draft restricted stock plan that, although not formally approved by the Supervisory Board (which was substantially equivalent to a Board of Directors) of CIFG Holding, had been approved by senior management, including Rolfo.

87.    During the time Cully was employed by CIFG, Rolfo, as president of the Executive Board of CIFG Holding, was authorized to make determinations under the drafts of the LTI plans.

88.    When Cully informed Rolfo in the fall of 2005 that she planned to retire, she relied upon the contents and provisions of the draft LTI plans.  At the time, she was over 55 years old.  In October 2005, Rolfo approved Cully's retirement.  When Cully and Rolfo discussed Cully's retirement, Cully stated that she intended to do consulting work after her retirement.  Rolfo suggested that she could consult for CIFG.

89.    In late November 2005, Cully, as instructed by Rolfo, announced her retirement to members of the management committee of CIFG.

90.    On December 30, 2005, the shareholder of CIFG Holding approved a revision of the draft LTI plans to require approval by the Executive Board for any paid post-retirement activity, with approval to be based on a finding that such activity did not compete with CIFG.  Cully was not informed and did not learn of this revision until January 2006.

91.    In January 2006, Cully learned of the changes in the draft LTI plans. Cully stated to Rolfo that she did not consider the new retirement provision applicable to her, as CIFG had approved her retirement under the prior provision in the draft plans, which was in conformity with the 2003 Stock Option Plan. Rolfo did not dispute Cully's statement.

92.    Upon information and belief, the change in control provisions in the draft plans were modified from those in the 2003 Stock Option Plan. Based on the contents and timing, after the revision the Natixis transaction would not constitute a change in control. Thus, while the Natixis acquisition was determined to be a change in control under the 2003 Stock Option Plan, the later plans deprived all employees with LTI granted for 2004 and 2005 (including Cully) of the benefit of accelerated vesting and exercise.

93.    As stated above, in July 2006, Rolfo for the first time took the position that engaging in any paid activity was inconsistent with retirement, and that the vesting of Cully's rights under the LTI plans would terminate upon her obtaining any paid employment, including consulting or self-employment, whether or not such employment competed with CIFG (contrary to the amendment purportedly effected by the shareholder's meeting in December 2005). Rolfo re-stated this position several times over the next few months, most recently in a letter to Cully dated January 4, 2007.

94.    Upon information and belief, on or about November 15, 2006, a meeting of the shareholder of CIFG Holding was held at which the definition of "retirement" was once again amended to preclude any employment or paid consulting unless explicitly approved by CIFG. The method by which the stock was to be valued was also revised. This meeting took place three days before the Natixis acquisition was consummated, which resulted in a change in the identity of CIFG's shareholder.

252441 v1                                        23

95.    By letter dated February 13, 2007, Rolfo, through counsel, informed Cully that CIFG considered the vesting of all of Cully's LTI, under all of the plans, to have terminated on December 31, 2006, regardless of whether or not Cully was engaging in any activity, paid or unpaid. Under this interpretation, the LTI Rolfo promised Cully to induce her to remain to the end of 2006 was worthless and the value of her prior LTI awards was substantially reduced. Upon information and belief, either Rolfo intended to make the LTI worthless when he offered it to Cully to induce her to stay until the end of 2006, or he added new requirements to the LTI in retaliation for Cully having hired counsel to assert her claims of discrimination and retaliation.

96.    On April 3, 2007, CIFG, through counsel, sent for Cully's signature proposed stock option and restricted stock agreements for the awards made in 2005, along with purported final versions of the 2004 Stock Option Plan and 2004 Restricted Stock Plan. Both plans state they are governed by French law. Both plans contained the new definition of change in control that would exclude the Natixis transaction and the more restrictive definition of retirement. In addition, the definition of retirement had been further modified to authorize the Executive Board to add a service requirement of unspecified length to individual agreements. The agreements sent to Cully imposed a service requirement of six years, slightly over two years more than Cully's years of service. If Cully signed the agreements as presented to her, she would be forfeiting a substantial part of her LTI awards, including most of the awards in 2005 for calendar year 2004. Cully has not received any agreements for later awards; if similar agreements are proposed for them, Cully would lose all of the awards in 2006 for calendar year 2005 and in 2007 for calendar year 2006.

97.    By letter dated April 18, 2007, Cully provided to CIFG an opinion from an expert in French law that the purported changes to the retirement and change in control

provisions were invalid under French law. One of the reasons stated by the expert was that under French law, the terms of the 2003 Stock Option Plan, in particular with respect to retirement and change in control, would be "tacitly renewed" by the later plans. As a consequence, Cully was entitled to the benefits of the retirement provision, Cully (like all employees granted stock options or restricted stock) was entitled to the benefits of the change in control provision under which the stock options and restricted stock became fully vested and exercisable, and CIFG was required to deliver quarterly reports as to Fair Market Value under all the stock option and restricted stock plans (such delivery being already required under the 2003 Stock Option Plan).

98.    With the expert opinion, Cully also provided CIFG with signed agreements for the stock options and restricted stock, with hand-written changes to conform the agreements to French law.

99.    By letter dated June 12, 2007, CIFG, through counsel, stated that CIFG did not accept Cully's changes to the stock option and restricted stock agreements. Moreover, CIFG stated that it considered Cully to have declined to accept and to waive the grants made to her in 2005 for 2004 and that the grants were therefore void. CIFG provided no basis for its decision and disregarded, without even mentioning, the opinion that Cully had provided.

100.    Since Cully's employment with CIFG terminated on December 31, 2006, she has not engaged in any activities that would constitute competition with CIFG.

Facts Concerning Performance Unit Plans

101.    In 2004 CIFG awarded many employees performance units under the 2004 Performance Unit Plan, which expired at the end of 2004. CIFG did not award Cully any performance units in 2004.

102.    The 2004 Performance Unit Plan, like the 2003 Stock Option Plan, defined "retirement" as referring, in the case of a United States resident, "to a Beneficiary who is at least 55 years of age at the time that he or she voluntarily ceases to be an employee" of CIFG, but added a provision that a retiree is not permitted to engage in specified actions that are deemed to compete with CIFG.  As in the 2003 Stock Option Plan, under the 2004 Performance Unit Plan a retiree's options continued to vest and become exercisable as if he or she were still employed.  Unlike the 2003 Stock Option Plan, the 2004 Performance Unit Plan did not contain a change in control provision.

103.    As stated above, in March 2006, CIFG provided Cully with the information that part of the LTI she was awarded in 2005 for 2004 consisted of performance units.

104.    Although awards of performance units were made in 2005, the related plans existed only in draft form, as discussed in greater detail below.

105.    CIFG has never presented Cully with a purportedly "final" plan for the award of performance units for 2004, nor any agreement governing that award.  Although performance units covered a three year period, which for this award would be 2004-2007, and although upon information and belief CIFG has calculated the value of the awards for this period, Cully has never been provided any information about the value of her award, nor been paid anything for the award.

106.    As stated above, although in March 2006, CIFG awarded Cully LTI with a notional value of $100,000 for calendar year 2005, CIFG has not provided Cully with the details of this award or any agreements governing the award.

107.    Through motion practice and discovery, Cully has learned that CIFG apparently has designated Cully's entire award for 2005 as performance units. No other employee at Cully's level, or even those who reported to her, received only performance units for 2005.

108.    Performance units were the least desirable form of LTI. Designating Cully's award for 2005 as solely performance units was done in retaliation for her opposition to unlawful employment discrimination.

109.    Although the 2004 Performance Unit Plan had differed in minor ways from the 2003 Stock Option Plan, CIFG intended for subsequent performance unit plans to conform substantially to the stock option and restricted stock plans being developed, which were in turn based on the 2003 Stock Option Plan.

110.    For 2004 there was a performance unit plan for CIFG Services and another, in draft form but substantially similar, for CIFG Europe. CIFG intended that in subsequent years that would be one performance unit plan for CIFG Services and CIFG Europe, with only such differences as were required by applicable law, and conforming as closely as possible to the stock option and restricted stock plans.

111.    Cully was not as involved in drafting the performance unit plans as she was in drafting the restricted stock/stock option plans.

112.    Under draft performance unit plans (as was the case under the 2004 Performance Unit Plan), awards were to be made within 120 days of the beginning of the performance period. Although CIFG apparently takes the position that Cully's entire award for 2005 was in performance units, no award was made to her in the first 120 days of 2005.

113.    To Cully's knowledge, the targets have not yet been announced for any of her performance units.  Upon information and belief, Cully's performance units accrued value for fiscal years 2005 and 2006 for which she is entitled to be paid.  CIFG has not paid Cully for her performance units or even provided any information concerning their value.

### FIRST CAUSE OF ACTION

### (Discrimination Under Title VII)

114.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 113 of this Complaint with the same force and effect as if set forth herein.

115.    By the acts and practices described above, CIFG discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender in violation of Title VII.

116.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of CIFG's discriminatory acts.

117.    CIFG acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

### SECOND CAUSE OF ACTION

### (Discrimination Under the Executive Law)

118.    Plaintiff repeats and realleges paragraphs 1 through 117 of the Complaint with the same force and effect as if set forth herein.

119.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender in violation of the Executive Law.

120.   CIFG is liable under the Executive Law as plaintiff's "employer."

121.   Rolfo is liable under the Executive Law as plaintiff's "employer" and is also liable under the Executive Law as an aider and abettor of the discrimination against plaintiff.

122.   Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

THIRD CAUSE OF ACTION

(Discrimination Under the City Law)

123.   Plaintiff repeats and realleges paragraphs 1 through 122 of the Complaint with the same force and effect as if set forth herein.

124.   By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the City Law.

125.   CIFG is liable under the City Law as plaintiff's "employer."

126.   Rolfo is liable under the City Law as plaintiff's "employer" and is also liable under the City Law as an aider and abettor of the discrimination against plaintiff.

127.   Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

128.   Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's protected rights.

## FOURTH CAUSE OF ACTION

### (Retaliation Under Title VII)

129.    Plaintiff repeats and realleges paragraphs 1 through 128 of this Complaint with the same force and effect as if set forth herein.

130.    By the acts and practices described above, CIFG retaliated against plaintiff for her opposition to unlawful employment practices in violation of Title VII.

131.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of CIFG's retaliatory acts.

132.    CIFG acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

## FIFTH CAUSE OF ACTION

### (Retaliation Under the Executive Law)

133.    Plaintiff repeats and realleges paragraphs 1 through 132 of the Complaint with the same force and effect as if set forth herein.

134.    By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful employment practices in violation of the Executive Law.

135.    CIFG is liable under the Executive Law as plaintiff's "employer."

136.    Rolfo is liable under the Executive Law as plaintiff's "employer" and is also liable under the Executive Law as an aider and abettor of the retaliation against plaintiff.

137.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

## SIXTH CAUSE OF ACTION

### (Retaliation Under the City Law)

138.   Plaintiff repeats and realleges paragraphs 1 through 137 of the Complaint with the same force and effect as if set forth herein.

139.   By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful employment practices in violation of the City Law.

140.   CIFG is liable under the Executive Law as plaintiff's "employer."

141.   Rolfo is liable under the Executive Law as plaintiff's "employer" and is also liable under the Executive Law as an aider and abettor of the retaliation against plaintiff.

142.   Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

143.   Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's protected rights.

## SEVENTH CAUSE OF ACTION

### (Breach of Contract – 2003 Stock Options)

144.   Plaintiff repeats and realleges paragraphs 1 through 143 of the Complaint with the same force and effect as if set forth herein.

145.   By refusing to process plaintiff's September 2007 exercise of the stock options in accordance with the 2003 Stock Option Agreement and to deliver the required reports as to their Fair Market Value, CIFG has breached its agreement with plaintiff.

146.   Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of CIFG's breach of its contractual agreements.

EIGHTH CAUSE OF ACTION

(Breach of Contract – Post-2003 Stock Option and Restricted Stock Plans)

147.    Plaintiff repeats and realleges paragraphs 1 through 146 of the Complaint with the same force and effect as if set forth herein.

148.    By altering the terms of CIFG's stock option and restricted stock plans (including the change in control provision and definition of retirement) after plaintiff announced and CIFG approved her intention to retire from CIFG, and by failing to deliver required reports as to Fair Market Value, CIFG has breached its agreements with plaintiff, because in the absence of timely new agreement governing the stock option and restricted stock awards, the terms of the 2003 Stock Option Agreement were renewed.

149.    In the alternative, by altering the terms of CIFG's stock option and restricted stock plans (including the change in control provision and definition of retirement) after plaintiff announced and CIFG approved her intention to retire from CIFG, and by failing to deliver required reports as to Fair Market Value, CIFG has breached its agreements with plaintiff, because the draft agreements in place in October 2005 and the oral representations made by CIFG to plaintiff formed binding contracts concerning the material terms of the stock option and restricted stock plans.

150.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of CIFG's breach of its contractual agreements.

NINTH CAUSE OF ACTION

(Breach of Contract – Performance Unit Plans)

151.    Plaintiff repeats and realleges paragraphs 1 through 150 of the Complaint with the same force and effect as if set forth herein.

152.    By altering the terms of CIFG's performance unit plan concerning the definition of retirement after plaintiff announced and CIFG approved her intention to retire from CIFG, by failing to make performance unit awards within 120 days of the beginning of the plan period, by failing to provide Cully with information concerning the performance unit targets and value, and by failing to pay Cully amounts due for her performance units, CIFG has breached its agreements with plaintiff, because the draft agreements in place in October 2005 and the oral representations made by CIFG to plaintiff formed binding contracts concerning the material terms of the performance unit plan.

153.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of CIFG's breach of its contractual agreements.

<u>TENTH CAUSE OF ACTION</u>

<u>(Breach of Contract – Terms and Conditions of Employment 2006)</u>

154.    Plaintiff repeats and realleges paragraphs 1 through 153 of the Complaint with the same force and effect as if set forth herein.

155.    CIFG breached its agreements with plaintiff concerning the terms under which she would remain employed in 2006.

156.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of CIFG's breach of its contractual agreements.

<u>ELEVENTH CAUSE OF ACTION</u>

<u>(Breach of Obligation of Good Faith and Fair Dealing)</u>

157.    Plaintiff repeats and realleges paragraphs 1 through 156 of the Complaint with the same force and effect as if set forth herein.

158.    By its course of conduct in breaching its agreements with plaintiff concerning the exercise of her 2003 stock options, in improperly altering the June 30, 2007 Fair Market Value, in rendering arbitrary interpretations of LTI compensation plans, in making material changes in its agreements concerning the LTI compensation, in failing to provide material information concerning plaintiff's LTI compensation, and in breaching its agreement concerning the terms of Cully's employment in 2006, CIFG has breached its obligations of good faith and fair dealing toward plaintiff.

159.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of CIFG's breach of their obligation of good faith and fair dealing.

### TWELFTH CAUSE OF ACTION

#### (In the Alternative – Promissory Estoppel - LTI)

160.    Plaintiff repeats and realleges paragraphs 1 through 159 of the Complaint with the same force and effect as if set forth herein.

161.    CIFG made clear and definite promises to Cully concerning the terms of receipt of awards under the post-2003 LTI plans as they existed through October 2005.

162.    Plaintiff reasonably relied upon CIFG's promises.

163.    CIFG did not fulfill the promises it made to plaintiff.

164.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of CIFG's failure to fulfill its promises to plaintiff.

### THIRTEENTH CAUSE OF ACTION

#### (In the Alternative – Promissory Estoppel – Terms of Employment 2006)

165.    Plaintiff repeats and realleges paragraphs 1 through 164 of the Complaint with the same force and effect as if set forth herein.

166.    CIFG made clear and definite promises to Cully concerning the terms and conditions of Cully's employment, including but not limited to her compensation, if she remained employed by defendants through the end of 2006.

167.    Plaintiff reasonably relied upon CIFG's promises.

168.    CIFG did not fulfill the promises it made to plaintiff.

169.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of CIFG's failure to fulfill its promises to plaintiff.

FOURTEENTH CAUSE OF ACTION

(In the Alternative – Unjust Enrichment)

170.    Plaintiff repeats and realleges paragraphs 1 through 169 of the Complaint with the same force and effect as if set forth herein.

171.    Plaintiff rendered work, service, and labor to CIFG as alleged above.

172.    CIFG accepted, benefited and profited from plaintiff's work, services and labor.

173.    CIFG has been unjustly enriched by its failure to allow plaintiff the full benefit of the LTI compensation plans, including the LTI offered to induce her to remain employed through 2006.

FIFTEENTH CAUSE OF ACTION

(Fraudulent Inducement)

174.    Plaintiff repeats and realleges paragraphs 1 through 173 of the Complaint with the same force and effect as if set forth herein.

175.    Defendants made the false representations described above concerning the terms of the transition in 2006 and the award of LTI compensation for 2006 to fraudulently induce plaintiff to remain employed until a new General Counsel could be hired.

176.    Plaintiff is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of defendants' fraud.

177.    Defendants acted with malice and/or reckless indifference to plaintiff's rights.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a)    declaring that the acts and practices complained of herein are in violation of Title VII, the Executive Law, the City Law, New York common law and French law;

(b)    enjoining and permanently restraining these violations of Title VII the Executive Law, the City Law, New York common law and French law;

(c)    directing defendants to place plaintiff in the position she would have occupied but for defendants' discriminatory and retaliatory treatment of her, and make her whole for all earnings she would have received but for defendants' discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, pension, LTI compensation, and other lost benefits;

(d)    directing defendants to pay plaintiff compensatory damages and damages for her mental anguish and humiliation, as provided by Title VII, the Executive Law and the City Law;

(e)    directing defendants to pay plaintiff punitive damages as provided by Title VII, the City Law, and New York common law;

(f)     issuing whatever orders are necessary to restore to plaintiff all of her LTI compensation, to process the exercise of her options, and otherwise to ensure her full rights under the plans;

(g)     awarding plaintiff attorney's fees and costs, pursuant to Title VII and the City Law;

(h)     awarding plaintiff interest and damages relating to adverse tax consequences; and

(i)     awarding such other and further relief as this Court may deem necessary and proper.

<u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
        June 16, 2008

                                        VLADECK, WALDMAN, ELIAS &
                                        ENGELHARD, P.C.


                        By:     _____
                                        Anne L. Clark
                                        Jeremiah J. Iadevaia
                                        Attorneys for Plaintiff
                                        1501 Broadway, Suite 800
                                        New York, New York  10036
                                        (212) 403-7300